```
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
 2                        LOUISVILLE DIVISION


 3
     UNITED STATES OF AMERICA,     )    Case No. 3:22-MJ-305
 4                                 )
                Plaintiff,         )
 5                                 )
          VS.                      )
 6                                 )
     STEPHANIE RUSSELL,            )
 7                                 )    May 24, 2022
                Defendant.         )    Louisville, KY
 8

 9                         *  *  *  *  *
              TRANSCRIPT OF PRELIMINARY & DETENTION HEARING
10               BEFORE HONORABLE REGINA S. EDWARDS
                   UNITED STATES MAGISTRATE JUDGE
11                         *  *  *  *  *
     APPEARANCES:
12
     For United States:   Marisa J. Ford
13                        U.S. Attorneys Office - Louisville
                          717 W. Broadway
14                        Louisville, KY, 40202

15   For Defendant:       Scott C. Cox
                          Coleman Cox
16                        Cox & Mazzoli, PLLC
                          600 W. Main, Suite 300
17                        Louisville, KY 40202
                          and
18                        David B. Mour
                          Law Office of David B. Mour
19                        513 S. Second Street
                          Louisville, KY 40202
20
     Transcriber:         April R. Dowell, RMR, CRR
21                        Official Court Reporter
                          Gene Snyder Courthouse
22                        601 W. Broadway, Suite 232
                          Louisville, KY 40202
23

24          Proceedings recorded by digital recording.
     Transcript produced by computer from audio recording that the
25   Court provided to transcriber.
```

-2-

1        THE COURT:  Good afternoon, everyone.

2        THE CLERK:  3:22-MJ-305.  United States of America

3  versus Stephanie Russell.  We're here for (inaudible).

4        MS. FORD:  Good morning, Your Honor.  Marisa Ford

5  appearing for the United States.

6        MR. COX:  Good morning, Your Honor.  I'm Scott Cox

7  along with David Mour and Coleman Cox.  We represent

8  Dr. Stephanie Russell.  She's with us seated to the far right.

9        THE COURT:  All right.  Okay.  We are here today for

10  preliminary hearing and detention hearing.  Are we ready to

11  proceed?

12        MR. COX:  We are, Your Honor.

13        THE COURT:  Okay.  Ms. Ford, I understand that the

14  United States has moved for detention in this case.  This --

15  is this a matter that involves a presumption in favor of

16  detention?

17        MS. FORD:  It does not, Your Honor.  There's no

18  rebuttable presumption in this case.

19        THE COURT:  All right.  Then I'll allow the United

20  States to go -- well, actually we're in the preliminary

21  hearing stage of this case.

22        MR. COX:  I've not talked to Ms. Ford about this.  I

23  apologize.  A lot of times we just have a blended hearing.  I

24  don't know if that would be okay with the judge.  If we have a

25  witness, we can just talk about both of those issues.

1          THE COURT:  All right.  Well, normally I have the

2     two separate, but if there are witnesses --

3          MS. FORD:  I'm not sure the government's witness

4     will have much to add in terms of the detention issue, Your

5     Honor.

6          THE COURT:  Okay.  Well, I'll let you-all proceed

7     and if there is a witness that you wish to present, you can

8     let me know whether that's for consideration under detention

9     as well.

10          MR. COX:  Thank you, Your Honor.

11          MS. FORD:  Judge, with respect to the preliminary

12     hearing, the United States intends to stand on the affidavit

13     in support of the criminal complaint that was presented to the

14     court last week.  I do have some supplemental evidence that I

15     would like to offer to the court and we'd like to -- I would

16     call Special Agent Joshua Russell to the stand at this time.

17          THE COURT:  All right.

18          (JOSHUA RUSSELL, called by the government, sworn.)

19                    DIRECT EXAMINATION

20     BY MS. FORD:

21     Q.  Do you have a copy of the complaint and the affidavit with

22     you?

23     A.  The affidavit, ma'am, yes.  The complaint, no.

24     Q.  Okay.  Why don't you go ahead and get your copy of the

25     affidavit.  If you didn't bring it up there with you, I

1    apologize.

2    A.   I apologize.

3    Q.   All right.  Would you please state your name for the

4    record?

5    A.   Yes, ma'am.  Special Agent Joshua Russell.

6    Q.   And you are with the FBI here in Louisville?

7    A.   Yes, ma'am.

8    Q.   And how long have you been a special agent with the FBI?

9    A.   Since January of this year, ma'am.

10   Q.   Okay.  And are you familiar with the investigation of the

11   defendant in this case, Stephanie Russell?

12   A.   Yes, ma'am.

13   Q.   Okay.  And are you familiar with the affidavit in support

14   of the criminal complaint charging her with a violation of

15   Title 18 United States Code Section 1958?

16   A.   Yes, ma'am.

17   Q.   Okay.  And to your knowledge are all the statements

18   contained in the affidavit true and correct?

19   A.   Yes.

20   Q.   Okay.  I want to direct your attention specifically to

21   paragraph 29 of the affidavit.  The last couple of sentences

22   in paragraph 29 state that the FBI had set up surveillance

23   outside the rear of Kidz Life Pediatrics to observe the

24   specimen boxes that the defendant had indicated she would

25   place the first payment for the assassination of her husband

1    in.

2    A.  Uh-huh.

3    Q.  Okay.  And the affidavit states that at one point

4    pre-surveillance, investigators saw the defendant and her

5    children outside the medical practice, but were -- did not

6    observe the defendant placing the payment into the specimen

7    box.  Do you recall that?

8    A.  I was not there that night, Your Honor, but I was informed

9    of it, yes.

10   Q.  Okay.  You don't have to call me "Your Honor."

11   A.  Oh, sorry.

12   Q.  That's all right.  The -- but you're aware that the

13   surveillance agents weren't able to observe her --

14   A.  Yes, ma'am.

15   Q.  Okay.  Were you there last Thursday when the warrant for

16   her arrest was executed?

17   A.  I was.

18   Q.  Okay.  And are you aware -- at that time was video

19   surveillance or security video from Kidz Life Pediatrics

20   itself recovered by the FBI?

21   A.  It was.

22   Q.  And have you viewed that video?

23   A.  I have, ma'am.

24   Q.  And can you describe for the court what that video shows?

25   A.  Yes, ma'am.  It shows the outside -- the rear of the

1    business and it shows the defendant walking out and touching

2    one of the drop boxes at the back of the door and then you can

3    see her take the box down, go inside with it, and then a short

4    time later -- a few minutes -- she comes back out and puts the

5    box back on the door where it was and exits that area, enters

6    back inside.

7    Q.  Okay.  And do you recall was there any communication

8    either by text or phone call to the FBI's undercover employee

9    contemporaneous with the events that are shown on that video?

10   A.  Yes.  It was communicated to him how to access that box.

11   Q.  Okay.  And specifically was a code sent to the undercover?

12   A.  I believe so, yes.

13   Q.  Okay.  That would have allowed him to access that specimen

14   box?

15   A.  Correct.

16   Q.  All right.  And inside the specimen box, did the FBI --

17   what did you find?

18   A.  I believe it was $3,500 cash that was taken.

19          MS. FORD:  Okay.  Judge, those are all the questions

20   I have.

21          THE COURT:  All right.  Thank you.

22          MR. COX:  Thank you, Your Honor.

23                      CROSS-EXAMINATION

24   BY MR. COX:

25   Q.  Good morning.  I'm Scott Cox and this is David Mour and

1    this is Coleman Cox.  We represent Dr. Russell.  I believe

2    that you mentioned that you did not prepare the affidavit in

3    this case; is that correct?

4    A.   That's correct, sir.

5    Q.   It was prepared by Special Agent Hernandez; is that right?

6    A.   That is correct.

7    Q.   And she's been an employee of the FBI for less than a

8    year; is that right?

9    A.   To my knowledge, yes.

10   Q.   And you've been an employee of the FBI for how long; four

11   months?

12   A.   Well, I was hired in August, but I've been on the job

13   since January.  Yes, sir.

14   Q.   All right.  Have you prepared an affidavit yet in support

15   of a criminal complaint?

16   A.   No.

17   Q.   Have you prepared an affidavit in support of a search

18   warrant?

19   A.   I have assisted, yes.

20   Q.   Okay.  You're familiar with this affidavit, correct?

21   A.   Yes, sir.

22   Q.   And you were involved in this investigation for -- for a

23   considerable amount of time; is that right?

24   A.   I was involved in the investigation.

25   Q.   And you've reviewed this affidavit, correct?

1    A.  Yes, sir.

2    Q.  And I believe you said that you believed to the best of

3    your knowledge it's all accurate; is that right?

4    A.  Yes.

5    Q.  All right.  Who took the lead, I guess, in preparing this

6    affidavit?  Is that Special Agent Hernandez?

7    A.  Yes.

8    Q.  And were you working with her during the entire course of

9    this investigation?

10   A.  No, sir.

11   Q.  All right.  Let me ask you a couple questions about the

12   affidavit, please.  And you have a copy in front of you.

13   A.  I do, sir.

14   Q.  All right.  And were you employed in law enforcement

15   before you became a special agent?  Where did you work?

16   A.  I was a police officer.

17   Q.  Where?

18   A.  Back in Michigan.

19   Q.  What about Agent Hernandez, does she have any law

20   enforcement experience before she became an FBI agent?

21   A.  She was not a local police officer.  I believe she worked

22   in the government for some capacity -- in law enforcement.  I

23   can't give specifics to that.

24   Q.  All right.  If you'll turn to Page 2 of the affidavit, if

25   you would like, and it states that LMPD Detective Samantha

1   Ernst met with your colleague Zach Harrison on November 25th

2   of 2019.  You're familiar with that, correct?

3   A.  I did hear that; yes, sir.

4   Q.  All right.  And you know that Detective Samantha Ernst is

5   assigned to the Crimes Against Children Unit; is that correct?

6   A.  I know that through the affidavit.  Yes, sir.

7   Q.  All right.  And you know that she was investigating

8   Mr. Crabtree, Dr. Russell's husband, for allegations of

9   abusing the children; is that right?

10  A.  Through the affidavit; yes, sir.

11  Q.  All right.  And she met with Zach Harrison on November 25,

12  2019, to talk about allegations she had heard about an alleged

13  murder-for-hire; is that correct?

14  A.  Yes, sir.

15  Q.  And she -- she told Harrison that alleged -- that Crabtree

16  had told her that the doctor was hiring an assassin so she

17  could get custody.  Do you recall that?

18  A.  Through the affidavit, yes.

19  Q.  Okay.  And, again, this happened while Ernst was

20  investigating Crabtree, correct?

21  A.  Yes.

22  Q.  And so Crabtree has a motive to try to turn the

23  investigation away from himself, correct?

24  A.  I am not aware of that investigation.  I have not read it.

25  Q.  Well, you know that he was under investigation for

1    allegedly abusing the children, correct?

2    A.   Yes.

3    Q.   That's why Crimes Against Children detective was assigned

4    to the case, correct?

5    A.   To my knowledge.

6    Q.   All right.  So he would like to kill that investigation.

7    That seems pretty plausible to you, doesn't it?

8    A.   I cannot speak to that.

9    Q.   And he makes these accusations through the detective that

10   then get passed along to the FBI, right?

11   A.   Yes.

12   Q.   All right.  Later, you're familiar when Crabtree's -- her

13   ex-husband had an attorney and he produced an affidavit from a

14   K.S., a former nanny, do you recall that?

15   A.   Through the affidavit; yes, sir.

16   Q.   All right.  And -- and she said the defendant alluded to

17   wanting to have her husband killed, do you recall that?

18   A.   Yes, sir; through the affidavit.

19   Q.   All right.  And that affidavit was prepared by whom?

20   A.   This affidavit was prepared by Special Agent Hernandez.

21   Q.   This -- the affidavit I'm talking about from C.S. [sic]

22   was prepared by Crabtree's lawyer, isn't that correct?

23   A.   May I refer to the document before I give an answer?

24   Q.   Of course.  Please do.

25   A.   It was Crabtree's attorney.

1    Q.  All right.  And who's paying Crabtree's attorney?

2    A.  I would think Mr. Crabtree.

3    Q.  That's right.  And who wants the investigation to veer

4    away from him and towards his wife?

5    A.  I cannot say, sir.

6    Q.  Well, you have a background in law enforcement.  Who do

7    you think?

8    A.  Mr. Crabtree could.  I cannot say for sure.

9    Q.  All right.  But we know he has a lawyer and he pays his

10   lawyer to prepare an affidavit for the nanny to sign, correct?

11   A.  Correct.  But I don't --

12   Q.  And the lawyer then turns that over to the FBI; is that

13   correct?

14   A.  Correct.

15   Q.  Has Crabtree been interviewed?

16   A.  Not to my knowledge.  I spoke with him to notify him that

17   he was a victim in this case.

18   Q.  Do you -- do you know whether he's ever been interviewed

19   by the FBI in this case?

20   A.  I do not.

21   Q.  You've not seen a 302 or anything else prepared?

22   A.  I have not.

23   Q.  Was -- did Detective Ernst share anything with the FBI

24   when she interviewed Mr. Crabtree?

25   A.  I am not aware.

1    Q.  Have you interviewed the nanny, K.S.?

2    A.  I -- no, sir.  I don't know who the nanny, K.S., is.

3    Q.  Has anyone interviewed her or him?

4    A.  I am not sure.

5    Q.  Do you know if a 302 was prepared?

6    A.  I am not aware.

7    Q.  You don't have any 302s with you?

8    A.  I provided the 302s to the prosecutor; the three

9    interviews I conducted on last Thursday.  Other than that, I

10   am unaware of any of the 302s or interviews.

11   Q.  Is anything in your 302 included in this affidavit?  Does

12   it talk -- are you talking of any of these three witnesses

13   about the facts and circumstances that are set forth in this

14   affidavit?

15   A.  I spoke to them about the defendant discussing

16   murder-for-hire, yes, but not about these 2019 issues, no.

17   Q.  Okay.  But later in the more current issues you talked to

18   him about that?

19   A.  Yes, sir.

20          MR. COX:  Well, we would ask to have those 302s

21   turned over to us, Judge.  It's 26.2 material which covers

22   preliminary examinations.  Also covers detention hearings.

23          MS. FORD:  Just to clarify, I don't have any problem

24   turning these 302s over.  Special Agent Russell interviewed

25   three individuals last Thursday at Kidz Life Pediatrics at the

1  time that the arrest warrant was executed.  Just to clarify

2  Mr. Cox's question, there's no information from those

3  affidavits -- from his interviews last Thursday post-arrest

4  that are included anywhere in the affidavit in support of

5  probable cause, but if Mr. Cox wants to look at them, I don't

6  have any problem with him looking at them.

7       I just want to clarify for the record because I

8  thought the question was ambiguous since we keep talking about

9  different affidavits.  There's no information from his

10  interview -- Special Agent Russell's interviews that went to

11  support the probable cause in this case.

12       THE COURT:  All right.

13       MR. COX:  We appreciate those being turned over and

14  we'll return them at the end of the hearing.

15       THE COURT:  All right.

16       MR. COX:  And Mr. Mour will read those and I'll

17  continue asking questions, Your Honor.

18       THE COURT:  Mr. Cox, you may continue.

19       MR. COX:  Thank you, Your Honor.

20  BY MR. COX:

21  Q.  After meeting with Detective Ernst with the Crimes Against

22  Children, Special Agent Harrison interviewed a number of

23  witnesses to see if anything could be corroborated about his

24  murder-for-hire story; is that correct?

25  A.  According to the affidavit; yes, sir.

1   Q.  All right.  And he closed the investigation, correct?

2   A.  Yes, sir.

3   Q.  He was unable to find anyone who corroborated what

4   Crabtree was saying or what Crabtree's lawyer was saying or

5   what this nanny was saying; is that correct?

6   A.  Yes, sir.

7   Q.  All right.  And so that at least temporarily closed down

8   murder-for-hire investigation; is that correct?

9   A.  Yes, sir.

10   Q.  In addition to that, that was the end of the investigation

11   related to the allegations of child abuse against Crabtree,

12   wasn't it?

13   A.  I have not seen that case, so I cannot testify to that.

14   Q.  You don't have any information that any other work was

15   done by the Crimes Against Children Unit after they were put

16   on notice of this alleged murder-for-hire plot?

17   A.  I cannot confirm or deny.  I've not seen that case, sir.

18   Q.  All right.  But you know that closed down the

19   murder-for-hire investigation at that point?

20   A.  Yes, sir.

21   Q.  All right.  What date was it shut down?

22   A.  The official date the case was closed?

23   Q.  Yes, sir.  By Special Agent Zach Harrison.

24   A.  I am not sure of that date, sir.

25   Q.  Do you know an approximate month even?

1    A.  I do not.

2    Q.  All right.  So the next thing that happened I understand

3    is on March 28 of this year.  An LMPD detective named Scott

4    Claxon referred the FBI to a private investigator.  Do you

5    recall that?

6    A.  Through the affidavit; yes, sir.

7    Q.  All right.  And you recall that's in paragraph 8 on Page 3

8    of the affidavit; is that correct?

9    A.  Yes, sir.

10   Q.  All right.  And the private investigator worked for

11   Crabtree, correct?

12   A.  I am not sure who they're -- who was paying them, sir.

13   Q.  Well, I mean, it wasn't just some random private

14   investigator.  It was someone who was involved in the family

15   court matter, right?

16   A.  I am not aware of who was paying the private investigator

17   or who the private investigator was.

18   Q.  Do you have any doubt in your mind that that person was

19   working for Crabtree --

20   A.  I cannot say, sir.

21   Q.  -- and that Crabtree was paying him?

22   A.  I cannot say, sir.

23   Q.  And who has a motive to shift attention away from

24   allegations of child abuse towards his wife, the person who's

25   making those allegations?  That would be Crabtree, correct?

1    A.  I cannot say, sir.

2    Q.  Well, in your experience you know attorneys hire private

3    investigators, right?

4    A.  Yes, sir.

5    Q.  You're not familiar of a private investigator ever getting

6    involved in case unless he or she's hired by an attorney,

7    right?

8    A.  Yes, sir.

9    Q.  So it makes sense to you as an investigator this would be

10   Crabtree's private investigator?

11   A.  It's possible.  I cannot confirm or deny.

12   Q.  And the affidavit doesn't mention anything about that,

13   does it?

14   A.  Not to my knowledge.

15   Q.  All right.  And as an investigator you like to know

16   whether people have a motive, right, to say what they're

17   saying or whether they can be impeached with what they're

18   saying, right?

19   A.  Yes, sir.

20   Q.  And this affidavit's completely blank about that?

21   A.  Yes, to my knowledge.

22   Q.  This is just a PI who parachuted into the case, right?

23   A.  I am not aware of who the private investigator was.

24   Q.  All right.  So we know that there are a couple of nurses

25   who worked for Dr. Russell who allegedly had been talked to by

1   her about trying to hire someone to do something to the

2   husband; is that correct?

3   A.  Yes, sir.

4   Q.  All right.  And you're familiar with Special Agent

5   Hernandez.  Is she some case agent in the case -- this case?

6   A.  Yes, sir.

7   Q.  All right.  Special Agent Hernandez and Special Agent Hoke

8   interviewed the confidential witness on April 6, 2022.  And

9   this is paragraph 10, sir, on page 3.

10  A.  Yes, sir.

11  Q.  All right.  And you recall that the two nurses did not

12  believe it was a real plot, right?

13  A.  They were not sure.  That is correct.

14  Q.  Well, they never called the police, did they?

15  A.  Well, the first CW contacted the FBI --

16  Q.  All right.

17  A.  -- but to my knowledge there was no contact before that.

18  Q.  And why did CW 1 contact the FBI?  What prompted her to do

19  that?

20  A.  May I refer to the affidavit --

21  Q.  Of course.

22  A.  Thank you.  CW 1 -- or CW approached the FBI because she

23  had learned from CW 2 that Russell had made certain

24  accusations -- communications to her.

25  Q.  All right.  And didn't she also say that it was not

1   something that she believed or -- confidential witness two

2   believed?

3   A.  I do not recall.

4   Q.  All right.  And we have some text messages in the

5   affidavit that are referenced and some of those are on page 5.

6   And you're familiar with allegedly Russell said she would pay

7   $4,000 to confidential witness two to have her male friend

8   kill her husband; is that right?

9   A.  Yes, sir.

10  Q.  And was confidential witness two working with the FBI at

11  that time?

12  A.  I am not sure.  I am unaware.

13  Q.  Who told confidential witness two to tell Dr. Russell that

14  she knew a hit man?

15  A.  Can you say that question again, sir?

16  Q.  Who -- if you know, who if anyone told confidential

17  witness two to tell Dr. Russell that she knew a hit man?

18  A.  I am not sure.

19  Q.  She wasn't working with the government at that time, was

20  she?

21  A.  I cannot say.

22  Q.  Do you know why she would say that?

23  A.  I do not, sir.

24  Q.  Was it the truth?  Do you know if confidential witness two

25  had someone who would kill someone for her?

1    A.   I do not know.  I have not talked to that person.

2    Q.   You don't know who that person is?

3    A.   No, sir.

4    Q.   All right.  And so when confidential witness two told

5    Dr. Russell she had an old friend who would do it, she wasn't

6    working with the FBI then?

7    A.   I am not sure, sir.

8    Q.   What was her motive for doing that then?

9    A.   I cannot say.

10   Q.   But she was encouraging Dr. Russell, correct?

11   A.   She communicated with Dr. Russell.

12   Q.   Well, she said "I got a guy who'll do it," right?

13   A.   She did communicate that, yes.

14   Q.   So she's encouraging her?

15   A.   I cannot say whether it was encouragement or not.  It was

16   communicated.

17   Q.   You don't know why she would do that?

18   A.   I did not speak to them.  I don't know her intent.

19   Q.   All right.  And then later -- this is later in the

20   affidavit we learn that Dr. -- that CW 2 told Dr. Russell that

21   her friend was killed himself.  Do you recall that?

22   A.   Through the affidavit; yes, sir.

23   Q.   And did she mean that, like, he had been killed by another

24   hit man?

25   A.   I do not know.

```
 1   Q.  She didn't say he had passed away or he was deceased or
 2   whatever.  She said he was killed?
 3   A.  Whether that happened or not, I am unsure, sir.
 4   Q.  But we know from the affidavit that's what --
 5   A.  Yes.
 6   Q.  -- confidential witness two told Dr. Russell?
 7   A.  Yes, sir.
 8   Q.  All right.  And she didn't ever tell Dr. Russell how he
 9   was killed or anything else, right?
10   A.  To my knowledge, yes.
11   Q.  And CW 2's not working with the government at this point
12   at all, correct?
13   A.  I do not know.  I cannot confirm or deny.
14   Q.  For all you know she's just a private citizen at this
15   point; an employee of the practice?
16   A.  It could be, yes.
17   Q.  All right.  It's my understanding that on April 21st of
18   this year, Special Agent Hernandez and Special Agent Bullard
19   interviewed cooperating witness two; is that right?  This
20   is -- I believe it's page 5, paragraph 14.
21   A.  Yes.  I do know they both interviewed them.
22   Q.  Is it your testimony that that's the first time the
23   government had ever spoken to her?
24   A.  I'm aware they spoke to her on April 21st per the
25   affidavit.  I am unaware of any other time before this.
```

1    Q.  So she came up with this story -- I'm talking about

2    confidential witness two.  She came up with the story that she

3    had a hit man who would do it and she -- and then her friend,

4    the hit man, was killed himself.  She -- no one with the

5    government told her to do that; is that right?

6    A.  I cannot confirm or deny.

7    Q.  You don't have any information to dispute that, do you?

8    A.  No.

9    Q.  All right.  And let me ask you this, is confidential

10   witness two, has she been charged in this case?

11   A.  To my knowledge, no.

12   Q.  Has she been charged anywhere -- state court, federal

13   court -- with this?

14   A.  I am unsure.  But to my knowledge, no.

15   Q.  I mean, is it the position of the Bureau that she was a

16   coconspirator?

17           MS. FORD:  Objection.  What is the relevance of this

18   to a probable cause hearing?

19           MR. COX:  Well, it's in the affidavit and she

20   offered the affidavit in toto and so I want to ask about it

21   just briefly.

22           MS. FORD:  It's not a discovery proceeding.

23           MR. COX:  It goes -- this isn't discovery.  It goes

24   directly to this person's motive because the affidavit, Your

25   Honor, on page 6, paragraph 15, says -- and this is written by

1    Special Agent Hernandez, (Reading) Between 5 December '21 and

2    28 December '21 CW 2 and Russell conspired to kill Crabtree.

3            So they're saying she's a criminal.

4            MS. FORD:  Whether or not another person is

5    charged -- will be charged, should be charged -- has no

6    relevance at all to whether there is probable cause to believe

7    this defendant committed the crime that is charged in the

8    complaint.

9            MR. COX:  And here's exactly why --

10           MS. FORD:  That is a standard Sixth Circuit jury

11   instruction.

12           MR. COX:  Here's exactly why it is relevant.

13   They're putting forth statements that CW 2 made as if they're

14   factual and I want to know was she told "You're under

15   investigation.  You're a coconspirator here.  We're going to

16   charge you."  Did that color the things that she told the FBI

17   that ended up in this affidavit?  They --

18           MS. FORD:  Well, the --

19           MR. COX:  Let me finish, please.

20           MS. FORD:  Okay.

21           MR. COX:  They chose to call her a conspirator.  I

22   didn't choose that.  They did.  And this is the affidavit they

23   want you to consider and I want to ask about it.

24           MS. FORD:  What Mr. Cox is omitting is the next

25   paragraph, paragraph 16, which states that the cooperating

1    witness two tried to cut off the conversations with Russell by

2    telling her that alleged -- the hit man that confidential

3    witness two knew had died.  It's clear that to the extent

4    there were discussions back and forth described in paragraph

5    15 which arguably could be construed as conspiring to find

6    somebody to kill Crabtree.

7            In paragraph 16 it's clear that CW 2 was withdrawing

8    from that conspiracy.  Paragraph 16 specifically states that

9    Russell asked CW 2 if CW 2 would pull the trigger themselves.

10   The cooperating witness declined and soon thereafter left the

11   practice.  Withdrawal from the conspiracy is a defense

12   obviously to being charged with a conspiracy.

13           THE COURT:  I'm going to allow limited questions

14   just in terms of you can ask the witness whether or not this

15   CW 2 was -- that there were questions of her, but I'm not

16   going to allow -- I'm not going to allow just a free-for-all

17   in terms of questions about CW 2.  We are here for a

18   preliminary hearing with regard to Ms. Russell and not CW 2.

19           MR. COX:  I'll make it fast.

20   BY MR. COX:

21   Q.   The FBI viewed CW 2 as a coconspirator in this crime at

22   that time; is that correct?

23   A.   I'm unaware of what Special Agent Hernandez viewed her as.

24   I just know she was interviewed.

25   Q.   But you know Special Agent Hernandez characterized her as

1    a conspirator in her sworn statement, correct, because you've

2    read it?

3    A.   I know what she said in her statement -- in her affidavit,

4    yes.

5    Q.   And she said they were conspiring; is that correct?

6    A.   The word "conspired" was used.

7    Q.   Okay.  Thank you.  And we heard the prosecutor say she

8    withdrew -- confidential witness two withdrew from the

9    conspiracy and so that's a defense, I guess, to potentially

10   her being charged.  But her husband told her "You need to keep

11   talking to Dr. Russell about this."  "You need to keep

12   bringing it up with her and see where it goes," correct?

13   A.   Before she ended it, yes, per the affidavit.

14   Q.   All right.  And -- and you know that from your

15   investigation that she did continue to talk to Dr. Russell, is

16   that correct, after she was interviewed by the FBI?

17   A.   That is correct.

18   Q.   All right.  And the FBI was -- was the FBI directing her

19   from the time that they interviewed her on April 21st of 2022,

20   were they directing CW 2 on what to say and do around

21   Dr. Russell?

22   A.   I cannot say.  I am unaware.

23   Q.   Okay.  You're unaware if she was asked to wear a wire and

24   things like that or being prompted on what to say to the

25   doctor?

1    A.   I am unaware.  I was not part of those conversations or --

2    Q.   But you do know -- I cut you off.  I apologize.

3    A.   I was just -- I was not a part of those conversations or

4    interviews.

5    Q.   But you do know that her husband prompted her to keep

6    bringing it up with Dr. Russell, correct?

7    A.   I am aware at some point during that, yes.

8              MR. COX:  All right.  The court's indulgence here

9    one second.

10   Q.   And eventually you know that confidential witness two quit

11   the practice; is that correct?

12   A.   Per the affidavit; yes, sir.

13   Q.   When she was -- when she was interviewed back on -- back

14   on April 21st, was she Mirandized to your knowledge?

15   A.   I am unaware.

16   Q.   Have you seen the 302 that was prepared by either Special

17   Agent Hernandez or Special Agent Bullard about that interview?

18   A.   I have not read the interview, sir.

19   Q.   And you don't have a copy of it?

20   A.   I do not.

21   Q.   And on page 8 of the affidavit, if you'll go to that.  And

22   these are some -- some text messages between Dr. Russell and

23   CW 2; is that fair to say?

24   A.   Yes, sir.

25   Q.   And hang on here real quick.  And she says at the very

1    first one that Dr. Russell said "We can talk about Christmas

2    flowers."  It's your understanding that that means having the

3    husband killed; is that right?

4    A.  According to the affidavit; yes, sir.

5    Q.  And CW 2 says "awesome sauce"?

6    A.  Yes, sir.

7    Q.  Does that kind of firm up the conspiracy in your mind;

8    "awesome sauce"?

9    A.  I cannot say.

10   Q.  And CW 2 was the one who said she would determine the

11   price; is that right?

12   A.  I am not sure.  I can refresh my memory --

13   Q.  I apologize.  Page 8, the text messages that are set out

14   in the middle of the page on the far right, "I will let you

15   know the price."  "It has to be cash and cash only."

16   A.  Yes, sir.

17   Q.  So she's the one setting the terms and how it's going to

18   be paid and everything else, right?

19   A.  According to that text message.

20            MR. COX:  All right.  I'm going to wrap it up really

21   soon, Judge.

22   Q.  On page 10 there's another excerpt from some text messages

23   and this is dated May 11th of 2022?

24   A.  Yes, sir.

25   Q.  And this is confidential witness two texting Dr. Russell;

1   is that correct?

2   A.  According to the affidavit; yes, sir.

3   Q.  All right.  And the FBI interviewed confidential witness

4   two on April 21 of '22.  And now about two weeks later,

5   confidential two is texting Dr. Russell, correct?

6   A.  Yes, sir.

7   Q.  Was that at the direction of the FBI?

8   A.  I'm unaware, sir.

9   Q.  Was the FBI aware that she was contacting her?

10  A.  I am not aware, sir.

11  Q.  Who would know that?

12  A.  Special Agent Hernandez.

13  Q.  Is she busy today?  Is she not able to come to court

14  today?

15  A.  I was asked to come because she is -- I am unaware of what

16  her schedule was, but --

17  Q.  And then if you'll look at some text messages on page 11.

18  This is CW 2 and Russell again on the far left.  She says "I

19  thought I would see how things are."  And Dr. Russell

20  responded to your knowledge "Worse every week."  "Molestation,

21  abuse, bruises," etcetera.  And she was talking about what was

22  going on with her children, correct?

23  A.  I am not aware what she meant in the text message.

24  Q.  Well, you know she's a board certified pediatrician,

25  correct?

1   A.  Yes, sir.

2   Q.  And isn't it -- wouldn't it be your best opinion they

3   would be able to recognize abuse more than just the typical

4   person on the street; a trained pediatrician?

5   A.  They should, yes.

6   Q.  And she's telling her friend "He's molesting our

7   children," right?

8   A.  I cannot confirm that.

9   Q.  "He's bruising up our children"?

10  A.  I cannot confirm that.

11  Q.  Well, it's in the affidavit, right?

12  A.  Yes, sir.

13  Q.  So as far as you know, confidential witness two is having

14  these continued contacts with Dr. Russell that's behind your

15  back.  The FBI doesn't know about that; is that fair to say?

16  A.  I cannot confirm or deny that.  I am unaware.

17  Q.  Let me shift gears here real quick.  First of all, did you

18  participate in Dr. Russell's arrest?

19  A.  I was there that day.  I didn't -- was not there for the

20  actual arrest of placing the handcuffs, but I was there

21  shortly after.  Yes, sir.

22  Q.  And you know that she didn't resist getting arrested in

23  any respect, did she?

24  A.  I did not hear of such.  No, sir.

25  Q.  And you would have if she had, correct?

1    A.   I cannot say, but I have not.

2    Q.   All right.  And do you know that she lives in a home here

3    in eastern Jefferson County?

4    A.   I am not sure of her address, sir.

5    Q.   Do you know that she doesn't own a firearm or have any

6    ammunition?

7    A.   I am unaware.

8    Q.   Do you know that she has no criminal record?

9    A.   I am unaware.  I've not seen her criminal record.

10   Q.   You don't know that she has no criminal history

11   whatsoever?

12   A.   I cannot confirm or deny.

13   Q.   But you're fully familiar with the contentious divorce

14   proceedings that have been taking place in Jefferson Family

15   Court?

16   A.   I am not fully aware.  I am somewhat aware.

17   Q.   And you know what the accusations were and allegations

18   against her husband towards abusing the children, correct?

19   A.   I know some of them.  I am not fully aware.

20   Q.   And you know what the acquisitions were and allegations

21   against her husband towards abusing the children, correct?

22   A.   I know some of them.  I am not fully aware.

23   Q.   And you know that when -- when her husband hired a private

24   investigator and attorney and they went to the FBI, that was

25   the end of the child abuse investigation.  Do you know that?

1    A.  I do not.  I am unaware.

2    Q.  Are you familiar with whether Dr. Russell has a passport?

3    A.  I do not know.

4    Q.  Do you know when the last time she ever traveled outside

5    of Kentucky?

6    A.  I do not, no.

7    Q.  Do you know that she has a extremely busy pediatric

8    practice here in Jefferson County?

9    A.  I am aware of the pediatric practice.

10   Q.  Do you know she has approximately 3,000 patients?

11   A.  I am aware that one of the nurses said that, yes.

12   Q.  And do you know who's taking care of those patients since

13   she's been in the Oldham County Jail?

14   A.  I do not.

15   Q.  Do you know who's going to be taking care of those

16   patients?

17   A.  I do not.

18   Q.  Would it surprise you to learn that some of these patients

19   are prescribed medicine?

20   A.  It would not surprise me.

21   Q.  And these prescriptions need to be renewed every month.

22   A.  It would not surprise me.

23        MR. COX:  And -- the court's indulgence.  That's all

24   I have.  Thank you, Judge.

25        THE COURT:  All right.  Any redirect?

```
1              MS. FORD:  Judge, yeah, just a couple follow-up

2     questions.  Judge, may I approach the witness?

3              THE COURT:  Yes.  Do you have a document to provide?

4     You can -- thank you.

5                        REDIRECT EXAMINATION

6     BY MS. FORD:

7     Q.  Special Agent Russell, I have just handed you what I've

8     marked as Government Exhibit 1.

9     A.  Yes, ma'am.

10    Q.  The front page is styled Jefferson Circuit Court, Family

11    Division 7, Ricky Crabtree versus Stephanie Russell, findings

12    of fact, conclusions of law and custody decree in Case Number

13    18-CI -- actually, it might be -- C-150 1606.  Would you turn

14    to the second to the last page of that document?

15    A.  Yes, ma'am.

16    Q.  And tell me, do you see a signature from a Jefferson

17    Circuit Court family division judge on that custody decree?

18    A.  I do, ma'am.

19    Q.  And what is the date of the custody decree?

20    A.  January 31, 2022.

21    Q.  Okay.  And can you tell me the total number of pages in

22    this Government's Exhibit 1?

23    A.  Total pages is 98.

24    Q.  Okay.  So this is custody decree entered by the family

25    court judge.  Mr. Cox had -- referred several times to the
```

1    very contentious divorce and custody case between the

2    defendant and her husband, Ricky Crabtree.  You have not read

3    through this order, have you?

4    A.  No, ma'am.

5    Q.  Okay.  Mr. Cox did ask you a number of questions about the

6    FBI's investigation in 2019 that had opened up and he

7    referred -- because it's described in the affidavit to the --

8    the affidavit that was -- I believe it was the Crabtree's

9    nanny -- Mr. Crabtree and Ms. Russell's nanny who indicated

10   that she had some concerns for Mr. Crabtree's safety.  Do you

11   remember that?

12   A.  Yes, ma'am.  Through the affidavit.

13   Q.  Okay.  And Mr. Cox asked you a lot of questions about who

14   would have the motivation.  You are aware through the

15   affidavit that Ms. Russell accused Mr. Crabtree of physically

16   and sexually abusing their two minor children, aren't you?

17   A.  Yes, ma'am.

18   Q.  Okay.  And Mr. Cox suggested during his questioning that

19   Mr. Crabtree had a motive to turn the attention away from the

20   allegations made by Ms. Russell, that he was abusing their

21   children, and turn them towards her and that that was the

22   basis for the first time these murder-for-hire allegations

23   came up.

24   A.  Yes, ma'am.

25   Q.  Okay.  If I could have you turn, Special Agent Russell, to

1    page 88 of Government Exhibit 1.

2         MR. COX:  Judge, let me just object for the record.

3    I recognize the rules of evidence really don't apply here, but

4    this couldn't be any more hearsay that -- that's being offered

5    again for the truth of the matter asserted.  And it's an

6    order -- you know, I haven't seen it, I don't know anything

7    about it.  I don't know how that case was litigated at all.

8         THE COURT:  All right.

9         MS. FORD:  Well -- I'm sorry.

10        THE COURT:  Go ahead.

11        MS. FORD:  I was just going to say, Judge, as

12   Mr. Cox knows, the rules of evidence don't apply.  This order

13   is a matter of public record.  Some of the findings -- these

14   are findings by a circuit court judge who's been handling

15   this -- what he described as the contentious divorce and

16   custody dispute between the parties.

17        You know, Mr. Cox has brought this into an issue and

18   this probable cause hearing by suggesting that Mr. Crabtree

19   initially fabricated allegations about murder-for-hire in

20   order to divert attention from him -- from the allegations

21   that Ms. Russell had made that he was abusing their children.

22        MR. COX:  I think she meant to say fabricating abuse

23   of the children.  Is that what you meant?

24        MS. FORD:  I think that's what I said.  You

25   suggest -- you're suggesting that the parties are accusing

1    each other of things that Mr. Crabtree presented an affidavit

2    from the nanny in order to shut down Crimes Against Children's

3    investigation of the alleged sexual abuse of the children.

4            THE COURT:  All right.  It is true that the rules of

5    evidence are relaxed in a preliminary hearing proceeding.

6    Because issues of the proceeding in family court were raised

7    in your cross, I'm going to allow -- allow you, Ms. Ford, some

8    latitude, but I don't --

9            MS. FORD:  And I'm offering this only for this --

10    for the very limited purpose in the probable cause part of

11    this case.  I think other aspects of Judge Brown's memorandum

12    opinion and order go to the issue of detention in this case.

13    I can merely proffer that to the court, but with respect to

14    Mr. Cox's examination of this agent, I do want to offer one

15    aspect of the judge's findings in the family court case.

16            MR. COX:  And just note our objection.  It's

17    probably being taken completely out of context.  You kind of

18    need to read the full 98 pages to have the full flavor of it,

19    but --

20            THE COURT:  Understood.

21            MR. COX:  -- we understand your ruling.

22            THE COURT:  And your objection is noted, but I will

23    allow it for this limited purpose.

24            MS. FORD:  And I'm offering the entire 98 pages in

25    as an exhibit.

1          THE COURT:  All right.

2    BY MS. FORD:

3    Q.  Special Agent Russell, if you could look at page 88.

4    A.  Yes, ma'am.

5    Q.  You see paragraph number six?

6    A.  Yes, ma'am.

7    Q.  And if you back up -- back up to page 84 of Government

8    Exhibit 1.  You see there in the middle of the page where it

9    states conclusions of law?

10   A.  Yes, ma'am.

11   Q.  Okay.  So as we page forward that begins with conclusions

12   of law, paragraph one.  As we page through and get to page 88,

13   this paragraph six that I'm referring you to is one of the --

14   one of Judge Brown's conclusions of law in the custody case?

15   A.  Yes, ma'am.

16   Q.  And you are aware that Judge Brown gave full custody of

17   the minor children in this case to Mr. Crabtree?

18   A.  I am aware, yes.

19   Q.  Okay.  And that the defendant in this case, Stephanie

20   Russell who is a pediatrician, has supervised visitation only?

21   A.  Yes, ma'am.

22   Q.  All right.  And if you look back again at the first page

23   of Government Exhibit 1, Ms. Russell is named as the

24   respondent?

25   A.  Yes.

1    Q.  Okay.  And Mr. Crabtree's the petitioner?

2    A.  Yes, ma'am.

3    Q.  All right.  So looking at paragraph six on page 88, would

4    you -- at the beginning of that paragraph please read into the

5    record?

6    A.  (Reading) Respondent has made constant allegations that

7    petitioner is an unfit or abusive parent.  The court concludes

8    there is no evidence to support these claims.

9         Would you like me to go on?

10   Q.  Yeah.  Just a little bit more.

11   A.  Yes, ma'am.  (Reading) Over the course of over three

12   years, these claims have been investigated countless times

13   over several agencies as well as through the custody

14   evaluation.  The issues have also been before this court in

15   the form of motion and domestic violence petitions.  Despite

16   this, no independent third party has produced any evidence in

17   support of respondent's claims.

18   Q.  And, again, who's the respondent?

19   A.  It is Stephanie Russell.

20   Q.  Okay.  Continue on.

21   A.  (Reading) Rather, they have all come to the same

22   conclusion which is that respondent has fabricated these

23   allegations and then used the children and misinformation in

24   order to build a false narrative that petitioner is abusive

25   and mentally unable to care for the children due to this MCL

1    diagnosis -- or MCI.

2    Q.  Okay.

3    A.  (Reading).  Further, the older child's disclosure of

4    alleged abuse are not reliable given the coaching, influence,

5    manipulation, exerted by respondent to obtain them as well as

6    the child's young age.  The older child appears to be unaware

7    of the meaning of the alleged disclosures.  The older child

8    has rarely made these disclosures to independent third parties

9    without respondent present.

10        Finally, the court does not find respondent to be a

11   reliable reporting source in this action due to her ongoing

12   manipulation of information and lack of credibility as

13   experienced by almost all third parties associated with this

14   litigation.

15   Q.  Thank you.

16   A.  Yes, ma'am.

17        MS. FORD:  Judge, I move to admit Government Exhibit

18   1 as an exhibit in this proceeding.  And those are all the

19   questions I have for Special Agent Russell.

20        MR. COX:  We object for the grounds that I already

21   stated.  And I just have a couple follow-up questions based on

22   what she asked.

23        THE COURT:  All right.  Exhibit 1 is admitted.  You

24   may ask follow-up questions, but they must be limited to the

25   redirect.

1              (Government Exhibit 1 admitted in evidence.)

2                          RECROSS-EXAMINATION

3     BY MR. COX:

4     Q.   This decision that you just quoted from, you're aware that

5     that is on appeal in the Kentucky Court of Appeals right now?

6     A.   I am not aware, sir.

7     Q.   And you know that there's been no final decision made by

8     the court of appeals which is reviewing that case right now,

9     correct?

10    A.   I am unaware, sir.

11    Q.   And you know that Dr. Russell exercises her rights to

12    visitation every single time, every single week, correct?

13    A.   I am unaware of her attendance.

14    Q.   All right.  And you are aware when the judge talks about

15    the allegations of abuse being unfounded or unsupported -- you

16    quoted that.  Are you aware about whether the judge knew the

17    Crimes Against Children investigation was shut down as soon as

18    the attorney for Crabtree prepared an affidavit for the nanny?

19    A.   I am not aware.

20    Q.   All right.  And K.S. never testified in the family court

21    matter, did she?

22    A.   I am unaware, sir.

23    Q.   Well, did you know that she was called to testify and

24    refused?

25    A.   I am unaware.

1    Q.  Thank you.

2            THE COURT:  All right.  No further questions of this

3    witness?  You may step down.  Thank you.  Does the United

4    States have any additional witnesses to call?

5            MS. FORD:  No, Your Honor.

6            THE COURT:  All right.  Mr. Cox, turn to you.

7            MR. COX:  We're not going to call any witnesses,

8    Your Honor.  We're just going to proffer on the -- first of

9    all, we submit on the issue of probable cause and, secondly,

10   we'll just proffer some evidence to the court with regard to

11   detention.

12           THE COURT:  Okay.  Well, then let's move into

13   discussion of detention and then I'll make a ruling on both

14   after I've heard all the evidence.  All right.  Ms. Ford, I

15   think I asked earlier, you moved for detention in this matter.

16   Is this a case involving a presumption in favor of detention?

17           MS. FORD:  It is not, Your Honor.  There is no

18   presumption in this case.  The defendant is charged with a

19   crime of violence which allows the government to move for

20   detention or I believe under the rule of the court can also

21   recommend -- or move for detention, but the government's

22   burden is to show by -- I believe by clear and convincing

23   evidence that there is no condition or combination of

24   conditions which would assure the appearance of the defendant

25   at future proceedings or the safety of the community or

1    specific individuals.

2          The -- I will note that the probation office in this

3    case in the pretrial services report has recommended detention

4    in this case.  One, because the defendant is a risk of

5    nonappearance because of the nature of the offense charged in

6    the case and the defendant also poses a risk of danger again

7    because of the nature of the offense; her mental health

8    history and safety concerns for the community and for specific

9    individuals.

10         THE COURT:  All right.  Will you be calling any

11   witnesses with respect to your motion for detention?

12         MS. FORD:  No, Your Honor.  I'm not calling any

13   witnesses.  I do believe that there is sufficient evidence in

14   Government Exhibit 1.  Judge Brown's findings of fact,

15   conclusion of law and custody decree that was entered just in

16   January of this year.

17         I'm referring specifically -- and as Mr. Cox

18   indicated, it's -- it is a lengthy order and it details, you

19   know, the back and forth of what's been going on between

20   these -- between the defendant and her ex-husband over the

21   last couple of years.  But as of January of this year when

22   Judge Brown entered this order -- I believe it was January

23   22nd.  In paragraphs -- let me back up for a minute.

24         THE COURT:  Let me interrupt you.  Do you have a

25   copy for the court?

1          MS. FORD:  I do, Judge.  We'll give you the one I've

2     marked as Government Exhibit --

3          MR. COX:  Can we have one also?

4          THE COURT:  Yes.

5          MS. FORD:  I don't -- I only have two.  I apologize.

6          THE COURT:  Well, we need a copy made for defendant,

7     so we can pause to allow that so that he has a copy in hand.

8     Can you-all get a copy over here pretty quickly for defendant?

9          MS. FORD:  Yes.

10         THE COURT:  Yes.

11         MS. FORD:  Yes.  In fact if I can find a copy

12    machine somewhere, Judge, I'll make the copy.

13         THE COURT:  Okay.  In the clerk's office.  And we'll

14    just take a brief recess to allow you to do that because I

15    wanted him -- I want defendant to have any exhibit that's

16    referred to.

17         MS. FORD:  Okay.  And I'll just let the court know

18    when I'm back.  I'll just run over to the clerk's office.

19         THE COURT:  Okay.  We'll stand in recess for just a

20    few minutes.

21         (Recess.)

22         THE COURT:  All right.  Let's pick up where we were,

23    Ms. Ford.

24         MS. FORD:  Yes, Your Honor.  The defense counsel has

25    been provided with copy of Government's Exhibit 1.  And for

1    purposes of the detention issue, Your Honor, I direct the

2    court's attention to page 23 of Government Exhibit 1 beginning

3    with paragraph 102.

4         The guardian ad litem -- the court appointed a

5    guardian ad litem to protect the interest of the two minor

6    children in this case.  And the -- there was a forensic

7    psychological evaluation that was done of both of the parties

8    in this case; of Mr. Crabtree as well as Ms. Russell.  And

9    they were -- a forensic psychological evaluation was done by a

10   psychologist.

11        Paragraph 102 describes what was involved in that

12   evaluation process, the number of times that the psychologist

13   met -- and I'm focusing specifically on the defendant in this

14   case as opposed to Mr. Crabtree because the results of the

15   evaluation for him I think are apparent from the fact that the

16   court ordered that he be granted sole custody of the children.

17        But the psychologist in this case met with the

18   defendant on multiple occasions between November 5th, 2018,

19   and July 7, 2020.  Paragraph 103 indicates that following the

20   evaluation process, the psychologist appointed in this case

21   filed a 298-page report containing five sections and included

22   a response that the defendant in this case, Ms. Russell, had

23   submitted.

24        I think the important things for the court to note

25   as a result of that evaluation process and for purposes of

1    detention, in paragraph 105 the psychologist recommended that

2    sole custody in the case be awarded to Mr. Crabtree as she

3    believed that Stephanie Russell's parental judgment is

4    critically compromised.

5         The conclusion was based on the psychologist's

6    determination that Ms. Russell suffers from a personality

7    disorder with narcissistic and antisocial traits which affects

8    her ability to parent her children and respond in an

9    empathetic manner --

10        MR. COX:  Judge, I just can't believe we're hearing

11   all this nastiness from someone -- I don't even know who she's

12   talking about.  They want to take away this person's liberty

13   just based on this hearsay from a family court judge's -- you

14   know, talking about hundred-page reports from people.  I don't

15   know who they are.

16        MS. FORD:  Well --

17        MR. COX:  We're not able to confront them.  And they

18   want you to keep her in jail based on this stuff.  This

19   couldn't be any more removed.  I know you let in the -- her

20   report, but holy cow, these are -- these are so-called

21   experts, but we don't even know who they are.

22        MS. FORD:  I'm happy to address that.  First of all,

23   I can't think of a case that I have had in my career where we

24   have had a judge make a finding that a person presents an

25   ongoing threat of potentially absconding with her children,

1    physically harming the children or her ex-husband;

2    Mr. Crabtree.  That's paragraph 107 of the judge's findings.

3    I've never seen that in a case.  I've never seen that in a

4    case and that finding was made before the offense conduct in

5    this case.

6            THE COURT:  All right.  In light of your objection,

7    your basis is hearsay, correct?

8            MR. COX:  Yes.  And just how incredibly removed it

9    is from calling a witness and offering something where we can

10   confront them where the only thing at issue here is the

11   doctor's liberty.

12           MS. FORD:  And let --

13           THE COURT:  The only thing I'm looking at in this is

14   not for the truth of the matter asserted in the report.  We're

15   not making a finding about the defendant's mental status.

16   What I'm hearing is a finding made by a lower court with

17   regard to issues that have been raised in conjunction with the

18   allegations charged.  I mean, this is regarding detention and

19   for that purpose alone.  I am not making a finding of the

20   defendant's mental state either, so for a limited purpose I'm

21   going to allow this in.

22           MS. FORD:  Thank you, Your Honor.

23           THE COURT:  And if you will confine it to the

24   purpose --

25           MS. FORD:  Yes.  And my point being that the court

1    after that evaluation found that this defendant was a

2    threat -- represented a threat to the safety of her children

3    and her ex-husband and that was in January of 2022.  A finding

4    made by a judge who doesn't have the power to detain the

5    defendant but nevertheless felt that she represented a danger

6    to people.  That was before she tried to hire somebody to kill

7    her ex-husband.

8            And I think -- Your Honor, I'd submit to the court

9    that in terms of -- Judge Brown made a finding that Stephanie

10   Russell presents an ongoing threat of absconding with her

11   children, causing physical harm to them or to her husband.

12   I'd submit to the court that Judge Brown treated the

13   psychological evaluation that was done in this case as

14   circumspectly as we would treat it in this court.

15           Paragraph 104 of the judge's findings indicate that

16   the psychologist in this case who was Dr. Kelli Marvin who I

17   believe is associated with the University of Louisville

18   provided a complete copy of her file to counsel for both

19   parties.

20           By agreed order under the same day, the parties

21   agreed that the file would not be provided to the parties --

22   to Mr. Crabtree or Ms. Russell -- or to third parties.  In

23   deference to the court, Your Honor, the United States did not

24   issue a subpoena to obtain this 298-page mental health

25   evaluation.

1        If the court has any reservations at this juncture

2   about detaining the defendant -- and I think the finding by

3   the lower court in addition to the nature of the offense

4   charged in this case supports detention, but if the court has

5   any concern or believe it's improper to rely on that

6   conclusion without Mr. Cox having an opportunity to review the

7   psychologist's report, then I would ask that the court take a

8   recess of this hearing until tomorrow.

9        The local rules provide for the issuance of a

10  subpoena duces tecum.  And I am sure that if the court wanted

11  or felt it necessary to have that report, we could subpoena

12  the psychological evaluation of this defendant and have it

13  produced under seal to the court for the court's review.

14       I haven't seen it.  And I presume that Mr. Cox

15  hasn't seen it.  I think the lower court's finding for

16  purposes of detention is sufficient, but I just wanted to make

17  that clear on the record.

18       THE COURT:  Mr. Cox?

19       MR. COX:  Well, first of all, the lower court did

20  not make any findings about whether the doctor should be

21  detained during the course of this criminal litigation.  That

22  never came up, nor should it.

23       Secondly, Your Honor, about her allegedly finding

24  that the doctor represents a threat or danger to abscond with

25  the kids or hurt the kids, Your Honor, she allowed her to

1    continue to have visitation which the doctor has exercised

2    every single time without any issue whatsoever, Your Honor.

3    She is 100 percent totally devoted to her children.  In fact,

4    she's devoted really to all children including all 3,000 of

5    them that she treats every single day, six days a week, Your

6    Honor.

7         We know that unlike a lot of cases where I can come

8    over here, Your Honor, there are no presumptions that favor

9    detention in this case.  The government bears the burden not

10   only of proving flight by a preponderance of the evidence but

11   also she represents a danger to someone in the community or

12   the community at large by clear and convincing evidence, Your

13   Honor, and the government has not done that here.

14        We understand that these are serious allegations and

15   we're certainly not asking you to release her without any

16   conditions, but if you can fashion conditions -- and we would

17   proffer to the court that you can -- Your Honor, that

18   reasonably satisfies you that she would not present a risk of

19   flight or danger to anyone in the community, then you're to

20   release her on those terms.

21        And so here's what we would propose to the court.

22   The practice is struggling right now as you might imagine.  I

23   should say these parents and children are struggling right now

24   because they miss Dr. Russell so much, and more than missing

25   her, they need her.  They need her.  They need her every

1    single day, Your Honor.

2              So what we would proposed is that you order her

3    home -- to stay at home under the terms of home detention,

4    Your Honor, with one release.  Her practice manager is here

5    today, Kathy Roberts.  And Ms. Roberts has been with her for a

6    long time and she is willing to pick up Dr. Russell in the

7    mornings five days a week and take her to work and stay at

8    work with her the entire day.

9              She's then willing to drive her home and drop her

10   off at her house and go into the house with her and make sure

11   that she's settled.  She'll wear an ankle bracelet, Your

12   Honor, so you know she would not go anywhere other than her

13   home or her office.

14             Ms. Rogers [sic] can handle the grocery duties and

15   everything else.  We would ask you continue to permit

16   visitation with her children consistent with the family court

17   orders, Your Honor, which she has always exercised.  There are

18   third parties there.  There are adults there with them.  And

19   that is important not only to her, but that's important to the

20   children, Your Honor.

21             This opinion is on appeal, Your Honor.  There are

22   countless issues in that decision that are being appealed.  We

23   would ask you to give that extremely a small amount of weight,

24   Your Honor, in light of the fact that you know we're talking

25   about a 300-page opinion.  "Well, if you're even thinking

1    about letting her go, we'll go get that, Your Honor."  You

2    know, I wasn't involved in that.  And nowhere in here does

3    anyone say anything about her having the kids permanently

4    taken away from her or anything else.

5         There's not a shred of evidence in her lifetime that

6    she has ever hurt anyone.  Never.  A child, an adult.  No one.

7    She's presumed innocent, Your Honor, and we would ask you to

8    give that right consideration and allow her to be released on

9    the most restrictive terms possible, Your Honor, short

10   outright detention which is she stays home full-time other

11   than when she's driven to work, taken back to her home by her

12   practice manager.

13        And one last thing.  And the reason why I have to

14   stop for just a second is Mr. Mour represents her in family

15   court.  And there were efforts made to eliminate her

16   visitation during the course of this family court matter and

17   Judge Brown never agreed to do that ever.  She wanted it to be

18   supervised, but she also wanted it to be regular and

19   consistent because she knew that it was important not only for

20   the doctor and the mother but it was important to those kids.

21        So we would ask you to order her to remain detained

22   in her home, Your Honor -- she lives by herself -- and go to

23   work being driven both ways by the practice manager.  Allow

24   her to have visitation with her children.  These are

25   allegations, Your Honor, only.  She's not been found guilty of

1  anything, not only in this case, of anything in her entire

2  life, Judge.

3        THE COURT:  All right.

4        MS. FORD:  Judge, the only other thing I wanted to

5  add is that with -- clearly with respect to Mr. Cox's request

6  that -- that any conditions of release that might be

7  considered by the court include visitation with her children,

8  that would be out of the purview of this court's order.

9        I fully expect that the guardian ad litem in this

10  case would potentially file motions with Judge Brown in light

11  of the (inaudible) charges.  And that -- while Mr. Cox is

12  true, Judge Brown has never recommended detention, that wasn't

13  something that's within Judge Brown's power to do, nor do I

14  think it is within this court's power to weigh in on whether

15  Ms. Russell should continue to have visitation with her

16  children.  That's something that should be left to the family

17  court to resolve.

18        But, again, I do think the judge's findings even

19  before the charged conduct in this case, that the defendant

20  presented a danger to several people including her own

21  children but more specifically to Mr. Crabtree, to her

22  ex-husband, and there's an indication in the court's order

23  that she hasn't abided by court orders that she doesn't agree

24  with.

25        She was ordered, I believe, by Judge Brown over a

1    year ago to enter into some counseling, and when she doesn't

2    agree with orders, she doesn't follow them.  And so for those

3    reasons, Judge, I don't care who picks her up and takes her to

4    work, there are no conditions that the court can impose that

5    would guarantee the safety of the individuals that are the

6    targets of her ire.

7            MR. COX:  If we could just respond to that really

8    quickly.

9            THE COURT:  Very quickly.

10           MR. MOUR:  Your Honor, as Mr. Cox noted, I'm David

11   Mour.  I represented and represent Ms. Russell in the family

12   court case which is on appeal at the Kentucky Court of

13   Appeals.  And not withstanding everything that the 98-page

14   January 31st opinion says, Judge Brown has insisted that

15   Dr. Russell's time with her children continue.

16           In fact, it was in-person visitation for a while.

17   Because of COVID and other things and other restrictions, the

18   judge imposed it was a Zoom meeting, then it was in a place

19   where parents go to visit children supervised.  Ultimately she

20   allowed it to be at her medical office in the lobby where

21   she's supervised by a retired Jefferson County deputy sheriff.

22           And the order -- my recollection of the order is she

23   was not ordered by Judge Brown into counseling and therapy

24   until the January 31st, 2020, 98-page opinion which you have

25   before you and Dr. Russell has complied with that.

1          And up until last week the parenting --

2     notwithstanding all of these things about her that the

3     prosecutor wants you to believe from Judge Brown's opinion,

4     which is on appeal as I stated, not withstanding all of those

5     allegations Judge Brown insisted -- and even since the 98-page

6     opinion, I think, was entered, there have been efforts to stop

7     her parenting time.

8          There was an emergency motion filed by the GAL,

9     guardian ad litem, yesterday and I explained to the court --

10    we were on a Zoom call and I explained to the court that this

11    event was happening today and we were supposed to be back in

12    front of Judge Brown at 1:00 o'clock.  I don't know if that's

13    going to happen, but obviously -- Mr. Murphy is here, the GLA,

14    and I will report back to the judge and Mr. Murphy will report

15    back to the judge regarding what happens today.

16              THE COURT:  All right.  Thank you.

17              MR. MOUR:  Thank you.

18              THE COURT:  All right.  I need to take this under

19    advisement.  Let's stand in recess.  I'm afraid that 1:00

20    o'clock hearing may be problematic 'cause I need a little

21    time.

22              MR. MOUR:  We advised Judge Brown when we were

23    finished, we would let her know.

24              THE COURT:  All right.  Thank you.

25              (Recess.)

1          THE COURT:  Thank you all for the indulgence of

2    time.  I know that went a little beyond 1:00 p.m.  All right.

3    After considering the affidavit in support of the complaint

4    against defendant together with the testimony of Agent

5    Russell, I find that the United States has met its burden and

6    there is probable cause to support the complaint in this case;

7    a charge under 18 U.S.C. Section 1958, use of interstate

8    commerce in the commission of murder-for-hire.

9          Turning to the issue of detention, the court is

10   presented with whether the United States has met its burden in

11   this non-presumption case.  First is the burden of proving by

12   a preponderance of the evidence that defendant is a risk for

13   not appearing at future proceedings.

14          The United States has argued that defendant poses a

15   risk based upon statements and findings made in the course of

16   a very contentious custody battle in state court.  Likewise,

17   the U.S. Probation Office has a recommendation that defendant

18   poses a risk of no appearance as she may not abide by court

19   orders.  Again, the burden is a low burden and I find that the

20   U.S. has met it.  There is sufficient evidence or information

21   in the record -- turning to U.S. Exhibit 1 and the nature of

22   the charges before the court -- that defendant does pose a

23   risk of not appearance if released.

24          The court next turns to whether the United States

25   has met its burden that the defendant poses a danger to a

1   particular victim or the community if released.  Here there is

2   a higher burden to be met; that of clear and convincing

3   evidence.

4        To determine whether this burden is met, the court

5   looks to the nature of the charges, defendant's criminal

6   history, arguments of counsel, and information provided by the

7   U.S. Probation Office which is recommending detention.  I find

8   that this burden has been met.

9        This court is not charged with determining the guilt

10  or innocence of the defendant.  She enjoys the presumption of

11  innocence in this and future proceedings; however, it is

12  permissible for the court to look to the nature of the offense

13  charged in determining danger.

14       Here the charge of soliciting someone to take the

15  life of another is by definition a violent crime.  What is

16  particularly concerning to the court is the allegation that

17  defendant persisted in her quest to solicit someone to kill

18  her ex-husband.  She did so according to the supporting

19  affidavit by attempting to hide her efforts by using coded

20  language and multiple cell phones.

21       She allegedly sought and continued to converse with

22  someone she believed to be helpful in her goal of killing the

23  intended victim and facilitated the act by allegedly placing a

24  large sum of money in an agreed upon place to pay for the

25  intended killing.

1          These alleged acts lead this court to find that the

2     defendant is a continued danger to the community and the

3     victim.   Defendant has submitted arguments to overcome both

4     risk and danger by submitting that there are a number of

5     conditions which would assure the court of both her appearance

6     and mitigate against any danger.

7          This court is particularly persuaded by the weight

8     of the evidence regarding dangerousness and the nature of the

9     charge defendant now faces.   The court is not persuaded that

10    allowing the defendant to be released and returned to her

11    medical practice will dampen the apparent resolve evidenced by

12    the allegations in the complaint.

13         The defendant was a practicing physician while

14    engaged in this alleged criminal activity and returning her to

15    her practice does not do away with the dangerousness her

16    actions posed to the victim in this case.

17         Counsel for the defendant argues that at the heart

18    of this case is a family dispute involving accusations lobbed

19    by both sides.   That may be true and may go to the merits of

20    this case at trial, but for purposes of determining detention,

21    this court is concerned with the circumstances surrounding

22    defendant's arrest and the violent charge she now faces.

23         This court cannot ignore those circumstances and for

24    the reasons stated on the record finds that the defendant

25    shall remain in the custody of the U.S. Marshals pending

1   further proceedings.  Are there any other matters to address

2   at this time?

3            MR. COX:  No, Your Honor.

4            MS. FORD:  No.  Thank you, Your Honor.

5            THE COURT:  All right.  Do we have a date for

6   further proceedings?  Is there a submission to the grand jury?

7            MS. FORD:  It will be submitted, Your Honor.  The

8   grand jury next meets on June 2nd, 3rd, and 16th.  So it will

9   be submitted to the grand jury on one of those dates.

10           THE COURT:  All right.  Thank you.  That concludes

11  the matter for today.

12                  C E R T I F I C A T E

13

14  I am an official court reporter for the U. S. District Court

15  for the Western District of Kentucky and certify that the

16  foregoing is a true and correct transcript, to the best of my

17  ability, of the digital audio recording provided to me by the

18  Court of the proceedings taken on the date and time previously

19  stated in the matter.

20

21  /s April R. Dowell                    6/8/22
    Official Court Reporter, RMR, CRR      Date

22

23

24

25

INDEX

WITNESSES:

JOSHUA RUSSELL

Direct Examination By Ms. Ford              3
Cross-Examination By Mr. Cox                6
Redirect Examination By Ms. Ford           31
Recross-Examination By Mr. Cox             38

EXHIBITS

GOVERNMENT:
Exhibit 1                                  38