UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA,                                                                 Plaintiff,

v.                                                                        Criminal Action No. 3:22-cr-58-DJH

STEPHANIE M. RUSSELL,                                                                   Defendant.

\* \* \* \* \*

**ORDER**

Defendant Stephanie M. Russell is charged with using facilities of interstate commerce to arrange the murder of her ex-husband, in violation of 18 U.S.C. § 1958. (Docket No. 13) Following a hearing, Magistrate Judge Regina S. Edwards ordered that Russell be detained pending trial (D.N. 9), and Russell now moves to revoke the detention order. (D.N. 28) After careful consideration, the Court will deny the motion to revoke.

**I.**

The following facts are set forth in the affidavit supporting the criminal complaint. *See United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010) ("[C]onducting a bail hearing by proffer is acceptable under the law and at the discretion of the district court." (citations omitted)). Russell and her ex-husband, Rick Crabtree, had a contentious custody dispute that resulted in Crabtree being awarded sole custody of the couple's two children, with Russell allowed twice-weekly supervised visitation. (Docket No. 1-1, PageID.4) In 2019, Crabtree reported to law enforcement that he believed Russell "was attempting to hire an assassin to kill him in order to take full custody of their two children"; a sworn affidavit from the couple's former nanny supported this allegation. (*Id.*, PageID.3) Although the resulting investigation was discontinued when the FBI was "[u]nable to corroborate [Crabtree]'s accusations," similar concerns were

1

raised with law enforcement in early 2022 by a cooperating witness (CW) who worked at Russell's medical office. (*Id.*, PageID.4)

CW initially contacted a private investigator, who discovered that Russell, a pediatrician, "had allegedly approached several employees in her medical practice about helping locate someone to kill her ex-husband." (*Id.*) In a subsequent interview with FBI agents, CW stated that Russell had separately approached two nurses at the practice between July 2021 and March 2022 "and asked each of them for assistance in killing [Crabtree]." (*Id.*, PageID.4-5) CW showed the agents screenshots of text messages from Russell to a second cooperating witness (CW2) in which Russell "discussed hiring someone to deliver 'Christmas flowers,'" which CW and CW2 knew "was code for killing [Crabtree]." (*Id.*, PageID.5) Russell agreed to pay $4,000 in exchange for Crabtree's murder, which was to be carried out by a friend of CW2's. (*Id.*) She "provided CW2 with dates and times [Crabtree] would not have their children so CW2 could provide this [information] to his/her friend," and she "begged CW2 for the 'flowers' to be delivered before Christmas." (*Id.*)

CW2 confirmed in an interview with FBI agents that Russell had repeatedly sought CW2's assistance in killing Crabtree, initially using her personal cellphone for text messages and later using "what she described as a 'burner phone'" that she told CW2 she had "obtained . . . specifically to discuss killing Crabtree." (*Id.*, PageID.7; *see id.*, PageID.6) In the course of their communications, Russell "told CW2 she wanted [Crabtree] dead so she could gain full custody of her children"; that she "did not care what method was used to kill her ex-husband"; and that "she would pay an additional $1,000 if it could be done by the week of December 12, 2021." (*Id.*, PageID.7) To end the conversation, CW2 told Russell

that the purported hitman had died. (*Id.*) Russell then asked CW2 to commit the murder personally. (*Id.*) CW2 "declined, and soon after, left the practice." (*Id.*)

In late April 2022, CW notified the FBI that Russell had spoken to a third employee of the practice about killing Crabtree. (*Id.*, PageID.10) On May 11, 2022, CW2 contacted Russell via text message. (*Id.*, PageID.11) During that conversation, Russell "informed the CW2 she was still looking for "flowers." (*Id.*) CW2 met with Russell the following day—a meeting recorded by audio and video—and provided Russell with the phone number of an undercover FBI agent (UCE-5029), purportedly from Illinois, whom CW2 "identified . . . as someone who would kill Russell's ex-husband." (*Id.*, PageID.12; *see id.*, PageID.13)

Russell called the number on May 15 from a third cellphone number. (*Id.*, PageID.13) During the call, which was recorded,

> RUSSELL informed UCE-5029 she was looking to find someone who would get rid of CRABTREE. UCE-5029 asked if she wanted CRABTREE killed, to which RUSSELL responded that she wanted him gone. UCE-5029 then asked how she would want it done. RUSSELL responded she would rather discuss methods in person. RUSSELL offered to meet UCE-5029 in Indiana, after stating she knew he/she was approximately four and a half hours away from Louisville. RUSSELL and UCE agreed to a payment of $5,000 to get rid of CRABTREE. UCE-5029 and RUSSELL terminated the call a short time later. RUSSELL proceeded to send text messages to UCE-5029 with the name, address and type of vehicle CRABTREE drove. RUSSELL also informed UCE-5029 that CRABTREE had multiple cameras in his home.

(*Id.*) The following day, Russell called UCE-5029—another recorded call—and

> [a]sked UCE-5029 if CRABTREE could be killed on or before Friday, May 20, 2022, due to it being the last day of school for their children. RUSSELL also stated the murder could occur during her visitation with her children on Sunday May 25, 2022. RUSSELL did not want her children to be present when CRABTREE was killed.

(*Id.*, PageID.13-14)

During the same call, Russell discussed in detail how UCE-5029 should kill Crabtree. Specifically, Russell "wanted UCE-5029 to make it appear as if [Crabtree] committed suicide"—

3

"[i]nitially, [Russell] asked for UCE-5029 to hold [Crabtree] hostage and force him to text her an apologetic suicide note before being killed." (*Id.*, PageID.14) UCE-5029 declined but agreed to text Russell a suicide note from Crabtree's phone. (*Id.*) Russell explained how UCE-5029 could unlock the phone after Crabtree's death and said she would provide UCE-5029 the contents of the desired suicide note. (*Id.*) The purpose of the note, Russell stated, was to deflect suspicion, as "she had been vocal about her hate towards [Crabtree] to a lot of people and was worried she would look guilty." (*Id.*)

> While RUSSELL did not use the word "kill" in her text communications with UCE-5029, during their telephone conversations she no longer used the coded language, or references to "flowers" that she had used in earlier communications with others. She was explicit that she wanted CRABTREE dead and that it should made to appear that he had committed suicide to avert suspicion from RUSSELL.

(*Id.*) Russell agreed to pay UCE-5029 $7,000 for killing Crabtree and making it look like a suicide, with half to be paid on May 18, 2022, and the balance paid once the murder was completed. (*Id.*, PageID.14-15) She told UCE-5029 that she had nearly $6,000 in cash that "she had obtained by selling items because she had hoped one day she would find someone to follow through with killing her [ex-]husband."[1] (*Id.*, PageID.15)

On May 18, 2022, Russell texted UCE-5029 that she had placed the first $3,500 payment in the specimen drop box on the rear doors of her medical office. (*Id.*) She provided UCE-5029 the code to unlock the box. (*Id.*) UCE-5029 retrieved $3,500 from the drop box later that day.[2] (*Id.*, PageID.16)

---

[1] CW had previously told investigators that although Russell generally used credit cards instead of cash, CW believed that Russell had some cash from items, including her children's clothes, that she had recently been selling at the practice. (D.N. 1-1, PageID.6)

[2] While "[i]nvestigators did not observe [Russell] actually place the envelope in the specimen box," "she appeared to be the last person who left the office on May 18, 2022, and no other person left after [Russell]." (D.N. 1-1, PageID.15-16)

4

## II.

The Court reviews the magistrate judge's detention decision de novo. *See United States v. Yamini*, 91 F. Supp. 2d 1125, 1130 (S.D. Ohio 2000). A defendant must be detained pending trial if, after a hearing, the Court "finds that no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). This case does not involve the presumption of detention set out in § 3142(e)(3). (*See* D.N. 11, PageID.68) "Regardless of whether the presumption applies," however, "the government's ultimate burden is to prove that no conditions of release can assure that the defendant will appear and . . . assure the safety of the community." *Stone*, 608 F.3d at 946.

> In determining whether the government has met that burden of persuasion, the court must consider certain factors:
>
> > (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, . . . ;
> >
> > (2) the weight of the evidence against the person;
> >
> > (3) the history and characteristics of the person, including--
> >
> > > (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> > >
> > > (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
> >
> > (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. . . .

*Id.* (second omission in original) (quoting 18 U.S.C. § 3142(g)). A "finding of dangerousness must be 'supported by clear and convincing evidence.'" *Id.* at 945 (quoting 18 U.S.C. § 3142(f)(2)(B)).

The statutory factors support pretrial detention in this case. First, the nature and circumstances of the charged offense—murder for hire—are extremely serious. Russell does not dispute that she is charged with a crime of violence. *See* 18 U.S.C. § 3156(a)(4)(B) (defining "crime of violence" for purposes of Bail Reform Act to include "any . . . offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense"); *see also United States v. Sadiqullah*, No. 5:19-101-KKC, 2019 U.S. Dist. LEXIS 141605, at *3-*4 (E.D. Ky. Aug. 21, 2019) (finding murder for hire to constitute crime of violence under § 3156). And the disturbing circumstances described in the affidavit indicate that Russell was determined to have Crabtree—her children's father—killed by any means.

The second factor likewise supports detention. "This factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *Stone*, 608 F.3d at 948 (quoting *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985)). As set out in the affidavit, Russell took substantial steps over an extended period of time to arrange the murder of her ex-husband. (*See* D.N. 1-1) The evidence of her dangerousness is strong.[3]

Russell's personal history and characteristics also weigh in favor of detention: she is no longer employed (D.N. 28, PageID.127), and her past conduct includes apparent previous efforts to have her ex-husband killed. (*See* D.N. 1-1, PageID.3-4) Finally, in light of the offense

---

[3] Indeed, Russell's reply acknowledges the evidence that she is dangerous to Crabtree. (D.N. 40, PageID.166-67 ("[T]here is no evidence, *apart from the allegations concerning her ex-husband*, that Dr. Russell has ever posed a danger of any kind to anyone." (emphasis added)))

6

charged and Russell's evident determination to carry out the plan, "the nature and seriousness of the danger" to Crabtree is extreme. § 3142(g)(4).

In her motion and reply, Russell offers little to counter the government's evidence, arguing primarily that incarceration restricts her ability to consult with defense counsel and briefly asserting that her medical issues—multiple sclerosis and high blood pressure—cannot be adequately treated while she is in custody. (D.N. 28, PageID.127; D.N. 40, PageID.168-70) She further contends that "[n]othing suggests" that her proposed third-party custodian, Dr. Sheila Guelda, "is unable or unwilling to shoulder the[] responsibilities" set out in § 3142 (D.N. 40, PageID.167-68), namely to "assume supervision and to report any violation of a release condition to the court, if the designated person is able reasonably to assure the judicial officer that the person will appear as required and will not pose a danger to the safety of any other person or the community." § 3142(c)(1)(B)(i).

While the Court does not question Guelda's willingness to undertake the statutory duties of supervision or her commitment to the task of supervising Russell, the weight of the evidence presented by the government and outlined above compels the conclusion that no third-party custodian can "reasonably . . . assure . . . that [Russell] . . . will not pose a danger to the safety of any other person." § 3142(c)(1)(B)(i); *see, e.g.*, *United States v. Walker*, No. 20-cr-20516, 2021 U.S. Dist. LEXIS 46213, at *13 (E.D. Mich. Mar. 12, 2021) (finding that availability of "excellent third-party custodian" and GPS monitoring did not overcome dangerousness concerns). Nor is "the need for [Russell's] close participation in the defense" (D.N. 28, PageID.127)—a factor present in every criminal case—a valid basis for release. *See* § 3142(i)(3) (providing that any detention order issued under § 3142(e) must, as did the order in this case (D.N. 9, PageID.28), "direct that the person be afforded reasonable opportunity for private

7

consultation with counsel"). And as acknowledged in Russell's reply (D.N. 40, PageID.169), concerns about medical treatment "are not, standing alone, grounds to grant an accused's release." *See* § 3142(g) (listing "the person's physical . . . condition") as one of more than a dozen factors to be considered in deciding whether detention is appropriate); *see also Walker*, 2021 U.S. Dist. LEXIS 46213, at *9, *15-*17 (concluding that defendant's history and characteristics weighed in favor of detention notwithstanding defendant's argument that he "ha[d] not received treatment for" severe leg and foot pain from a gunshot wound "and thus need[ed] to be released pending trial to receive adequate medical care"). In sum, the Court finds by clear and convincing evidence that "no condition or combination of conditions will reasonably assure the safety of any other person and the community" if Russell is released.[4] § 3142(e)(1); *see* § 3142(f)(2).

### III.

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** that Russell's motion to revoke the detention order (D.N. 28) is **DENIED**.

October 20, 2022

David J. Hale, Judge
United States District Court

---

[4] Although the magistrate judge also found that Russell was a flight risk (D.N. 9, PageID.27), the government does not argue that point in its response (*see* D.N. 37), and the Court need not address it in light of the finding of dangerousness made above. *See* § 3142(e); *United States v. Marcrum*, 953 F. Supp. 2d 877, 881 (W.D. Tenn. 2013) ("Pretrial detention can be ordered based on a judicial finding of either substantial danger to the community or risk of flight; only one is required." (quoting *United States v. Hernandez*, No. 1:02-CR-006, 2002 U.S. Dist. LEXIS 26904, at *9 (E.D. Tenn. Feb. 27, 2002))).