UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA					PLAINTIFF

v.						CRIMINAL ACTION NO. 3:22-CR-58-DJH

STEPHANIE M. RUSSELL						DEFENDANT

UNITED STATES' REPLY

Comes the United States of America, by counsel, for its' reply to Defendant's Response to Government's Objections to Her Proposed Jury Instructions. [DN 111].

Charitably, the Defendant's response is a veritable cornucopia overflowing with legal sleight-of-hand. Less charitably, it is pure sophistry. Defendant's entire argument flows from the premise that she is entitled to present to the jury evidence regarding mental disease, defect, or condition. It is founded on the argument, wrongly, that extreme emotional disturbance is an element of the crime of murder under Kentucky state law. Finally, her proposed instructions presume that the jury should be instructed on the affirmative defense of extreme emotional disturbance, regardless of the evidence presented at trial. Each of these presumptions reflect a misstatement, or misunderstanding, of the law.

I.    Evidence Regarding Mental Disease, Defect, or Condition

Lost in the back and forth over objections to proposed jury instructions is the basic premise that there are significant limitations in federal law on the admissibility of mental-health evidence in federal criminal prosecutions.

The Insanity Defense Reform Act of 1984 (the "IDRA"), 18 U.S.C. § 17, passed after a jury acquitted John Hinckley, Jr. of assault, murder, and weapons charges in the attempted

1

assassination of Ronald Reagan, finding him not guilty by reason of insanity, put limits on the admissibility of mental-health evidence in federal criminal cases. The statute provides in relevant part as follows:

> It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

18 U.S.C. § 17(a).

In passing the IDRA, "Congress sought to place a number of limitations on a criminal defendant's ability to introduce mental health evidence." *United States v. Jones*, 2018 WL 1115778, at *4 (S.D.N.Y. February 27, 2018). It did so by: (1) eliminating "any form of legal excuse based on a defendant's lack of volitional control"; (2) eliminating "affirmative defenses such as 'diminished capacity,' 'diminished responsibility,' 'mitigation,' and 'justification,' " (3) limiting "the use of expert psychological testimony on ultimate legal issues," (4) altering "the burden of proof to require the defendant to prove the affirmative defense of insanity by clear and convincing evidence," and (5) creating "a special verdict of 'not guilty by reason of insanity,' which triggers federal civil commitment proceedings." *Id.* (citing *United States v. Cameron*, 907 F.2d 1051, 1061 (11th Cir. 1990); *United States v. Sabir*, 2007 WL 1373184, at *5 (S.D.N.Y. May 10, 2007)).

While Congress intended to bar "alternative 'affirmative defenses' that 'excuse' misconduct," it does not bar mental disease "evidence that disproves an element of the crime itself." *United States v. Pohlot*, 827 F.2d 889, 897 (3d Cir. 1987); *see United States v. Jones*, 2018 WL 1115778, at *4 (S.D.N.Y. Feb. 27, 2018). Thus, notwithstanding the IDRA, a defendant may "submit[ ] mental health evidence for the purpose of rebutting the prosecution's

proof of the *mens rea* element of a specific intent crime." *United States v. Dupre*, 462 F. 3d 131, 137 (2d Cir. 2006); *see also United States v. Odeh*, 2016 WL 7092980 (E. D. Mich. Dec. 6, 2016).

However, the district court, in the first instance, must police the boundaries between permissible expert evidence that goes to negating the intent element of a crime and impermissible evidence that seeks to "excuse" the crime. *United States v. Ray*, 583 F. Supp. 3d 518, 534-535 (citations omitted). That is, the court must guard against the risk "that [mental-health] evidence—even if characterized as strictly relevant to negate intent—will result in the resurrection of precisely the kinds of defenses that the IDRA was enacted to prohibit." *Id.* (quoting *Cromitie v. United States*, 2017 WL 1383982, at *5 (S.D.N.Y. Apr. 7, 2017).

At the same time, the court must also ensure that the defense is afforded its Sixth Amendment right to call witnesses and to present the best defense. In balancing those considerations, courts require the defendant to "demonstrate a direct link between [the proffered expert] evidence and the *mens rea* that the Government is required to prove." *Id.* Put another way, the evidence must, " 'if believed, support a legally acceptable theory of lack of *mens rea.*' " *Jones*, 2018 WL 1115778, at *5 (emphases omitted); *see also United States v. Pirro*, 76 F. Supp. 2d 478, 485 (S.D.N.Y. 1999) ("Mental disease evidence is generally excluded where no link is demonstrated between the evidence and the defendant's *mens rea* or where the defendant could not demonstrate that he actually lacked *mens rea* at the time of the offense because of any psychological defect.").

In addition to not being barred by IDRA, any proffered expert mental disease evidence must also meet the standards of the Federal Rules of Evidence, including Rules 702, 704(b) and 403. Rule 704(b) prohibits an expert witness from testifying about whether the defendant did or

3

did not have a mental state or condition that constitutes an element of the crime charged or an element of a defense. Fed. R. Evid. 704(b). And under Rule 403, a court may exclude evidence even if it is relevant "if its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

While the United States has objected to the Defendant's proposed instruction incorporating mental condition evidence, it remains that the Court could exclude the Defendant's proffered experts at trial altogether after the evidence begins to come in. *See United States v. Schneider*, 111 F. 3d 197 (1st Cir. 1997). It should not be accepted as a fait accompli that the Defendant's expert witness testimony is admissible.

II.   <u>Extreme emotional distress is not an element of the crime of murder in Kentucky.</u>

Defendant hangs her entire argument on a single sentence cherry-picked out of a single Kentucky case. Defendant states, twice, that "once evidence of EED (extreme emotional disturbance) is introduced, the absence thereof becomes an element of the offense of murder." *Coffey v. Messer*, 945 S.W. 2d 944, 946 (Ky 1997). The entire quote from the case adds some important context:

> Although we have occasionally described EED as a mitigating circumstance, *e.g., Gall v. Commonwealth,* Ky., 607 S.W.2d 97, 108 (1980), *overruled on other grounds, Payne v. Commonwealth,* Ky., 623 S.W.2d 867 (1981), *cert. denied,* 450 U.S. 989, 101 S.Ct. 1529, 67 L.Ed.2d 824 (1981), it is, in fact, a defense to the extent that its presence precludes a conviction of murder. KRS 507.020(1)(a). We have often characterized EED as a defense, and it is referred to as a "defense to the crime" in the mitigating circumstances section of our capital penalty statute. KRS 532.025(2)(b). **Once evidence is introduced to prove the presence of EED**, its absence becomes an element of the offense of murder. *Gall v. Commonwealth, supra,* at 109.

Russell asserts that her "proposed language is what any trial court in Kentucky would read to a Kentucky jury in a murder prosecution." [DN 11, PageID # 471]. This is patently false

4

under Kentucky case law. In *Wellman v. Commonwealth,* 694 S.W.2d 696, 697 (Ky. 1985), there was *no evidence* that the defendant was acting under the influence of EED at the time of the offense. The holding in *Wellman* was that the Commonwealth is not required to prove the absence of EED if there is no evidence tending to prove its presence.

Moreover, an instruction on murder need not require the jury to find that the defendant was not acting under the influence of extreme emotional disturbance *unless there is something in the evidence to suggest that he was,* thereby affording room for a reasonable doubt in that respect. 694 S.W.2d at 697, quoting *Gall v. Commonwealth, supra,* at 109 (1980). (Emphasis added.) In summary, it is only once admissible evidence of EED is introduced that the absence thereof becomes an element of the offense of murder. Therefore, the presence of EED is a defense which bears upon the issue of the defendant's guilt of the charged offense. *Coffey v. Messer*, 945 S.W.2d 944, 946-947 (Ky. 1997).

To establish extreme emotional disturbance as an affirmative defense in a murder prosecution, a defendant must show a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes. *Park v. Commonwealth*, 413 S.W.3d 638 (Ky. App. 2012). The trial court is not required to give an instruction on extreme emotional disturbance when nothing in the record suggests that the accused was acting under the influence of extreme emotional disturbance. *Carwile v. Commonwealth*, 656 S.W. 2d722 (Ky. 1983). Russell's assertion that every trial judge in Kentucky gives a jury instruction on extreme emotional disturbance in every murder prosecution is unsupported by the law.

Russell cites a handful of federal cases for the proposition that "district courts in the Sixth Circuit have routinely used state law to define "murder" in murder-hire-cases, and the Court of Appeals has regularly noted this with approval. [DN 111, PageID # 472]. The United States does not disagree with the proposition that the elements of the crime of murder should be defined for the jury. Department of Justice prosecutors routinely submit proposed substantive instructions which do so:

> GOVERNMENT'S PROPOSED INSTRUCTION
> 1.5: Murder Defined
>
> For purposes of these instructions, the term "murder" means the following:
> (1) A premeditated and intentional killing of another; or
> (2) Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, ...to effect the death of any human being other than him who is killed.
>
> Source: T.C.A. § 39-13-202 and Title 18, U.S.C. §1111

*United States v. Johnson,* 2009 WL 3812304 (W.D.Tenn. 2009).

None of the cases cited by Russell, however, support her proposition that EED must be included as an element in the instruction to the jury defining the crime of murder. In *United States v. West*, 70 F. 4th 341, 345(6th Cir. 2023), West was indicted in the Eastern District of Michigan for conspiracy to use interstate commerce facilities in the commission of a murder-for-hire under 18 U.S.C. § 1958. After West's first trial ended in a mistrial, he was retried. The trial court had instructed the jury that a guilty verdict required finding that one or more members of the conspiracy had (1) "traveled in interstate commerce"; (2) "done so with the intent that a murder be committed"; and (3) "intended that the murder be committed as consideration for the promise or agreement to pay anything of pecuniary value." That was the extent to which the

court defined "murder" under Michigan law, a simple instruction of which apparently even Russell approves. *West*, 70 F.4th at 345.

In *United States v.* Watson, 852 F. App'x 164, 169 (6th Cir. 2023), on appeal, Watson raised two issues with the district court's instructions. First, Watson contended that the district court's definition of murder was flawed because it did not include the element "that the killing was not justified, excused, or done under circumstances that reduce it to a lesser crime." Mich. Crim. J.I. 16.1(6). However, Watson never argued any defenses to his murder of the victim, and the model instruction provided that this element "may be omitted if there is no evidence of justification or excuse, and the jury is not being instructed on manslaughter or any offense less than manslaughter." Accordingly, the district court properly instructed the jury on what constituted murder in violation of Michigan law. As in Kentucky, where the evidence does not support an instruction on manslaughter, an instruction on a lesser included offense may be properly omitted.

In *United States v. Acierno*, 579 F.3d 694, 699 (6th Cir. 2009), the Sixth Circuit noted that, in order to obtain a conviction under the federal murder-for-hire statute, 18 U.S.C. § 1958, the Government was required to prove that Defendant (1) caused a person to use any facility of interstate commerce, (2) with the intent that a murder be committed, in violation of the laws of Ohio, and (3) that the murder was to be committed as consideration for the promise or agreement to pay anything of pecuniary value. The only element which Defendant attacked on appeal was whether the Government established beyond a reasonable doubt that Defendant had promised or agreed to pay anything of pecuniary value as consideration for commission of the murder. *Acierno*, 579 F.3d at 699. While Russell cited the *Acierno* case with approval, one has to wonder

why since its' generic description of "murder…, in violation of the laws of Ohio" seems to lack the specificity which Russell insists is required.

Finally, in *United States v. Cottone*, on appeal, Cottone contended that the district court erred in instructing the jury on the elements of murder under Virginia law. The murder-for-hire statute under which Cottone was charged provided that it is unlawful "to use ... any facility in interstate ... commerce, with intent that a murder be committed in violation of the laws of any State of the United States." 18 U.S.C.A. § 1958(a). For the jury to decide whether Cottone intended that a murder that violated state law be committed, an instruction on the elements of murder under state law was not only appropriate but required. 928 F.2d 400 (4th Cir. 1991). And that is literally all the Fourth Circuit had to say on the matter of instructing the jury on the elements of murder under state law.

None of these cases stands for the proposition for which Defendant cites them: that the absence of extreme emotional disturbance is an element of the crime of murder under Kentucky state law, or conversely, the presence of the influence of extreme emotional disturbance negates the mens rea necessary to be found guilty of murder and that every jury in every homicide prosecution in Kentucky must be so instructed.

Russell asserts that the government's objection "urges the Court to give a generic (and frankly inauthentic) definition of "murder" when it instructs the jury. [DN 111, PageID # 476]. An inauthentic thing isn't what it's said to be. Unfortunately for Defendant, the proposed jury instruction tendered by the United States for 18 U.S.C. § 1958, included the following (frankly authentic) definition of murder:

> The Kentucky Penal Code provides that a person is guilty of murder when, with intent to cause the death of another person, he or she causes the death of such person or of a third person. KRS 507.020. Under the Kentucky Penal Code, a person acts intentionally with respect to a result or to conduct described by a

8

  statute defining an offense when his or her conscious objective is to cause that result or to engage in that conduct. KRS. 501.020.

[DN 80, PageID # 332].

  Russell's tendered instruction, advises the jury that "[a] person commits murder as defined by Kentucky law when he or she: (1) causes the death of another person, and (2) does so intentionally and not while acting under the influence of extreme emotional disturbance." [DN 92-1, Page ID # 374]. The tendered instruction, however, does not accurately set forth Kentucky law and is, at best, premature until the trial court determines that Defendant's proffered evidence of extreme emotional disturbance is relevant, admissible, and not strikingly like evidence of the sort of "justification" defense foreclosed by the Insanity Defense Reform Act and therefore likely to confuse the issues or mislead the jury.[1] At this juncture, the instruction tendered by the United States comports with the directives of *United States v. Carrillo*, 229 F. 3d 177 (2d Cir. 2000) which the Defendant cites so approvingly.

  III.  <u>Defendant's Summary of Admissibility of Hearsay Evidence is Incorrect.</u>

  Because the United States anticipates that the Defendant will choose to exercise her Fifth Amendment right not to testify at trial, but still attempt to offer evidence of her mental state, the United States flagged for the Court the potential evidentiary issue that Defendant may try to

---

[1] In the federal courts, diminished capacity may be used only to negate the *mens rea* of a specific intent crime. *United States v. Fazzini,* 871 F.2d 635, 641 (7th Cir.1989); *United States v. Twine,* 853 F.2d 676, 679 (9th Cir.1988). There are special concerns for relevance and potential jury confusion in the case of expert testimony regarding mental disease evidence offered to negate the intent element of an offense. Testimony about mental disease should not be allowed where it is offered to support the conclusion, or will mislead the jury into concluding, that the disease caused the defendant to commit the crime or otherwise impaired her ability to exert volitional control, or that the disease impaired the defendant's ability to reflect on the consequences of her conduct. *United States v. Ray*, 583 F. Supp. 3d 518, 535 (S.D.N.Y. 2022) (quoting *United States v. Dupre*, 339 F.Supp. 2d 534, 540-41 (S.D.N.Y. 2004). Thus, "if the risk that the jury will interpret the evidence to support an affirmative defense that is impermissible under the IDRA rather than to negate the *mens rea* element of the offense substantially outweighs the probative value of the evidence, it must be excluded." *United States v. Jones*, 2018 WL 1115778, at *5 (S.D.N.Y. Feb. 27, 2018).

backdoor evidence in through other witnesses that she "believed her ex-husband was abusing their children." Russell argues that such statements would be offered not to prove the truth of the matter asserted, but to prove the state of mind of the declarant and cites Federal Rule of Evidence 801(c) in support.

First, an opposing party's statement is not hearsay pursuant to Fed. R. Evid. 801(d)(2)(A). It is this rule which allows the United States to introduce out-of-court statements made by a defendant or by a coconspirator during and in furtherance of the conspiracy. *See* 801(d)(2)(E). A defendant may not, however, offer her own out-of-court statements in evidence because they are hearsay and not subject to the exceptions in 801(d)(2). Defendants frequently, however, attempt to do an end run around this evidentiary rule at trial to get into evidence out-of-court statements made to others while wrapping themselves in the protection of the Fifth Amendment.

Russell apparently believes that out-of-court statements made by Russell to others that she believed her former husband was abusing their children would be admissible as non-hearsay because "where the statement if offered to prove the state of mind of the declarant, that statement is not being offered for the truth of the matter asserted." [DN 111, PageID # 477]. Surprisingly, none of the cases cited by the Defendant support this proposition.

In all but one instance, the out-of-court statements at issue were statements made by crime victims that were offered to show their state of mind before they became victims. In *United States v. Mayhew*, 380 F. Supp. 2d 961 (S.D. Ohio 2005), letters written and addressed to her mother by alleged murder victim before her death were not hearsay, for purposes of determining their admissibility in prosecution of defendant on federal kidnapping and murder

10

charges, since letters were not to be offered for truth of statements made therein, but for limited purpose of demonstrating victim's state of mind at time of alleged kidnapping.

In *United States v. Williams, 952 F.2d 1504* (6th Cir. 1991), testimony that politically powerful sheriff had told the witness that he was not opposed to zoning which witness sought, testimony by witness that he had been told that another official would not support the project unless the sheriff supported it, testimony that the witness had been told by two persons that they did not believe that sheriff was against the zoning, testimony that a deputy sheriff told another public official that the sheriff approved of the rezoning, and testimony that one of the property owners had said that the sheriff wanted money in order to approve the zoning was not hearsay, as it was not admitted to prove the truth of the matter asserted but, rather, to establish the state of mind of the victims of extortion.

In *Anthony v. Dewitt*, 295 F.3d 554 (6th Cir. 2002), a government witness' testimony that defendant's coconspirator asked her to accompany defendant to murder victim's apartment to knock on door so that defendant could talk to victim about dropping theft charges she filed against coconspirator, and that coconspirator threatened witness' life if she told anyone what happened on night of murder, did not constitute hearsay, so that admission of testimony in defendant's murder prosecution did not violate confrontation clause of the Sixth Amendment; out-of-court statements were necessary to explain witness' actions before murder and her inaction in approaching authorities afterwards, and they were not offered to prove the truth of the matter asserted.

Finally, in *United States v. Hanson*, 994 F.2d 403 (7th Cir. 1993), the only case cited by Defendant in which an out-of-court statement was offered by the defense, the statement at issue was purportedly made by defendant's employer to the defendant and it was offered not for the

11

state of mind of the declarant but the state of mind of the defendant. The evidence was excluded at trial and on appeal the court concluded the ruling was harmless as the defendant husband's guilt on filing incomplete tax returns was overwhelming.

The United States flagged this evidentiary issue for the Court because where it is most likely to come up at trial is if Defendant's expert witnesses attempt to offer evidence about what Defendant told them or what Defendant "believed." Testimony regarding what Russell "believed" is not expert testimony at all. It is a regurgitation of the defense uttered through the mouth of an expert. If the defense wishes to put on evidence regarding Russell's beliefs, assuming that such evidence is relevant, it can do so through testimony from Russell who can be subject to cross-examination. It would only confuse the jury and prejudice the United States for Defendant's expert to reiterate what would otherwise be considered hearsay and attach to it the expert label.

IV.     The Third Circuit's *Yung* case is inapplicable to the stalking instructions.

Russell tendered jury instructions defining intent to "intimidate," for purposes of the stalking charge in Count 2, as acting with the specific intent or purpose of putting a person in fear of death or bodily injury, and intent to "harass" as acting with the specific intent or purpose of causing distress by a "true threat," and a "true threat" as "a serious threat expressing an intent to commit an act of unlawful violence against the person."

Defendant relies exclusively on the "careful and persuasive" holding in *United States v. Yung*, 37 F. 4th 70 (3rd Cir. 2022). AS the Third Circuit Court of Appeals recounted the facts:

> Yung wanted to go to Georgetown Law. He had good grades and strong test scores. Georgetown invited him to interview with an alumnus. But that interview went poorly. Yung thought his interviewer was insensitive and rude. And a few weeks later, Georgetown rejected him. Though Yung eventually got into a good law school, Georgetown's rejection still stung. So, a year later, he struck back against the interviewer. [Among other things] he launched a cyber-campaign: he

12

>created fake obituaries for the interviewer's wife and son; social-media profiles littered with Ku Klux Klan content in the interviewer's name; and blog posts as the inter-viewer, bragging about raping women, a boy, and an eight-year-old girl. A Google search of the interviewer's name revealed thousands of similar posts.

The opinion details additional, subsequent steps Yung took in his cyber-campaign against the interviewer.  Yung was ultimately charged with cyberstalking. 18 U.S.C. §§ 2261A(2)(B) & 2261(b). Faced with a mountain of evidence, he challenged the cyberstalking law as overbroad under the First Amendment. But when that challenge failed, Yung pleaded guilty. Though he waived most of his right to appeal, Yung reserved his right to appeal the overbreadth ruling.

On appeal, Yung revived his overbreadth challenge under the First Amendment. His case did not involve jury instructions actually given by the district court to a jury.  While Yung challenged the cyberstalking statute as overbroad, he did not argue that it was improper as applied to him because even the *Yung* opinion recognized that ***the First Amendment does not protect defaming a private person.*** And ultimately, the Third Circuit concluded that the statute was not unconstitutionally overbroad.

Russell ignores the other cases, including Sixth Circuit law, addressing how the terms "harass," "intimidate," and "substantial emotional distress" should be defined. These terms are not defined in the statute. As of June 2015, four circuits—the 6th, 4th, 9th, and 5th—had found that 2261A was not unconstitutionally vague.  To the government's knowledge, a vagueness challenge has not been sustained in any court.

In *U.S. v Bowker*, 372 F.3d 365, 372 (6th Cir. 2004), rev'd on other grounds, the court ruled that these terms "can be ascertained fairly by reference to judicial decisions, common law, dictionaries and the words themselves, because they possess a common and generally accepted meaning." (citing *Staley v. Jones*, 239 F3d 769 (6th Cir. 2001)).

13

In *United States v. Shrader*, 675 F.3d 300, 310 (4th Cir. 2012), the court found that a "common sense reading of the statute adequately defines the prohibited conduct. 'Harass' and 'intimidate' are not obscure words." Moreover, the court found that 2261A's intent requirements weighed against striking down the statute on vagueness grounds, since "'a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.'" *Shrader*, 675 F.3d 311 (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499 (1982)).

In *United States v. Conlan*, 782 F.3d 380, 386 (5th Cir. May 14, 2015), the 5th Circuit found that 2261A "need not define 'harass' and 'intimidate' because they are not obscure words and are readily understandable by most people. Any vagueness concerns are further alleviated by the list of easily understood terms surrounding 'harass' and 'intimidate'—'kill, injure . . . or cause substantial emotional distress'—and by the statute's scienter requirement, which narrows its scope and mitigates arbitrary enforcement."

Russell's tendered instruction, that intent to "intimidate" means to act with the specific intent or purpose of putting a person in fear of death or bodily injury, or that to "harass" requires expression of an intent to commit an act of unlawful violence narrows the meaning of those words unnecessarily and without support in either the statute or case law.

Respectfully submitted,

MICHAEL A. BENNETT
United States Attorney

/s/ Marisa J. Ford
Marisa J. Ford
Assistant United States Attorney
717 West Broadway
Louisville, Kentucky 40202
(502) 582-5930
