Russell, Stephanie
Date of report 4/23/2023

AMY J. TRIVETTE, M.D.
P.O. Box 676
LaGrange, KY 40031
Telephone (502) 724-5941

## FORENSIC EVALUATION

**NAME:** Russell, Stephanie
**DOCKET NUMBER:** 3:22-CR-58-DJH
**DATE OF BIRTH:** _____, 1970
**DATE OF EVALUATION:** 3/29/2023
**DATE OF REPORT:** 4/23/2023

### IDENTIFYING INFORMATION:

Dr. Stephanie Russell is a fifty-two-year-old, divorced, Caucasian female who was indicted for Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire on 6/15/2022 related to events that allegedly occurred between July, 2021 and May, 2022 in violation of Title 18, U.S.C., Sections 1958. According to Orders dated 2/14/2023 and 3/03/2023, United States District Court Judge David J. Hale ordered this evaluation pursuant to Title 18, U.S.C., Section 4241 to determine Dr. Russell's history and present symptoms, diagnosis, prognosis, and whether she suffers from any mental disease or defect or any other mental condition bearing on the issue of guilt.

### SOURCE OF REFERRAL:

This evaluator was contacted in February, 2023 by Assistant United States Attorney Marisa Ford for the purpose of requesting a forensic mental health evaluation of Ms. Stephanie Russell, date of birth    /1970.

### REFERRAL ISSUE:

Pursuant to Federal Rule of Criminal Procedure 12.2(c)(1)(B), this examiner completed a forensic mental health evaluation of the respondent to aid the Court in determining Ms. Stephanie Russell's history and present symptoms, diagnosis, prognosis, and whether she suffers from any mental disease or defect or any other mental condition bearing on the issue of guilt.

### STATEMENT OF NONCONFIDENTIALITY:

Ms. Stephanie Russell was informed that she was being evaluated pursuant to a court order and advised of the limits of confidentiality. It was explained to her that a written report would be prepared and forwarded to the Court. She was informed that testimony of this evaluator may be required. She verbalized understanding and indicated a willingness to cooperate with portions of the evaluation.

Russell, Stephanie
Date of report 4/23/2023

## SOURCES OF INFORMATION:

1) Interview of Stephanie Russell on 3/29/2023.
2) Results of psychological testing administered and interpreted by Martine Turns, PsyD., licensed psychologist on 3/29/2023.
3) Criminal Complaint and Supporting Affidavit, *United States v. Stephanie Russell,* Case Number 3:22-CR-58-DJH, dated 5/19/2022.
4) Indictment, *United States v. Stephanie Russell,* Case Number 3:22-CR-58-DJH, dated 6/15/2022.
5) Order, *United States v. Stephanie Russell,* Case Number 3:22-CR-58-DJH, dated 3/03/2023.
6) Videos of Stephanie Russell and unknown female Confidential Source.
7) Text Messages exchanged between Stephanie Russell and FBI employee.
8) Phone calls between Stephanie Russell and FBI employee.
9) Order of Immediate Temporary Custody, *Ricky Crabtree v. Stephanie Russell,* Case Number 18-CI-501606, Jefferson Circuit Court, Family Division 10, dated 6/30/2020.
10) Child Custody/Access Evaluation of Stephanie Russell by Kelli Marvin, Ph.D., dated 7/24/2020.
11) Narrative Report: Crabtree v. Russell by Kelli Marvin, Ph.D., dated 8/02/2020.
12) Conclusions & Recommendations: Crabtree v. Russell by Kelli Marvin, Ph.D., dated 8/12/2020.
13) Forensic Timeline by Kelli Marvin, Ph.D.
14) Findings of Fact, Conclusions of Law, and Custody Decree, *Ricky Crabtree v. Stephanie Russell,* Case Number 18-CI-501606, Jefferson Circuit Court, Family Division 7, dated 1/31/2022.
15) Independent Psychiatric Evaluation by Walter Butler, J.D., M.D., dated 12/16/2022.
16) Independent Psychological Evaluation by Wayne Harper, Ed.D., dated 12/16/2022.

## PAST HISTORY:

The following information was provided by Dr. Russell, unless otherwise specified. Throughout the assessment, she was calm and cooperative with evaluation procedures, except that she declined to discuss the alleged offense. She related general awareness that an evaluation was ordered, but said she expected to be transferred back to Oldham County Detention Center for it. She unsuccessfully attempted to contact her attorney, Scott Cox, prior to any discussion of the alleged offense.

### *PERSONAL HISTORY:*

Dr. Russell reported she was born in Honolulu, Hawaii on 11/30/1970 as the only child produced by the married union of her parents. Her father was stationed in the Navy there, but the family returned to Pleasant Ridge, Kentucky prior to her parents divorcing when she was around 2 years old. After leaving the Navy, her father worked in freelance photography and carpentry. Her mother worked for the phone company. Her father relocated to Michigan, remarried once or twice, and had no other children. Her mother remained in Kentucky, and remarried when Dr. Russell was young. She referred to this man as "dad." They had one son who is 8 years younger

Russell, Stephanie
Date of report 4/23/2023

*PERSONAL HISTORY (continued):*

than Dr. Russell and who practices psychiatry in California. Dr. Russell said she was raised in Kentucky, primarily by her maternal grandparents who lived next door and "hung the moon." She described her grandmother as her "best friend" which was "hard" for her mother with whom she did not have a close relationship. She visited her father in Michigan for a couple of weeks in the summer for a few years until she was adopted by her stepfather.

She related infrequent contact with her father as an adult, and said he passed away one to one and a half years ago. She did email her paternal grandmother regularly until she was arrested. Her mother and adoptive father divorced when Dr. Russell was in her 20's, and she noted no contact with him after he and her maternal grandfather "got into it and I took my grandfather's side." Her mother is healthy and living independently. She said they "talk some." She does not talk to her half-brother often either.

She described her childhood as "fantastic." She did not report any history of abuse or neglect. However, her mother told her that her father "took me to get her back" when she was an infant. She said she was placed in foster care or with an aunt briefly until the court date when she was returned to her mother. She went to a babysitter's home across the street from school until age 8. Then, she started going to her grandparent's home after school and during summers for childcare. She described being raised on a farm with livestock, riding her bike, swimming, gardening, and attending church. Her grandparents had a trucking business, and she denied any financial problems with the family. She did not report childhood behavior problems, and described herself as "angelic, perfect." She left home at age 17 to attend Western Kentucky University, and she has lived in Kentucky since.

*EDUCATIONAL HISTORY:*

Dr. Russell graduated Ohio County High School and Western Kentucky University cum laude with double majors in chemistry and biology and a minor in mathematics. She had a final GPA of approximately 3.7. She completed one year of research at University of Kentucky prior to matriculating to University of Louisville School of Medicine. She graduated in the top one third of her class and completed Residency in Pediatrics at University of Louisville in 2000. In school, she participated in cheerleading, gymnastics, Fellowship of Christian Athletes, and 4-H Club. She was a sociable youth who dated and had a boyfriend. She did not report behavior problems in school, and denied ever being suspended or expelled.

*MILITARY HISTORY:*

Dr. Russell has not served in the military.

*EMPLOYMENT HISTORY:*

Dr. Russell previously worked in babysitting, washing cars at her grandfather's trucking business, retail in a department store, tutoring, research, as a teacher's assistant in a laboratory, and pathology assistant. Her longest period of employment has been 22 years as a pediatrician.

SR-18

Russell, Stephanie
Date of report 4/23/2023

## *EMPLOYMENT HISTORY (continued):*

She was working full time in a practice she owned prior to arrest. She has never received disability benefits.

## *MARITAL HISTORY:*

Dr. Russell married once and is currently divorced. They were involved for about 10 years, married in October 2015, and separated intermittently beginning in 2016. She was unable to recall the year they divorced. Her ex-husband is the victim of her alleged crime. They have two children, a 7-year-old son and a 2-year-old daughter, who were the product of in vitro fertilization and not his biological children. She was involved with her high school boyfriend for 3 years, and she said the relationship ended when he refused to study in college and "I didn't want to be his mother." She said the "love of my life" ended a relationship after 7 years when she was in her early 30's because of racial/ethnicity and religious differences. Her children currently live with her ex-husband. She has no other children. Prior to arrest in May 2022, she was living alone in Louisville with her dog and two cats, and saw her children three times weekly. She spent her time working and enjoyed crocheting, crafts, refurbishing items, reading, and spending time with friends.

## *FAMILY HISTORY:*

Dr. Russell denied any family history of mental illness, suicide attempts, or substance abuse.

## *PAST MEDICAL HISTORY:*

Dr. Russell reported being diagnosed with multiple sclerosis after a "small lesion" was noted on brain MRI after an episode of diplopia. However, she denied experiencing any symptoms except for that event. She also noted a thyroid nodule, occasional migraines, and developing hypertension since arrest. She underwent two cesarean sections, breast reduction, bilateral bunion removal, and wisdom teeth extraction. She has been pregnant twice, both complicated by pre-eclampsia. The first delivery was via cesarean section due to failure to progress. The second occurred at 34 weeks, also via cesarean section due to pre-eclampsia.

She currently takes Norvasc 10 mg daily, Hydrochlorothiazide 12.5 mg daily, and Prozac 40 mg daily.

## *PSYCHIATRIC HISTORY:*

Dr. Russell reported no psychiatric admissions, but said she saw a grief counselor after her grandfather died. She attended marital counseling with her ex-husband a few times years ago, and was attending court ordered therapy prior to arrest. She did not report any history of being prescribed psychiatric medications, but noted taking samples of "something with this custody mess...I couldn't sleep." She was unable to recall the name of the medication. In October 2022, she requested Prozac for "stress" while at Oldham County Detention Center, and it was prescribed without further assessment. A couple of weeks prior to this evaluation, she asked for

Russell, Stephanie
Date of report 4/23/2023

*PSYCHIATRIC HISTORY (continued):*

the dose to be increased, and it was changed without seeing anyone. She did not report a history of suicide attempts or self-injurious behavior.

*SUBSTANCE USE HISTORY:*

Dr. Russell denied any history of alcohol or drug use.

*LEGAL HISTORY:*

Dr. Russell reported no prior arrests. She was sued once, but successfully defended herself at trial. She initially filed for divorce, but reconciled after she was told her husband would likely get joint custody of their son. After having their daughter, she said he filed for divorce before her, and child custody dispute proceedings began in 2018. She expects those proceedings to continue after the criminal charge is resolved.

**COLLATERAL INFORMATION:**

In the Child Custody/Access Evaluation of Stephanie Russell by Kelli Marvin, Ph.D., dated 7/24/2020, Dr. Russell reported no contact with her mother for years and regular contact with her half-brother which was inconsistent with text messages supplied by her ex-husband. Indeed, her brother noted she was "not always truthful." During CPS investigations, she was described as "dishonest and deflective." Medical records and a letter from Neurologist Jeffrey Cohen, M.D. document multiple lesions suggestive of Multiple Sclerosis, but "burden of disease is deemed to be mild" and "very unlikely that Dr. Russell has significant cognitive impairment." Dr. Cohen further noted allegations that "sporadic and volatile interactions of the parties" were a result of Multiple Sclerosis were "not viable." Regarding the divorce and custodial situation, Dr. Russell reported limited intimacy after the marriage that, in retrospect, she speculated was a result of him being a "pedophile." She described "cognitive slippage" and personality changes in her ex-husband after the birth of their first child. He was diagnosed with a Mild Cognitive Impairment and prescribed Aricept. She filed for divorce in 2017, but reconciled after the mediator informed her she would not likely gain sole custody of the child. She said her ex-husband was not helpful with the children after their daughter was born. He "became increasingly aggressive and physically abusive." She described him grabbing and twisting her arm, shoving her into a refrigerator while she was holding a child, and being arrested for assaulting her in October, 2018. He filed for divorce in 2018 and moved into the former family home.

She said he threatened, "I will destroy you, I will bankrupt you, I will take you down." She said he displayed "odd and possibly paranoid behaviors" as evidenced by installing a camera in their home, possibly "bugging" her medical office (because he knew information only available there), and accused her of attempting to hire someone to kill him. She alleged he was emotionally, physically, and sexually abusing the children, and medically negligent/neglectful of them. She complained that CPS, detectives, court officials, and evaluating physicians were "unfairly biased against her" and provided "impressively misleading" information to Dr. Marvin regarding some of those interactions. Dr. Marvin noted text/video evidence refuting Dr.

Russell, Stephanie
Date of report 4/23/2023

## COLLATERAL INFORMATION (continued):

Russell's claims that her ex-husband was not involved in caregiving of the children. Dr. Russell also alleged her ex-husband used his financial and political affiliations to "bias these proceedings in his favor," and that he presented a danger to the children due to his Mild Cognitive Impairment. Dr. Russell displayed college level reading ability on the Wechsler Individual Achievement Test, Third Edition. On the Minnesota Multiphasic Personality Inventory-2-Restructured Form, her responses produced no clinical elevations suggestive of severe mental illness. The Child Abuse Potential Inventory revealed a valid and non-abusive profile.

In the Narrative Report: Crabtree v. Russell, dated 8/02/2020, Dr. Marvin notes 7 requests for Emergency Protective Orders that were all dismissed or denied, 31 CPS reports that were all found to be unsubstantiated, and 8 medical investigations conducted by the Division of Pediatric Forensic Medicine that were all found to be false. Indeed Pediatric Forensic Medicine expressed concerns for Pediatric Condition Falsification defined as "fabrication or exaggeration of injuries or maltreatment to the children to achieve a secondary goal" by Dr. Russell. According to Friend of the Court Rosalie Guthrie, Dr. Russell "openly solicited others to find a way to kill" her ex-husband and "personality may not admit subordination to the law if she is unsatisfied with the outcome of this case." School staff expressed concerns that Dr. Russell was "leading" her child to make abuse allegations and seemed "happy" to see his father. During forensic interviews with the older child, there were no allegations of sexual abuse and he reportedly stated, "My mommy is not telling the truth…My daddy is telling the truth." Police investigators concluded that her ex-husband was not abusing the children, but that "all evidence indicates that it is the respondent Russell who has engaged in emotional abuse to the children" by "instilling false beliefs in the children." In summary, they noted she "lied, manipulated, misled, and misrepresented" and has "no credibility." Dr. Marvin and Vinod Rao, M.D. from Pediatric Forensic Medicine expressed concerns for coaching in videos Dr. Russell took of her son making allegations of sexual abuse. When confronted regarding evidence to support her ex-husband's allegations that she attempted to generate false allegations, she conceded, "I used to do that…I don't do that anymore." However, she displayed a "dismissive stance regarding the obvious distress her behavior has caused" the children and her ex-husband.

According to the Conclusions & Recommendations: Crabtree v. Russell by Kelli Marvin, Ph.D., dated 8/12/2020, Dr. Russell was diagnosed with Other Specified Personality Disorder, with Narcissistic and Antisocial Traits. Dr. Marvin also referenced Histrionic and Borderline "qualities are present but are less pronounced." She concluded, "Should this Court find that respondent Russell engaged in the combined acts listed above [in the service of an overall goal of 'alienation'], she is an extremely rare and pathological mother." She noted "internal and external inconsistencies" in Dr. Russell's reports, "manipulations; exaggerations; well-times displays of emotion…; subtle flattery of the undersigned's professional prowess…and partial truths, as well as lies of omission and commission." In summary, Dr. Marvin stated that Dr. Russell "engaged in a deliberate, premeditated, and, frankly, 'diabolical' campaign to convince, in particular, the toddler age subject child     that he is the victim of multiple forms of abuse perpetrated by the petitioner/his father." She recommended that Dr. Russell's ex-husband maintain sole custody of the children and that the children have only supervised visitation with Dr. Russell. She further recommended Dr. Russell begin Psychotherapy with Ida Dickie, Ph.D.

SR-21

Russell, Stephanie
Date of report 4/23/2023

**COLLATERAL INFORMATION (continued):**

In the Forensic Timeline, Kelli Marvin, Ph.D. notes, "The extent to which SR [Dr. Russell] misused public funds and professional services is profound…this is diagnostic."

An Order of Immediate Temporary Custody granted temporary custody of the children to Dr. Russell's ex-husband on 6/20/2020.

The Findings of Fact, Conclusions of Law, and Custody Decree dated 1/31/2022 awarded full custody to Dr. Russell's ex-husband, deemed Dr. Russell unfit to be their legal custodian, and allowed her only 2 hours of supervised visitation 3 times per week. The Court also ordered her to pay $100,000 in legal fees to her ex-husband.

According to the Criminal Complaint, between July 2021 and May 2022, Dr. Russell approached multiple individuals to solicit someone to murder her ex-husband, Rick Crabtree, in exchange for $4000. She reportedly told a witness that Mr. Crabtree sexually abused their children. She allegedly purchased a cell phone to discuss the murder-for-hire plot and utilized "flowers" as code for murder. A witness connected her with an undercover FBI agent. Calls and text messages between them were preserved, and reveal she agreed to pay $7000 in exchange for the murder of her ex-husband being staged to appear to be a suicide. On 5/18/2022, she left half of the amount in a drop box outside of her business for the undercover investigator.

According to an Independent Psychological Evaluation by Wayne Harper, Ed.D., dated 12/16/2022, Dr. Russell was assessed on 7/30/2022 and 11/26/2022. She reported deciding to end her marriage due to her ex-husband's "judgment was off…left the stove on…left the baby gate to the stairs open…left the door open…left his Adderall pills on the floor and   found them." He referenced testimony from Kelli Marvin, Ph.D. stating that Dr. Russell displayed Antisocial and Narcissistic traits. On the Test of Memory Malingering, the Word Choice test from the Wechsler Advanced Clinical Solutions protocol, and the Reliable Digit Span, her responses did not indicate malingering of cognitive deficits. She obtained a standard score of 120 in sentence comprehension on the Wide Range Achievement Test-5. On the Kaufman Brief Intelligence Test-II, she earned a composite score of 116 with verbal score of 110 and visual spatial score of 120. On the Personality Assessment Inventory, her responses suggested a desire to be viewed in a favorable light. A single elevation was noted in trauma-related symptomatology with some depressed mood and transient thoughts of suicide. On the Millon Clinical Multiaxial Inventory-III, she displayed a tendency toward social desirability, but endorsed depression, anxiety, and trauma. Results of the Evaluation of Competency to Stand Trial-Revised suggested no impairment in her ability to consult with an attorney or rationally participate in her defense. Dr. Harper noted she met criteria for Post-Traumatic Stress Disorder, Major Depression with "accompanying melancholia and anxious distress," and "personality compromise is seen along the Obsessive-Compulsive/Histrionic/Narcissistic pathways." He stated that individuals with this profile "when confronted with profound levels of situational stress and distress,…defend through significant compartmentalization." He proposed an "alternate hypothesis" to Dr. Marvin with suggestion that Dr. Russell "became delusional…her husband as dangerous to her children."

**SR-22**

Russell, Stephanie
Date of report 4/23/2023

## COLLATERAL INFORMATION (continued):

Independent Psychiatric Evaluation by Walter Butler, J.D., M.D., dated 12/16/2022, indicates Dr. Russell was evaluated 7/30/2022. Dr. Butler noted no current evidence of psychosis or mania. He opined Dr. Russell "deteriorated to the point of a delusional psychosis under increasing intensities of stress and distress related to a very contentious custody battle in which she saw her husband as dangerous to her children." He compared it to a "road rage state of mind."

## PSYCHOLOGICAL TESTING:

A psychological test battery was administered and interpreted by Martine Turns, Psy.D., to assist this examiner with assessment of symptom presentation and current psychological and cognitive status. Her findings are noted below in italics:

*Psychological consultation was requested by Amy Trivette, M.D., for Stephanie Russell, age 52. Psychological testing was performed on March 29, 2021. All tests were administered by Martine Turns, Psy.D. These test scores are interpreted blind to a complete review of all medical records associated with this case. Medical conclusions will be clinically correlated by the requesting physician and an opinion will be provided.*

### *RECORDS REVIEWED*

1. *Forensic Report, authored by Walter Butler, M.D., dated December 16, 2022.*
2. *Child Custody/Access Evaluation Crabtree v. Russell, authored by Kelli Marvin, Ph.D., dated 7/24/2020.*

*Confidentiality:*

*Dr. Russell was informed of the nature of the current evaluation and the limits of confidentiality associated with this assessment. She verbalized understanding of this information and agreed to complete the assessment.*

*Diagnostic Interview/Mental Status during testing*

*Dr. Russell completed the assessment in a meeting room at the Grayson County Detention center on March 29, 2023. She was fully cooperative with testing and able to understand test instructions and requirements. Psychological testing was completed in approximately one hour. She was fully engaged in the evaluative process.*

*Prior to testing, Dr. Russell was asked some basic questions regarding current psychiatric symptoms. Regarding self-reported mental health symptoms, she described her mood prior to testing as "grouchy." She elaborated that she did not want to eat her lunch without being provided a beverage, so she did not eat prior to our meeting. Her affect was initially mildly annoyed about the lunch issue, but she was polite and appropriate throughout our time together. She denied any current or previous problems controlling her anger. She rated her feelings of sadness on the day of the evaluation as a "5 or 6" out of 10 (0= no sadness; 10 = severe*

- 8 -

SR-23

Russell, Stephanie
Date of report 4/23/2023

## PSYCHOLOGICAL TESTING (continued):

*sadness). She reported her depressive symptoms started amidst divorce proceedings and she did not have any problems with depression prior to that. She said that she has lost about 15 pounds in 9 months. She described her self-esteem as "it's okay." She reported sleep problems and related this to anxiety related dreams. She reported guilt related to her children. She denied hopelessness, suicidal or homicidal ideation, or any history of self-injury or suicide attempts. She reported anxiety related to her current legal situation. She did not describe any periods of time that would be consistent with a manic episode. She denied any current or previous difficulties with auditory or visual hallucinations or substance use issues.*

*She reported a history of suspiciousness related to her ex-husband. She related that most of her problems are due to her legal situation. She related that Prozac (currently prescribed) has helped manage her psychiatric symptoms. Dr. Russell did not describe any history of trauma that would meet criteria for a trauma related anxiety disorder. She denied feelings of self-importance/entitlement, preoccupation with success or power, lacking in empathy, or arrogance. She reported a turbulent relationship with her ex-husband but not with others.*

## *PSYCHOLOGICAL TESTING*

*The following tests were administered:*

1. *Wide Range Achievement Test, Fifth Edition - (**WRAT-5**) Reading subtest*
2. *Rey 15 Item Figure Memory Test (**Rey-15**) for cognitive effort and validity*
3. *Hopkins Symptom Checklist 90-Revised (**SCL90-R**)*
4. *Trail Making Test*
5. *Beck Depression Inventory (**BDI-II**)*
6. *Personality Assessment Inventory (**PAI**)*
7. *Structured Inventory of Malingered Symptomology (**SIMS**)*
8. *Miller Forensic Assessment Test (**M-FAST**)*
9. *Modified Wisconsin Card Sorting Test (**M-WCST**)*

## *PSYCHOLOGICAL TEST RESULTS*

## *EFFORT AND VALIDITY*

*On the <u>Rey 15 Item Figure Memory Test</u> (Recall), a test of cognitive effort, Dr. Russell achieved a score that fell within the **acceptable** range. On part two of the Rey 15 (Recognition), she achieved a score that fell within the **acceptable** range. The total combined score of 30 out of 30 fell within the **acceptable** range.*

**SR-24**

Russell, Stephanie
Date of report 4/23/2023

## PSYCHOLOGICAL TESTING (continued):

### *ATTENTION AND CONCENTRATION*

*Trail Making Test*

On the *Trail Making Test, Part 1*, a simple test that requires the ability to count from one to twenty-five, intact visual scanning abilities and intact ability of the dominant hand, she achieved the following score when corrected for age and education: T-Score = 61 (Above Average range).

### *EXECUTIVE FUNCTION*

On the *Modified Wisconsin Card Sorting Test* (M-WCST), a test of abstract reasoning and a test of the ability to shift cognitive strategies in response to changing environmental contingencies, Dr. Russell achieved T-score of 51 on perseverative errors (Average range) and a T-score of 45 on total errors (Average range). She achieved a standard score of 97 (Average range) on the Executive Function Composite. These scores contraindicate executive functioning deficits.

On the *Trail Making Test, Part 2*, which requires all the requisites of *Trail Making Test, Part 1*, plus additional abilities of divided attention and cognitive flexibility; she achieved the following score when corrected for age and education: T-Score = 55 (Average range)

### *MEASURES OF PSYCHOLOGICAL SYMPTOM DISTORTION/Malingering*

On the *Symptom Checklist 90-Revised* (SCL-90-R) Positive Symptom Total, she achieved a raw score of 22. This score falls within the **acceptable** range. This score indicates honest symptom reporting.

The *Miller Forensic Assessment of Symptoms Test* (M-FAST) is a screening measure designed to provide information regarding the probability that an individual is malingering symptoms of mental illness. The M-FAST queries the presence of 25 "symptoms" that are extremely rare in legitimate mental illness (regarding presence, severity, or combination with other symptoms). Dr. Russell achieved a total score of 0 that did not exceed the recommended cut score above which was found to indicate feigning of psychiatric symptoms in the normative sample. As such, there was no evidence of feigning on this measure.

The *Structured Inventory of Malingered Symptoms* (SIMS) is a 75-item malingering screening measure used in clinical and forensic settings. The items compose five scales and a total score. The five primary scales consist of: 1) Psychosis (P), 2) Neurologic Impairment (NI), 3) Amnestic Disorders (AM), 4) Low Intelligence (LI) and 5) Affective Disorders (AD). On this measure, Dr. Russell achieved a **total score** of 3. Scores greater than 14 suggest the presence of malingering. However, in forensic settings a more conservative cut score of 24 is typically utilized (Wisdom et al., 2010).

SR-25

Russell, Stephanie
Date of report 4/23/2023

## PSYCHOLOGICAL TESTING (continued):

### *PSYCHOLOGICAL FUNCTIONING*

*Dr. Russell completed the **Symptom Checklist 90-R**, a screen for psychological symptoms. Profile elevations were noted in the areas of anxiety and depression with general symptomatic distress levels to be low average to average, suggesting good psychological integration and little global psychological distress overall. Levels of obsessive-compulsive symptoms were at normative mean levels and essentially unremarkable. Slight suspiciousness of others was not outside the ordinary range. Sleep disturbance should be further explored.*

*Results of the **Beck Depression Inventory** (BDI-II) indicated current symptoms of depression. Her score of 17 fell within the mild range.*

*Dr. Russell completed the **Personality Assessment Inventory (PAI)** a self-administered test of personality and psychopathology used in clinical and forensic settings. A review of the validity scales indicated that she approached the test with a slight tendency to portray herself as relatively free of common shortcomings to which most individuals would admit (PIM = 64) and she appears somewhat reluctant to recognize minor faults in herself. Some idiosyncratic responding was also noted (INF = 63). Though technically valid, some score elevations might under-represent significant findings in certain areas due to her tendency to avoid negative or unpleasant aspects of herself. There were no marked elevations that would suggest clinical psychopathology. Despite the level of defensiveness noted, there are some areas of greater intensity than is typical of defensive respondents. These areas included impact of traumatic events, unhappiness, physical signs of depression/and or transient depressive symptoms, helplessness, tension, and apprehension. Responses related to self-concept suggest a rather negative self-evaluation. However, she also reported good social support, an autonomous and balanced interpersonal style, and a reasonably low stress environment at present.*

### *SUMMARY*

*Based on tests of effort, Dr. Russell's approach to psychological testing was valid and test results should be considered a reliable estimate of her current cognitive functioning. Results of the cognitive assessment contraindicated any current deficits in executive functioning or attention/concentration. Based on collateral information, Dr. Russell functions within the above average range of cognitive ability.*

*On objective measures, validity scales suggested some defensiveness regarding current psychological symptoms. With that consideration in mind, results of the current assessment indicate that Dr. Russell likely experiences mild and/or transient symptoms of anxiety and depression that are likely exacerbated by situational stressors but appear to be reasonably managed by her current medication regimen at this time. Based on her self-report, these concerns developed amidst divorce proceedings a few years ago and were not present prior to that time. I will defer to Dr. Trivette to provide medical conclusions in that regard.*

Russell, Stephanie
Date of report 4/23/2023

## INTERVIEW:

Dr. Stephanie Russell was interviewed individually for one hour and forty-five minutes on 3/29/2023. She took a fifteen minute break to attempt to contact her attorney. The interview was initiated with a review of the purpose of the evaluation and limits of confidentiality, as noted above. There was no evidence of malingering or symptom exaggeration throughout the assessment.

Dr. Russell was evaluated individually in a small interview room at Grayson County Detention Center. She was dressed in standard jail attire. She was calm, coherent, and cooperative, except that she declined to discuss details of the alleged crime. She related requesting Prozac for "stress" in October 2022 while housed at Oldham County Detention Center. In mid-March 2023, she requested an increased dose for "bad dreams, crying...I don't see my kids in jail...hard to fit in here," and was prescribed 40 mg every night. She denied medication side effects and stated, "I wish I had taken it 5 years ago...helps with stress." She described her mood as "OK, hanging in there." She noted sleep disruption due to the lights remaining on all night and noise, and related sleeping perhaps 6 hours per night. She described her appetite as "fair" but noted 15 pound weight loss since arrest. She denied suicidal or homicidal ideation, plan, or intent. She related wanting to live for her children and "this has to be over." She contracted for safety to inform someone if she felt suicidal or homicidal. She did not report hallucinations, delusions, or other symptoms of psychosis. She complained about delays in the trial due to mental health evaluations. She noted few activities in jail, "don't do anything, no sun." She related living in a nine person cell with bunk beds and no significant problems with peers. She reported daily contact and support from her office manager, "the mother I wish I had."

## MENTAL STATUS EXAMINATION:

Dr. Russell presented dressed neatly in standard jail attire. She appeared her stated age. Gait was steady. No psychomotor abnormalities were noted. Personal hygiene was good. Eye contact was intact. Speech was normal rate and tone. On cognitive examination, she was alert and oriented to person, place, time, and situation. Memory and concentration were grossly intact throughout the interview. On formal testing, she repeated three out of three objects immediately and recalled all three items spontaneously after five minutes. She identified the current United States President and past presidents to Obama along with five other recent presidents. She demonstrated the ability to spell the word "world" forward and backwards. When questioned about the similarity between an apple and an orange, she replied, "They're both fruit, both round." She described her mood as "OK, hanging in there." Her affect was calm and euthymic with no periods of tearfulness. Thought processes were organized and logical. She did not report auditory or visual hallucinations, and was not observed responding to internal stimuli during the interview. She did not express delusional beliefs. She denied suicidal or homicidal ideation, plan, and intent. She contracted for safety and made future oriented comments. Insight and judgment were fair. When asked the nature of her main problem, she said, "I'm in jail."

Russell, Stephanie
Date of report 4/23/2023

**LEGAL ISSUES:**

Dr. Russell was questioned regarding her legal situation. She identified her charge as "Murder for Hire" and acknowledged being accused of attempting to have her ex-husband murdered. She indicated awareness of the seriousness of the charge, noting it is a "felony" that could result in "up to 10 years" in prison if convicted. She said a felony is "much worse, carries with you forever" in contrast to a misdemeanor. She identified her attorneys as David Mour and Scott Cox, and noted speaking to them "when something is going on." She related a favorable impression of them, said, "They believe me," and reported a willingness to continue working with them in defending herself against these charges. She demonstrated awareness of the roles of various courtroom personnel. She said the judge is there "to keep everybody moving along in line…has the final say…sentencing." She was aware that a "jury" will determine guilt or innocence, that there are "12" jurors, and that a "unanimous" decision is required. She said a "hung jury" occurs when the decision is not unanimous, and "they redo it or it's over."

She demonstrated an understanding of the meaning of various pleas, including guilty and not guilty. She described a plea bargain as "when the prosecutor comes to you and says if you'll say you did it, you get just this much time." When asked how she might assist counsel in the preparation of a defense, she reported reviewing the available discovery in this matter, stated she has not discussed strategy in detail with her legal team, and said, "I'm not sure I should talk about it. He said not to say anything to anybody." She demonstrated familiarity with the concepts of witnesses and testimony. She was aware of her right to testify or to refuse to testify.

During the time in question, Dr. Russell reported living alone in Louisville. Her ex-husband had custody of their children, and she saw the children for 2 hours at her office 3 times per week. She was working full time managing her practice and seeing patients. Her main stressor was the child custody litigation. She described her mood as "fine I guess…I don't remember…I never cried at the office." When asked if co-workers would have noticed a change in her, she said, "I don't think so." She related sleeping about 6 hours per night and feeling rested, noting, "There were no nightmares until I was arrested." Appetite was stable. She denied suicidal or homicidal ideation. She denied hallucinations or delusions. When asked about the impression from others that she was paranoid at that time, she replied, "I must've confused a lot of people then." She reported her ex-husband followed her, had other people follow her, and even had someone break into her home while a babysitter was napping there. She acknowledged feeling "on edge all the time" as a result, but denied misperception of events. She declined to further discuss her activities during this time period.

**DIAGNOSTIC IMPRESSION:** According to *The Diagnostic and Statistical Manual of Mental Disorders-5*, Dr. Russell meets criteria for the following diagnoses:

    Unspecified Personality Disorder with Antisocial traits

SR-28

Russell, Stephanie
Date of report 4/23/2023

## ANALYSIS AND OPINIONS:

In summary, Dr. Stephanie Russell is a fifty-two-year-old Caucasian female with no known psychiatric history beyond situational issues related to grief and marital strife. However, she does endorse a pattern of cognition, affective response, and interpersonal functioning consistent with a personality disorder. Available information specifically indicates Antisocial traits as evidenced by repeated acts of deceitfulness, manipulation, lack of remorse, and engaging in activities that grounds for arrest.

Throughout assessment procedures, including psychological testing, she did not report or display evidence of a serious mental illness, such as a major mood disorder or psychotic disorder. She did not report suicidal or homicidal ideation, plan, or intent. She related no self-defeating motivation. She was able to provide a detailed account of her past personal history. Vocabulary, educational history, employment history, and psychological testing indicated intellectual functioning in the above average range. Although she did endorse minor dysphoria and anxiety related to her current circumstances, she did not appear markedly depressed or anxious. She reported improvement in symptoms with current psychopharmacological interventions. Results of psychological testing were consistent with that impression, noting "mild and/or transient symptoms of anxiety and depression that are likely exacerbated by situational stressors but appear to be reasonably managed by her current medication regimen at this time."

Kelli Marvin, Ph.D. diagnosed Other Specified Personality Disorder with Narcissistic and Antisocial Traits with reference to Histrionic and Borderline "qualities." Wayne Harper Ed.D. diagnosed Post-Traumatic Stress Disorder, Major Depression with "accompanying melancholia and anxious distress," and "personality compromise is seen along the Obsessive-Compulsive/Histrionic/Narcissistic pathways." Walter Butler, M.D. did not provide specific diagnoses, but referred to Dr. Harper's report and noted "presence of several psychiatric diagnoses coupled with personality disorders." Results of this evaluator's assessment are consistent with Dr. Marvin's findings, except that Narcissistic traits were less evident.

Dr. Russell declined to disclose her specific activities with regard to the alleged criminal behaviors. Dr. Marvin opined she "engaged in a deliberate, premeditated, and frankly 'diabolical' campaign to convince" her child that he was the subject of abuse. Dr. Harper proposed an "alternate hypothesis" to Dr. Marvin with suggestion that Dr. Russell "became delusional…her husband as dangerous to her children." Dr. Butler further opined Dr. Russell "deteriorated to the point of a delusional psychosis under increasing intensities of stress and distress related to a very contentious custody battle in which she saw her husband as dangerous to her children." He compared it to a "road rage state of mind."

However, there is no evidence Dr. Russell was suffering from psychosis or any other serious mental illness during the time in question. She does not report and there are no witness statements indicating hallucinations, delusions, or disorganization of thoughts or behaviors during that time period. Indeed, she continued managing her daily activities, pediatric practice, and litigation without apparent impairment. Her efforts to engage in Pediatric Condition Falsification (defined as "fabrication or exaggeration of injuries or maltreatment to the children

Russell, Stephanie
Date of report 4/23/2023

### ANALYSIS AND OPINIONS (continued):

to achieve a secondary goal") are consistent with Antisocial efforts to rationalize having harmed her children and ex-husband, and her minimization of the harmful consequences to her children.

With regard to the alleged Murder-for-Hire, there is no specific "triggering event" or uninterrupted series of events that resulted in Dr. Russell's alleged actions. Instead, the alleged acts appear to be the result of anger and not reasonable under the circumstances as she believed them to be. There was a sufficient "cooling-off period" between any "triggering event(s)" and her alleged crimes. Indeed, her alleged behaviors were clearly premeditated and well thought out over an extended period of time, not the result of a sudden "road rage" type reaction.

*Thus, it is the opinion of this evaluator that Dr. Russell exhibits no mental disease or defect or any other mental condition bearing on the issue of guilt.*

### RECOMMENDATIONS:

Dr. Russell should continue her current antidepressant medication if she continues to feel it is beneficial in mitigating emotional distress related to her circumstances. The prognosis for treatment of depression and anxiety is excellent with psychopharmacological interventions, although the outcome of this matter and other litigation may affect her condition. The Personality Disorder is chronic, longstanding, and less amenable to treatment without long term psychotherapy and her interest in making meaningful changes.


Respectfully submitted,

*[signature: Amy J. Trivette]*

Amy J. Trivette, M.D.
General & Forensic Psychiatrist