

*Marvin & McCrary*
FORENSIC EVALUATION SERVICES

## CONCLUSIONS & RECOMMENDATIONS: CRABTREE V RUSSELL
## CHILD CUSTODY/ACCESS EVALUATION
## PRIVILEGED AND CONFIDENTIAL: REDISCLOSURE PROHIBITED

DKT/Case #:18-CI-501606 _____ X-REF: 18-D-501907-004 & 19-M-1195 _____

PETITIONER: Rick Crabtree _____
RESPONDENT: Stephanie Russell _____
SUBJECT CHILDREN: J: _____
              K _____

CLINICIAN: **Kelli Marvin, Ph.D.** _____  **DATE OF REPORT:** 8/12/2020 ____

*The information contained in this report was obtained for the purpose of a child access/custody or child protective evaluation and should not be used or re-disclosed except as authorized under court order or by directive of the Court to a child protective agency. If any of the information is HIV/AIDS-related, law prohibits use or re-disclosure of that information without specific written consent of the individual(s) to whom the information pertains, unless permitted by federal or state law.*

### SUMMARY OF REPORTS SUBMITTED:

| | | |
|---|---|---|
| 1) | Petitioner's Report, Rick Crabtree | 37 pages |
| 2) | Respondent's Report, Stephanie Russell | 22 pages |
| 3) | Narrative Report | 137 pages |
| 4) | Conclusions & Recommendations | 50 pages |
| | a. Attachment: Forensic Timeline | 53 pages |
| | b. Attachment: Respondent's Rebuttal to Final Forensic Contact | 12 pages |

[Note: At the time that the undersigned completed the final forensic contact, the respondent had additional information that she wanted presented and represented in the reports; the undersigned had reached a critical threshold of information but agreed to attach the respondent's rebuttal to the reports as a courtesy.]

### SUMMARY OF INFORMATION CONTAINED IN THE NARRATIVE REPORT:
Evaluation Timeline
Psycholegal Identification & Issue; Purpose of the Evaluation & Limits of Confidentiality
Sources of Information
Collateral Interviews:

- Crimes Against Children Unit [CACU], LMPD; Detectives Simpson and Ernst
- Division of Pediatric Forensic Medicine, Dr. Vinod Rao and Emily Neal, Forensic Nurse
- Division of Pediatric Forensic Medicine, Dr. Melissa Currie, Division Chief

Kelli Marvin, Ph.D.
P: 502-741-4841
E: kmarvin@marvinmccrary.com

Office: service@marvinmccrary.com

Kristen McCrary, Psy.D.
P: 864-567-1251
E: kmccrary@marvinmccrary.com

**SR-129**

Crabtree & Russell Children                FES #: 1482                Dkt/Case #: 18-CI-501606

- Ginger Crumbo, Psy.D., Child Sexual Abuse Specialized Therapist
- Collateral Email Contact: Erica Williams, MD
- Summary of Collateral Interviews re: Petitioner Crabtree's Neurocognitive Status
- Attempted Collateral Interview, Christie Brown, Speech Language Pathologist
- Summary of Collateral Interview with Tammy Palmero Crabtree Lewis
- Collateral Note: Respondent Russell's cousin/friend, Leslie Poore
- Collateral Note: Respondent Russell's Former Chinese Au Pairs [Suri and Yoyo]

Parental Interactions w/the Subject Children and Home Visits
Record Review, Subject Children
Record Review, Records Pertaining to Mother-Children Supervised Visitation
Record Review, Petitioner & Respondent
Record Review, These Divorce and Child Custody/Access Proceedings
Record Review, History of Child Welfare Involvements
     Summary of Child Welfare, CAC, and PFM Involvement
     Forensic Medical Assessments, Division of Pediatric Forensic Medicine
     CPS/CHFS Records
Forensic Interview
Petitioner's Responses to the Concerns of the Respondent
Respondent's Responses to the Concerns of the Petitioner
Dispositional Preferences
Psychometric Testing
Mental Status Examination (MSE)

## DIAGNOSTIC IMPRESSIONS:

*Respondent Russell:*
- Other Specified Personality Disorder, with Narcissistic and Antisocial Traits

Note: The application of antisocial features largely hinges on 1) the Crimes Against
Children's Unit/LMPD's investigation conclusions of likely involvement in attempts at
murder for hire and stalking/conspiring to stalk; 2) possible involvement in attempts to
intimidate staff at Sacred Heart and Prospect Latin Schools; 3) possible involvement in
attempts to intimidate, humiliate, and harass petitioner Crabtree by sending a denigrating
letter to his employer and placing similarly denigrating flyers on cars in the parking lot of his
workplace. Should this court conclude that these allegations are inaccurate or unconvincing,
the application of antisocial features would be largely mitigated, though a compelling

Page **2** of **50**

**SR-130**

Crabtree & Russell Children                FES #: 1482                     Dkt/Case #: 18-CI-501606

argument could be made for the presence of these features based on the video and audio evidence recovered from respondent Russell's cell phone, which was seized by law enforcement following issuance of a search warrant. For in depth discussion, the reader is respectfully referred below to CONCLUSIONS.

**CONCLUSIONS:**
Though these proceedings have spanned but 2 years, the legal history is remarkably long and complex. For detailed information regarding the legal background, the reader is referred above to the PSYCHOLEGAL IDENTIFICATION & ISSUE section of the instant report. However, for review, the undersigned offers the following summary:

- The subject children are full biological/natural siblings who were conceived at the same time though invitro fertilization. The now 4-year-old subject child J      was born in :/2015. Following a period of cryopreservation, the now 2-year-old subject child K was born in     '2017. Respondent Russell is the biological/genetic/natural and gestational parent. As a sperm donor was utilized, the petitioner is not the biological/genetic/natural father. After an extended period during which the respondent and her counsel accepted, without argument, the legal characterization of the petitioner as these children's father and asserted themselves that the petitioner was these children's father, vigorous and formal objections to his paternity were raised. Following review, this Court issued a lengthy decision detailing the basis for the finding that petitioner Crabtree is indeed these children's legal father for reasons including, but not limited to, the marriage of the parties at the time of the births of both children: "Therefore, the court concludes allowing the amended answer and counter-petitioner [*sic*] would severely prejudice Petitioner, who is the legal father of the children and has been held out to be their father since their respective births, despite the fact the parties used donor sperm to conceive the children. To allow Respondent to now deny the Petitioner's paternity would result in an injustice to both Petitioner and the minor children."
- The parties somewhat disagree regarding why donor sperm was utilized – respondent Russell maintains that she never intended for the petitioner to be a genetic father as he has a family history of miscarriage and genetic anomaly [a nephew]; petitioner Crabtree maintains that there were limited, but genuine, attempts to conceive. He reports that he was reluctant to bring children into the troubled romantic union. Regardless, both parties agree, that in approximately 2010, respondent Russell made a unilateral decision to proceed with fertility treatment with donor sperm.
- The parties vigorously disagree regarding petitioner Crabtree's investment in parenting. Petitioner Crabtree maintains he was ultimately excited about the pregnancies and was invested, from the outset, in his role as father; the respondent maintains that the petitioner was wholly disinterested in the children and relegated all childcare tasks to her and childcare staff. Indeed, she never referred to the petitioner as "Dad"; she alleged that the respondent never referred to himself as "Dad" or "Daddy" until such time he decided to create a false image for this Court that he is these children's "Dad."
- Though respondent Russell filed for divorce in 2017, she acknowledges that she sought marital reconciliation following mediation because she was sobered by the mediator's statements that she would not likely prevail with regard to her legal goals of 1) securing sole custody and primary residential care of the then only child J      and 2) restricting the petitioner's access to J    .

Page **3** of **50**

**SR-131**

- From the time of marital reconciliation to the present, the respondent has maintained that the petitioner has significant cognitive impairments such that he is unable to safely and minimally adequately parent. Specifically, she reported that he has been diagnosed with Mild Cognitive Impairment [MCI] and that he has sought to falsely present he is of sound mind and not a threat to the children by using political power/influence or his position as a financial manager for a prestigious firm to bias the impressions of various doctors including, but not limited to, Indiana-based neuropsychologist Burton, Louisville-based psychiatrist Schrodt and neurologist Friedman, and the physicians at Pediatric Forensic Medicine, University of Louisville. On or about 7/19/2017, petitioner Crabtree signed, and had notarized, a statement that he would not provide care to the child J     and the soon to be born K     until such time respondent Russell "is comfortable and decides that Rick can provide proper care for J     and/or his sibling without supervision". Again, the parties vigorously disagree regarding the circumstances surrounding the creation of this document. Specifically, respondent Russell maintains the document is to be taken at face value – the petitioner was aware that he was cognitively compromised and, as such, was and is a risk to the safety and welfare of the children; petitioner Crabtree maintains that he was relentlessly harassed by the hysterical respondent who threatened to refuse to honor a legal/financial agreement which would result in the loss of the deposit on the purchase of a home [a substantial amount] unless he signed this agreement to have no contact with the children unless supervised – further, he very much wanted to "keep my family together" and spare the very young subject children a divorce. Thus, the petitioner maintains that he signed the agreement under duress.

- In the spring of 2018, petitioner Crabtree was made aware, by former nanny Kim Steinbock [who signed an affidavit], that respondent Russell was conspiring to have him killed and was most serious about locating a "bad person" to carry out this deed using a gun with a "silencer" and while the respondent was out of town. Though the respondent denied these allegations, CACU/LMPD has investigated and believes these reports to be credible. Respondent Russell produced a counter affidavit from a medical student, Stephanie Nelson, who was reported to study in the family home. However, this affidavit did little to assuage the petitioner's fears as it was confirmed that there was potentially serious discussion regarding killing the petitioner – specifically, Ms. Nelson reported that she heard Ms. Steinbock suggesting that the respondent kill the petitioner. Further, CACU/LMPD has confirmed that, over time, additional individuals have come to the fore with reports that respondent Russell has made seemingly serious statements regarding killing petitioner Crabtree.

- In the late fall of 2018, a man, who identified himself as "John Schnatter," made contact with the petitioner – he presented to petitioner Crabtree's workplace, was captured on surveillance camera in the petitioner's garage where he left a primitive letter, and he left threatening voicemails on the petitioner's cellphone [the number for which is not available to the public]. The content of the voicemails revealed detailed knowledge of the case facts and abuse allegations that also were not generally available. Similarly, on or about 4/23/2019, the petitioner's supervisor/employer received an anonymous letter alleging that the petitioner was a domestic abuser, who was the subject of multiple EPOs, and who had active criminal charges pending. Mr. Schnatter's last known appearance in the petitioner's life was 1/24/2019. Though the identity of this individual is unknown to the undersigned, CACU/LMPD reports that there is evidence [the nature of which is also unknown to the undersigned] that there is a link between this stalker [or stalkers] and respondent Russell.

Page **4** of **50**

SR-132

- On or about 6/21/2019, an anonymous female caller contacted the Prospect Latin School and threatened the Director, Susan Bumann-Reihl. This call was in response to petitioner Crabtree's enrollment of the children for his summer parenting days. This caller 1) objected to the enrollment of the children on the basis that respondent Russell did not consent to said enrollment; 2) stated that should harm befall the children, Ms. Bumann-Reihl would be held personally responsible and there would be litigation; 3) reported that petitioner Crabtree was the subject of active CPS actions and had criminally assaulted the respondent; and 4) underscored that the school had a violent parent "on their hands."

- From June of 2018 onward, these proceedings have been characterized by a remarkable degree of consistently increasing co-parental animus and allegations, lodged by respondent Russell, of DV/IPV and child abuse/neglect as perpetrated by the petitioner.

- In the late summer of 2019 [8/9/2019], defamatory flyers were placed on cars in the parking lot of the petitioner's workplace. Similar to the letter which was sent to the petitioner's employer/supervisor, the flyer contained information that could only be known by someone with intimate knowledge of the instant proceedings. The flyer alleged that the petitioner, in essence, preyed on women with children as a means by which to gain access to child sexual abuse victims – it was specifically stated that the petitioner "molested the children" of his first wife; he is now doing the same to the children of his current wife. CPS and this Court/Judge Denise Brown were also mentioned, with derogatory references. Noteworthy is that the respondent and her cousin, Leslie Poore, located, contacted, and audio recorded the petitioner's former wife, Tammy Lewis, who alleged that the petitioner was controlling, enjoyed causing her young son emotional distress, and was sexually inappropriate [on one occasion] with her then 4-5 year old daughter. It is this "first wife" that is referenced in the above flyer. [Note: Ms. Lewis contacted the undersigned and reported that she was illegally recorded by the respondent as, in her state of residence, it is illegal for audio recordings to be made of calls without the consent of all involved. She refused to provide information, stating fear of the petitioner as, if he could harm the subject children as he was alleged to have done, she had concern that he would harm her family. She also stated that, should respondent Russell seek to use this recording, her spouse, who is an attorney, would seek criminal prosecution.]

- On 10/24/2019, the respondent's cell phone was seized, under search warrant, by CACU/LMPD as the focus of the criminal investigation had been expanded to include respondent Russell [and no longer exclusively focused on the multiple allegations of child abuse and neglect brought by respondent Russell against petitioner Crabtree.]

- During the course of these proceedings, there has been extensive involvement by this Court related to EPO petitions/hearings, CPS/CHFS, the Division of Pediatric Forensic Medicine [PFM], and CACU/LMPD. As tallied, by the undersigned:
  - Respondent Russell has filed **7 EPO petitions, all of which have been denied** – at least one of which involved an extended 2-day hearing with witness testimony and video evidence.
  - **From 2018 to the present, there have been a *minimum* of 31 child welfare reports/allegations, including duplicate and "FYI" type reports.**
    - Approximately **25 of the approximately 31 reports/allegations identified petitioner Crabtree as perpetrator** – all investigated reports/allegations were unsubstantiated.
    - Only **6 of the approximately 31 reports/allegations identified respondent Russell as perpetrator** – 5 of these reports/allegations were

SR-133

investigated and unsubstantiated. A minimum of four [4] reports or linked reports were generated by different professionals [an unknown medical professional, the undersigned, the subject child J    's therapist, and PFM]. **At the time the instant evaluation was submitted, an open investigation pertained to Emotional Injury as possibly perpetrated by respondent Russell**, seemingly based on 1) PFM's concerns related to Pediatric Condition Falsification; 2) Dr. Crumbo's reports that the subject child J stated in session respondent Russell informed him that the petitioner had cameras in his home and, corresponding to this time frame, this child's reports of sexual abuse changed from allegedly occurring "on the couch while watching TV" to in the bed, "under the covers"; and 3) the undersigned's affidavit, dated 6/30/2020, which detailed audio/video evidence from the respondent's seized cell phone which indicated direct coaching of the subject child J    to bring forth false allegations of abuse against petitioner Crabtree, CACUs reports of credible evidence of criminal behavior on the part of respondent Russell, and PFM's concerns that the respondent exaggerated and/or falsified child abuse and neglect allegations consistent with Pediatric Condition Falsification [PCF; sometimes referred to as Munchausen's by Proxy].

- As reported by current CPS/CHFS SSW/caseworker, Ms. Henry, there have been **8 investigations**, some of which have included multiple allegations or allegations that have been reported and then met acceptance criteria during the course of an ongoing investigation.
- There have been **8 PFM consultation reports, response letters, or concluding Emails** to CPS, dated 9/17/2018 [K    , 9/17/2018 [J    ], 10/6/2018 [K   ], 10/12/2018 [J    ], 11/8/2018 [K    , 1/3/2020 [K    , 5/14/2020 [J    ], and 7/16/2020 [J    ].
- **The now 4-year-old subject child J    has been subjected to 3 forensic interviews at CAC**, on 9/28/2018, 7/19/2019, and 3/17/2020 related to allegations of child physical and sexual abuse.
- The now 2-year-old subject child K    has been the subject of allegations related to child physical abuse. There do not appear to have been any formal allegations of child sexual abuse related to K    However, the respondent alleged to the undersigned that, in 6/2020, the subject child J    reported to her that petitioner Crabtree was now sexually abusing this child per "rubbing" her "no no area."
- In 6/2020, and following extended collateral interview with CACU's Detective Ernst, the undersigned noted the existence of multiple risk factors for violence presented by respondent Russell [which will be further explained in the body of the instant report]. As the evidence collected by CACU from the respondent's seized cell phone mandated a report to CPS that the respondent had engaged in Emotional Injury of the subject child J    and Risk of Harm/Emotional Injury with regard to the subject child K    the undersigned coordinated a safety plan with GAL Murphy and Det. Ernst of CACU, who had reported that the respondent represented a credible threat of harm to petitioner Crabtree. Further, it was both Det. Ernst's and the undersigned's opinion that this threat would be most viable at the time of the respondent's final forensic contact, planned for 6/30/2020, as, at that time, she would become aware of the cumulative CACU evidence. Based on the alleged threat in the pleadings that the respondent had threatened to abscond with the children, this Court's response to order forfeiture of the children's passports, and the respondent's

Page 6 of 50

assessed personality characteristics, the undersigned also was of the opinion that the respondent may represent a threat to the subject children or herself.

- Following an emergency hearing on 6/30/2020, this Court awarded petitioner Crabtree temporary sole custody of the subject children. This finding was, at least partially, based upon the undersigned's testimony, which included:
  - o Recent reports from the Division of Pediatric Forensic Medicine, signed by Vinod Rao, MD, FAAP and Emily Neal, BSN, RN, SANE concluded that, despite the multitude of child abuse allegations made by respondent Russell, there is no medical evidence that petitioner Crabtree is engaging in abusive behavior. Further, PFM concluded: "J    's current presentation is very concerning for pediatric condition falsification by the mother. Additionally, prior presentations for J    : and his sibling were highly concerning for pediatric condition falsification by the mother, through fabrication of child maltreatment concerns … these authors would have concern for J    and his sibling if exposed to the caregiving environments where concerns have been noted …." [Note: Pediatric Condition Falsification is sometimes referred to as Munchausen's Syndrome by Proxy and describes a pattern of behavior on the part of a parent in which medical or psychological/psychiatric symptoms are induced, fabricated, or exaggerated in a child for some form of gain, while said parent disclaims knowledge of the origin of the symptoms.]
  - o On 6/25/2020, the undersigned met for a period of 5 hours [of a total of 8 hours] with Detective Ernst of LMPD's Child Abuse Crimes Unit [CACU], who shared information in the CACU case file. The totality of the information imparted, so long as the information was accurate and reliable, made evident that respondent Russell had engaged in emotional abuse of the subject child J    which has been ongoing since 2018. Specifically, videos and audio recordings downloaded [seemingly, from the cloud] and/or stored on mother's cell phone, which was seized by law enforcement/CACU indicate the following:
    - Respondent Russell induced distress in the subject child J    by making a series of communications, over time, that his sibling is unsafe in the care of petitioner. Over a period of time, J    is made upset by the respondent until such time he engaged in an uncontrolled, violent tantrum, punctuated by screams and hysterical, loud crying.
    - Video/audios are present that indicate that respondent Russell rehearses with the subject child J    : until an allegations of sexual abuse is generated.
    - In a series of recordings, duplicate conversations are taped. During one of the versions of the conversations, the subject child J    is talking and then pauses. The respondent, or someone present with the respondent, with sound amplification provided by CACU/LMPD, can be heard whispering "c'mon" to the child during the pause in his conversation – the conclusion of Detective Ernst and the undersigned is that the child is likely being prodded to generate an allegation of abuse against the father consistent with the allegations in audio/video tapes generated in the same timeframe.
    - Audio recordings establish that respondent Russell interrogated this child about his time in his father's care. For example, on 8/29/2018: "Can u talk to me about Rick's house? … Can you take your paccy out of your mouth and talk to me about Rick's house? …. Did he let you watch TV? What did

Upon emergency hearing on 6/30/2020, this court awarded temporary sole custody to petitioner Crabtree. At the time of the submission of the instant reports, supervised telehealth visits were implemented, between mother and children, conducted by Children's Safe Haven.

On 7/21/2020, the Honorable Eric Haner, Jefferson District Court, signed an Agreed Order dismissing the criminal Assault 4th Degree charges filed against petitioner Crabtree related to the respondent's allegations that he assaulted her, in 10/2018, in a parking garage with the subject child J     present: "It is hereby ordered that the above case against the Defendant is dismissed with prejudice with a stipulation of probable cause as to his arrest by Louisville Metro Police Department."

Both parties have the preference that they be awarded permanent sole custody of the subject children and that these children reside in their primary care.

Petitioner Crabtree believes that the children's contact with respondent Russell should be limited to strictly supervised visits with some form of mechanism put in place for safety to protect the children from her overt hostility and the long term potential negative psychological effects related to coaching these children to believe they are victims of child physical and sexual abuse by their father. He has no objections to a schedule of telephone/FaceTime calls so long as there are no negative verbalizations made to the children; there should similarly be no communications that jeopardize these children's sense of safety and security. He indicated that he would be inclined to follow the recommendations of trusted professionals involved regarding if and when it is prudent for the children to attend face:face contacts with their mother/respondent Russell.

Respondent Russell believes that, in addition to her allegations that the petitioner is abusive, violent, and chronically neglectful, he is fundamentally unable to co-parent. He lacks the experience, investment, and sound judgment to have input into educational, developmental, mental health, and medical decisions. He is cognitively compromised, as is evidenced by his diagnosis of Mild Cognitive Impairment, which was initially applied by neurologist Puri in 2018 and reassigned by neuropsychologist Perri in 2020 following updated neuropsychological testing. Ideally, the petitioner would have no contact with the subject children and would not be involved in their lives as the children are at risk of injury, neglect, maltreatment, and multiple forms of abuse in his care.

Page 8 of 50

PAGES 9-14 REDACTED

Indeed, the undersigned knows of no studies that scientifically examine risk in children who have been cumulatively and maliciously exposed to all of the stressors to which J        has been exposed:

1) Coaching for the generation of false claims of sexual abuse, physical abuse, and medical neglect against a target parent
2) The instillation of false fears of retaliation for the generation of these false reports of abuse and neglect against the target parent
3) The instillation of false fears that this child and his sibling(s) are unsafe in the care of the target parent
4) Chronically hostile parental exchanges
5) Chronic denigration of the target parent
6) Interrogations regarding the child's experience at the home of the target parent
7) Unnecessary, chronic body checks in which pictures and videos are routinely taken, including the genitals, both before and after visitation exchanges
8) Maternal behaviors consistent with Pediatric Condition Falsification [PCF; aka Munchausen's by Proxy]

The research on exposure of a child to malicious, false generation of child sexual abuse allegations alone underscores how very rare it is for mothers to subject their child such psychological distress – that is, most allegations or child sexual abuse are true and false allegations occur at a negligible rate, with most studies estimating that the rate of malicious false allegations falls at a very low rate (O'Donohue, Cummings, & Willis). The research literature also strongly suggests that, when child sexual abuse is unfounded, the accusing parent is most often under the genuine perception that the child was abused. That is, even when a Court has determined that abuse did not occur, the vast majority of these reports were not made maliciously (Fidler, Bala, Birnbaum, Kavassalis, 2008; Challenging Issues in Child Custody Disputes). Further, with regard to false allegations of sexual abuse within the context of divorce and custody/visitation disputes, it appears that these allegations may be more likely to be false than allegations in other situations. However, even in these situations, *most* false allegations come from adults rather than from children (Bala, 2001; Berliner, 1988; Faller 1988; Faller & DeVoe, 1995; Jones & McGraw, 1987). In other words, even parents who are willing to generate false allegations of only a single type of abuse – sexual abuse – generate these allegations themselves and do not seek to cause their child the psychological distress that is implied by convincing a child that he or she has been violated by a parent who purports to love them. One of the few well-designed studies on "Malicious False Allegations" of Child Maltreatment, examined 7,600 cases in 1998 concluded:

- o Only 4% of cases contained maliciously false allegations
- o 12% of the cases with maliciously false allegations were in the context of a custody dispute

SR-137

Crabtree & Russell Children                    FES #: 1482                    Dkt/Case #: 18-CI-501606

- o  Fathers were more likely to make intentionally false allegations than mothers and children [allegations made against the mother's new boyfriend or spouse]
- o  Another conclusion was that not all false allegations are intentional – this finding has been present across additional studies, indeed most mothers who make inaccurate allegations genuinely believe that the child is being abused

O'Donohue, Cummings, Willis, The Frequency of False Allegations of Child Sexual Abuse: A Critical Review, Journal of Child Sexual Abuse, 2018, Vol. 27, No. 5, 459-475.

Trocme, N & Bala, N. False Allegations of Abuse and Neglect When Parents Separate, Child Abuse and Neglect 29 (2005) 1333-1345.

Thus, what is so very concerning is that, should this Court be inclined to find that respondent Russell engaged in the combined acts listed above [in the service of an overall goal of 'alienation'], she is an extremely rare and pathological mother. Indeed, false allegations are very rare, mothers typically do not engage in the generation of false allegations, and when they do, they tend to make false allegations but believe the allegations to be genuine. In 11/2019, when the undersigned reviewed the videos submitted by respondent Russell with Dr. Rao of PFM, the undersigned and Dr. Rao were perplexed and deeply concerned by the videos:

- o  J       was highly aware of the camera, he often looked directly at the camera vs the respondent when he made reports of abuse, and often there was a snack or fun activity involved – in this regard, the videos were worrisome for coaching. In particular, the video of J    reporting fear of the petitioner was problematic as J     was so keenly aware of the camera. His distress was so very palpable, this child was clearly caused emotional distress as a result of either abuse by the father or coaching by the mother.
- o  Despite the above indications of possible coaching by respondent Russell in the videos, her behavior as viewed in the videos provided [by the respondent] to the undersigned was empathic, loving, and, though she sometimes asked leading questions, her statements and responses were admirably neutral. Both Dr. Rao and the undersigned agreed that the respondent's comportment on the videos, while not textbook perfect, was the best that any parent could likely muster given the circumstances. [Note: To hold the respondent to a standard of perfection because she is a pediatrician is unfair – she is a mother and, regardless of training or experience, perfect parental behavior when faced with reports of abuse by one's own child is an unrealistic expectation.] Further, the respondent often does not lead the child or present any visible cues that could trigger reports of abuse. *Noteworthy is that the undersigned stated to Dr. Rao that while it was possible that the respondent could have coached the subject child J     to this degree, this was not at all a likely hypothesis. Indeed, to coach to the extent indicated in the videos would indicate extreme maternal psychopathology at a level rarely seen even in the most contentious of custody cases. Further, respondent Russell is a successful pediatrician – it would be, again, extremely unlikely that she could have such severe psychopathology and successfully run a busy practice which necessarily requires a high level of functioning. The undersigned and Dr. Rao concurred that coaching a child at this level would require rehearsal of information with the child and linked cues and rewards – the level of deliberateness of this type of conditioning would be extremely unlikely as the degree of maternal*

Page **16** of **50**

SR-138

*psychopathology would have to be rare and profound; there would have to exist a critical deficit in empathy as the mother in this scenario would have to deliberately and systematically convince the child he was the physical and sexual victim of his father [who should protect the child] and then tolerate that she was inflicting emotional distress and fear in her own child over extended time.* ***Therefore, while this form of deliberate coaching was essentially initially ruled out, CACU/LMPD subsequently obtained evidence which indicates that this hypothesis not only cannot be dismissed.***

The subject children's interactions with each parent are described below. The children were not individually assessed as these children have been assessed by multiple professionals and are uniformly described as intellectually intact, developmentally on target, and socially motivated. Both children have been referred for speech/language assessment and/or therapy. Further, the subject child J      has had multiple exposures to CPS and forensic interviews – additional interview by the undersigned would not reveal additional information and would represent yet another intrusive contact.

Due to the COVID-19 pandemic, the undersigned did not view the interior of the parties' homes. Both parties reside in quiet, upscale residential neighborhoods that offer playmates for the children and access to child-friendly amenities. Neither party raised concerns about the conditions of the opposing party's homes. Further, CPS has been to both homes, with no concerns noted in the records. Lastly, Det. Ernst reported that she has been to the petitioner Crabtree's home and has viewed his surveillance system – she described his home as more than appropriate for children; the surveillance system allows for motion-activated monitoring of the children's whereabouts as they move throughout the home. In the opinion of Det. Ernst, the surveillance system has integrity and meets standards for law enforcement purposes. It has been the conclusion of Det. Ernst and GAL Murphy that a percentage the respondent's more recent allegations have effectively been proven to be inaccurate on the basis of the recordings generated by said surveillance system.

PAGES 18-23 REDACTED

### *Respondent Russell:*

Respondent Russell presented as a socially adept and persuasive informant. When in forensic interview, she comported herself in a superficially cooperative manner inasmuch as she responded to all queries, provided information requested, and supported her narrative with the submission of documents, photos, and video recordings. However, over the course of 20 hours of forensic interview, there existed internal and external inconsistencies such that it was evident that the majority of her reports had little, if any, integrity. For example, though she was responsible for delaying the custodial evaluation process for a combined minimum of 6 months, she denied that she did so by use of skilled obfuscation – noteworthy is that though the undersigned was highly aware of the delay tactics employed by the respondent [which are detailed in the 2 page *Report Timeline*, attached Narrative Report], the respondent's explanations were surprisingly convincing. Also remarkable was the respondent's seemingly sincere upset, in 11/2019, when sharing videos with the undersigned of the subject child J     reporting sexual abuse victimization and physical abuse/injury alleged to have been perpetrated by the petitioner. The undersigned was indeed deeply concerned for this child; there was discussion with respondent Russell that the videos indicated that her maternal behavior was admirable – not only were there no indications of coaching, the respondent did not ask leading questions or respond in a dramatic manner such that this child would be influenced to withhold or produce reports. The respondent was encouraged to continue to respond to J     in this empathic and neutral manner. Ultimately, in 6/2020, the undersigned became aware of the contents of the respondent's seized [by law enforcement and following search warrant] cell phone – CACU had downloaded audio/video that made evident that the respondent's posture, as described above in 11/2019, was a façade. The cell phone evidence made abundantly clear that, by 11/2019 and prior to meeting with the undersigned, the respondent was very much aware of what constituted coaching/leading behavior – the cell phone contained multiple versions of some of the videos shown the undersigned. Specifically, the respondent essentially rehearsed information with the subject child J     and videotaped these conversations until such time an

Page **24** of **50**

allegation of abuse was produced by this child. Indeed, the respondent had effectively cherry-picked videos and was initially successful at misleading undersigned to the erroneous impression that J      had spontaneously produced reports of physical and sexual abuse. At no time over the course of year-long contacts with the undersigned did the respondent provide corrective information – to the contrary, she was supportive of the undersigned's intention to forward these misleading videos to a professional colleague, who is a renowned expert in children's reports of sexual abuse. As such, the respondent was deemed to be a highly manipulative reporter of poor reliability. This impression of the respondent is supported by CPS/CHFS' notations that the respondent was "dishonest and deflective" during the course of child welfare investigations; PFM's conclusions that the respondent's presentation is "highly concerning" for intentional exaggeration or fabrication of medical information related to the subject children to achieve secondary goals; and CACU's/Detective Ernst's reports that the respondent, following 1 ½ years of related criminal investigation has "manipulated" and "lied" to the extent that "she has zero credibility."

Tactics to support what was ultimately an indefensible narrative included not only the aforementioned obfuscation, but also manipulations; exaggerations; well-timed displays of emotion [tearfulness, facial expressions indicating fear and confusion]; subtle flattery of the undersigned's professional prowess; a posture of naïveté; references to numerous and/or well-respected others who agreed with her stance or were aware of the situation ["18 witnesses," "8 or 9 people that are not me [were told by J    : he was abused]," child welfare supervisors, "highly concerned" doctors, the office of the Governor's wife], and partial truths, as well as lies of omission and commission. For the ease of the reader's review, some, but not all of these internal and external discrepancies are presented below in table format. [Note: The table below is not all inclusive – there exist other examples – however, the undersigned offers a cross-section of the problematic ways in which the respondent presented information as this is diagnostically relevant.]

Table of Internal/External Inconsistencies; Partial Truths, Lies of Omission & Commission

| Circumstance/Event | Correction; Source of Correction | Category of Inaccurate Information |
|---|---|---|
| The respondent denies that she restricted the petitioner's time with the subject child J      in the 2017 divorce pleadings. | In forensic interview in 2019, the respondent described herself as having absolutely restricted the petitioner's time from the time of J     's birth onward, stating that she did do due to his neurocognitive compromise. | Commission |
| The respondent stated to the undersigned, Det. Ernst, and other professionals that the petitioner was a disinterested parent who did not engage with the children and relegated all childcare tasks to the respondent and childcare staff. | The audio/video evidence on the respondent's seized cell phone demonstrates otherwise – the petitioner is seen playing with the children, as well as providing care [feeding, rocking, holding] the children.<br><br>Talking Parents [App] and recovered texts from the seized cell phone demonstrate that these claims are not accurate; the petitioner was up at night to provide care. | Commission |

SR-141

Crabtree & Russell Children          FES #: 1482          Dkt/Case #: 18-CI-501606

| | | |
|---|---|---|
| EPO filed by NM obo children against father – "… this has been ongoing, but the most recent incident was today 10/23/2018 at 12 pm. We were leaving NCH with my 3 yo child J . Ricky grabbed my left arm, pulled me and told me to move the f*** away from his car. I was consoling my 3 yo who was still under anesthesia and was crying for me. Rick was so anxious and angry … J was crying … I told him I could not have him buckled in the car seat with his coat on, his [Rick's] behavior immediately escalated, he jerked the coat off J and threw it in his car while my child was still heavily under the effects of the medicine. It scared me when he did this. I have a witness who saw the entire thing. | Following extended hearing, this Court dismissed the EPO and issued a lengthy Finding of Fact that, upon testimony, the respondent exaggerated and fabricated information.<br><br>These reports are inconsistent with video evidence. | Commission; Exaggeration |
| The respondent reported to the undersigned that the petitioner, who is not at all religious and who does not hold religious convictions, volunteered with Go Ministries to work with children in impoverished areas. [Note: This information was offered to support the respondent's claims of pedophilia.] | The undersigned confirmed that the petitioner has been a member of Southeast Christian Church since 2012.<br><br>The petitioner produced a picture from many years ago supporting his claim of involvement with a church-based basketball team.<br><br>Det Ernst/CACU reported that the petitioner's involvement with Go Ministries was investigated with no problematic indications. | Commission; Manipulation |
| On 10/6/2018, the respondent reported to J 's psychiatrist, Dr. Nichols, that therapist Crumbo was concerned as the petitioner was "filming" J naked prior to visitation exchanges as a means by which to document "lack of harm." There are no notes that the respondent informed Dr. Nichols that she was engaging in body checks of the children following visitations and was taking photos of these children's genital areas on a routine basis. | When asked to reference her notes from this time period, Dr. Crumbo clarified that she communicated on 10/3/2018: "One on one with mom, mother reports Jerry, supervisor at CPS, suggested after transitions mom take client to pediatric or family and children's place to be checked for injuries. Discussed impact of father videoing body check of children and mother "checking thoroughly "– over focus on child's body. Mother expressed understanding and discussed alternatives (changing kids' clothes). Processed importance of decreasing tension at transitions – neither parent should curse, | Manipulation; Omission |

Crabtree & Russell Children                     FES #: 1482                     Dkt/Case #: 18-CI-501606

| | mother concerned about child safety seats." | |
|---|---|---|
| The respondent is heard on audio recording stating in an aggressive tone: "Dr. Crumbo says she [K   ] is way too young for overnights with you." | Dr. Crumbo clarified that she does not recall nor does she have record of this conversation. The respondent often asked Dr. Crumbo to make recommendations for visitation and parenting time. Dr. Crumbo refrained from making such recommendations and explained, on a number of occasions to the respondent, that such was beyond the scope of her role. At times, Dr, Crumbo will provide neutral developmental information [e.g., children who are breast feeding have difficulty remaining away overnight from the primary parent]. | Manipulation; Commission |
| The respondent reported to the undersigned that she had Dr. Crumbo's support, when speaking to J  , to refer to the petitioner as "Rick" vs "Dad." The respondent stated that Dr. Crumbo advised that J should call the petitioner "whatever" term "he wanted." | Dr. Crumbo stated that this report is inaccurate. | Manipulation; Commission |
| During J  's first course of treatment w/Dr. Crumbo [9/12/2018-4/4/2019], the respondent reported that she was enrolling J   in "sand tray therapy" as a tx for sexual abuse trauma. Dr. Crumbo explained that sand tray therapy was not best practice and withdrew her involvement as she was not comfortable with consent on a session-by-session basis. | In 11/2019, and in the respondent's second forensic contact, the respondent stated her intention to enroll J  , upon the recommendation of Dr. Nichols, in sand tray therapy. The undersigned, unaware that Dr. Crumbo had already informed the respondent that sand tray therapy was not best practice, informed the respondent that sand tray therapy was not an empirically validated treatment and that this intervention was not at all appropriate. The undersigned was alarmed that J would be possibly exposed to a treatment provider who would engage in this treatment – the risk was that an unaware therapist would validate sex abuse that did not occur and, in doing so, would reinforce or create J  's impression that he was/is a victim of child sexual abuse. | Manipulation, relevant information withheld; relevant omission |
| The respondent is documented in child welfare records to have reported that Dr. Crumbo referred her to Claudia Crawford, LMFT re: sexual abuse of J  | Dr. Crumbo reported to the undersigned that this is absolutely inaccurate – she never made such a referral; when queried by the undersigned in 6/2020, the respondent reported that she was referred to Ms. Crawford by her former attorney. | Commission |
| In all communications, the respondent postured that she was | On 1/3/2020, Det. Ernst played an audio recording of the respondent stating that | Commission; Manipulation |

Crabtree & Russell Children          FES #: 1482          Dkt/Case #: 18-CI-501606

| | | |
|---|---|---|
| supportive of Drs. Crumbo, Marvin, and Rao's 12/2019 recommendation for neutral 3rd party body checks to clarify which parent was problematic and reduce exposure of the children to up to 4 [parents] body checks per visitation exchange vs 1 [professionals]. | she had no intention of complying with the checks and that the recommendation was, in her opinion, ridiculous.      [The respondent was subsequently confronted by the undersigned and, as she was aware there was an audio recording, conceded that she made the statement.] However, she then submitted Email documentation with her attorney, dated 1/2/2020, in which she asks said attorney: "How do we proceed with the body checks?" Respondent Russell also provided a comprehensive response, in writing, to the undersigned providing explanations that, from her perspective, demonstrate that, regardless of what she stated on audio recording to Det. Ernst,      she was supportive of the checks as recommended by Drs. Crumbo, Marvin, and Rao. However, given this critical discrepancy in the respondent's reports, the undersigned has no confidence that the respondent submitted accurate copies of Emails and/or was merely posturing to be supportive in the Emails to counsel. | |
| Prior to being made aware that the undersigned was aware of her statement on audio recording, the respondent suggested to the undersigned in a chain of texts that the petitioner was responsible for the failure of the body checks. When told that both parties must agree and, as such, she must have the agreement of the petitioner, the respondent texted: "Therein lies the problem." | Audio recording reveled that the respondent's implication was not true. | Manipulation; Commission |
| Respondent Russell presented information to the undersigned from 11/2019 into 2020 to yield the impression that the petitioner is cognitively compromised.<br><br>She reported that the petitioner's PCP, Dr. Williams, confirmed that she witnessed a significant degree of cognitive impairment during a home visit in 2017-2018. | Erica Williams, MD, sent respondent Russell an email, dated 3/9/2018, that made clear the position of petitioner Crabtree's providers: The email summarizes collateral information between Dr. Williams and Drs. Schrodt [psychiatry] and Puri [neurology] regarding the petitioner's diagnosis of mild cognitive impairment [MCI] and how this diagnosis impacts his overall adjustment and functioning. Dr. Williams reports in the email that Dr. Schrodt reported that the petitioner was doing well off of his prescribed sleep aid, Ambien – | Manipulation; Partial Truth; Omission; Commission |

Page **28** of **50**

- 16 -

**SR-144**

Crabtree & Russell Children                 FES #: 1482                 Dkt/Case #: 18-CI-501606

| | | |
|---|---|---|
| The respondent reported to the undersigned in 11/2019 that the petitioner's failure to fill his prescription for Aricept was highly problematic.<br><br>The respondent made statements to various professionals, including CPS staff and physicians of the children, that the petitioner was cognitively compromised and/or had "an early form of dementia." [Note: The undersigned assessed the respondent to have a highly detailed fund of knowledge regarding MCI; while it is believable that a lay person would confuse MCI in this manner, the respondent is a physician and is not easily afforded the benefit of this doubt.]<br><br>As of 6/2020, the respondent continued to maintain in EPO petitions that the petitioner has significant cognitive compromise. | his sole recommendation was couples counseling. Dr. Puri reported that, other than the diagnosis of MCI, there were no other neurological concerns. Further, the "stress in the relationship could contribute to [the petitioner's] symptoms," and he recommended that petitioner Crabtree undergo another neuropsychological evaluation. Dr. Williams noted that she "specifically asked about the importance of the medication he recommended … he stated that was a minor thing and was an attempt to see if it would make a difference, but the most important thing was to follow up with neuropsych testing … His overall impression was the same as his consult note, that this [MCI] is a mild situation that needs to be followed but no major or worrisome concerns."<br><br>The respondent had the benefit of information provided by Drs. Burton, Dr. Friedland, and Dr. Schrodt in 2017-2019, that the petitioner did not suffer from significant cognitive compromise.<br><br>The respondent was made aware by the undersigned on 6/2/2020 that though Dr. Perri applied a diagnosis of MCI, he noted that there was minimal to mild impact – the respondent was aware that the undersigned was pending collateral interview with Dr. Perri to clarify at the time she referred to the petitioner's cognitive compromise in the 6/2020 EPO petitions. | |
| The respondent reported to the undersigned that PFM physicians Rao and Currie would not "meet" with her and, thus, these physicians did not have the benefit of her perspectives, thereby reducing the validity of their conclusions that the petitioner had engaged in no medical misconduct or acts of physical abuse. | PFM reports and information provided upon collateral interview revealed that the respondent had extended phone conversations with 1) attending physician Dr. Rao/Drs. Rao and Green 2) Dr. Green and Nurse DeJarnette and 3) Division Chief Currie, Dr. Rao, and Dr. Green [conference call] – indeed, the respondent was technically correct that these doctors did not "meet" with her, but she omitted from mention these very relevant contacts.<br><br>The respondent mischaracterized the statements of Dr. Rao to Dr. Green, who corrected the misinformation provided by the respondent and reminded the | Manipulation using semantics to yield an erroneous impression<br><br>Commission |

|  |  |  |
|---|---|---|
|  | respondent that she was present during the respondent's conversation with Dr. Rao. |  |
| In 11/2019, respondent Russell represents to the undersigned in forensic interview that the petitioner "broke" the subject child J____'s arm and perpetrated a number of other alleged injuries. | In late 2018, PFM documents that respondent Russell continued to misrepresent J____'s arm injury and other alleged injuries to the children to various professionals despite awareness that the arm injury was not conclusive: "*Despite multiple conversations with the mother [the respondent], it appears that she continues to not accurately recount the PFM impressions regarding J____ and his sibling ... these authors have identified no findings definitive of physical abuse ... the mother has been informed of this multiple times ... contrary to her [ongoing] interpretations of Dr. Currie's initial note on the case, the elbow injury was never documented to be diagnostic of abuse.*" | Manipulation Omission Partial Truth |
| The respondent reported to both the undersigned and Det. Ernst that the petitioner "never put a spoon of food in her [k____'s] mouth" – thereby indicating that he never fed the subject child K____. [The respondent offered this information to support her argument that the petitioner was never invested in the subject children]. | Video/audio on the respondent's seized cell phone contained video of petitioner Crabtree feeding/rocking K____ and texts in said phone document that he was up at night for feedings.<br><br>When confronted, the respondent stated that she did not lie – she "never said he never feed her ... I said he never put a spoon of food in her mouth." The undersigned noted that as K____ was approximately 6 months of age at the time the petitioner vacated the family home, the majority of feedings would have been by bottle. | Manipulation using semantics to yield an erroneous impression |
| PFM notes that the respondent provided discrepant accounts of an injury within a very short or the same timeframe. | The respondent stated to PFM staff that J____ hurt his "shoulder" in the conversation whereas she made other statements that the petitioner shoved J____ into a stroller hurting his elbow. | Unknown if deliberate or a mistake; possible commission; Notable discrepancy |
| The respondent reported that Dr. Currie provided her with her private cell phone number. The respondent reports that Dr. Guelda was present when this occurred. | Dr. Currie reports that this is inaccurate.<br><br>[The respondent called Dr. Currie on her private cell, after hours.] | Commission |
| The respondent reported that the petitioner shoved her into the refrigerator while she was holding J____ – she files a related EPO. She reports that Dr. Guelda was present. | DVO dismissed. | Misrepresentation, exaggeration, or commission/fabrication based upon denial of DVO |

Crabtree & Russell Children                    FES #: 1482                    Dkt/Case #: 18-CI-501606

| | | |
|---|---|---|
| The respondent reported to Dr. Rao/PFM staff that she was told by the NCH physician that a mark on one of the subject children was "very concerning" for a bruise. | PFM staff twice followed up with the ER physician who clarified that there was no definitive finding of a bruise and no definitive concern for inflicted injury. To the contrary, the NCH physician stated that respondent Russell was informed that it could not be determined that the mark was definitely a bruise or that this was definitively concerning; Of particular concern was that mother's statements were noted to be contradictory to the ED/NCH physician's statements: Dr. Herr denies having ever attributed significance to the ear bruise, stating uncertainty what it was and "denied ever telling NM any impression of the mark." NM "is adamant when speaking with PFM and SSW that Dr. Herr DID tell her it was bruise and it was highly concerning." | Exaggeration; Commission |
| Dr. Rao reports upon collateral interview that the respondent's photographs of a bruise [on ear] is clearly purple/discolored. When the mark was assessed, the coloration was much less pronounced. | Dr. Rao stated concern that the photograph was altered to make the mark darker and more pronounced than it was; the mark was possibly enhanced by some other means [e.g., make-up] | Unknown if malicious or deliberate; concern for commission |
| PFM/professional records document the respondent's reports that the subject child J____ informed his pre-K teachers at Sacred Heart that the petitioner was engaging in acts of sexual abuse. | Staff at SH deny that J____ has ever made sexual abuse disclosures.<br><br>Det. Ernst reports J____ has never made disclosures of sexual abuse to SH staff – rather, respondent Russell reported that the petitioner was sexually abusing J____ at a parent teacher conference. Thus, it was the respondent, not the subject child J____ that triggered the Sacred Heart staff to make what was the school's one and only CPS report. | Commission |
| The respondent reported to professionals that the petitioner used political influence to sway the opinions of various professionals in his favor.<br><br>It was for this reason that the respondent opposed the use of Louisville-based Dr. Perri to perform the petitioner's updated/2020 neuropsych assessment, thereby significantly delaying the completion of the evaluation. | The respondent could not produce the names of these alleged individuals upon deposition, other than a reference to an unnamed possible acquaintance who worked in an ancillary government department; following deposition, the respondent later stated to the undersigned that the petitioner had a contact in the office of Senator Mitch McConnell's wife. | Commission |

Page **31** of 50

SR-147

Crabtree & Russell Children                    FES #: 1482                    Dkt/Case #: 18-CI-501606

| | | |
|---|---|---|
| In 2020, the respondent attempted to contact Dr. Perri by Email and called his office several times in attempt to engage Dr. Perri in conversation about the petitioner's neuropsychological status – which she knew or very well should have known [she is a physician] would represent a HIPAA violation.<br><br>The petitioner reported that the respondent engaged in this very same behavior with his former neuropsychologist, Dr. Burton. [Note: The undersigned spoke to Dr. Burton in an attempt to verify these reports – Dr. Burton could not recall if this occurred.] | The respondent acknowledged having done so. She reported that she shared her perspective with her attorney who agreed that Dr. Perri needed the benefit of her observations of his compromised cognitive status prior to the marital separation. Though she is a physician, she stated that she did not appreciate that Dr. Perri would be the best arbiter of what information was needed; she denied that she recognized that this would have represented a HIPAA violation; and she maintained that as front desk staff gave her Dr. Perri's Email address, it was then permissible for her to contact Dr. Perri. The respondent also feigned a lack of awareness that 1) her reports of the petitioner's functioning would be considered invalid and as fundamentally biased given the current litigation [she was also directly told this by the undersigned]; 2) the undersigned drew the connection that, in all likelihood, she sought contact with Dr. Perri to inspire Dr. Perri to withdraw from the evaluation as an additional delay tactic as she was aware that the petitioner was not and is not neurocognitively compromised. | Manipulation<br><br>Feigned Naïvete |
| The respondent is documented to have reported to professional staff that Cabinet supervisor or official Joey Minor, advised her to call 911 regarding the abuses alleged to have been perpetrated by the petitioner. | The undersigned notes this is not CPS protocol. | Unknown; likely inaccurate or exaggerated |

Respondent Russell alleged that petitioner Crabtree is a wholly unfit parent who should be permanently restricted from contact with the subject children. As the basis for her dispositional preference, she alleged:

- The petitioner never wanted children and he was unsupportive during the years she endured fertility treatment – indeed, he did not participate in the selection of a sperm donor and he attended only a small percentage of related medical procedures.
- Despite his denials, the petitioner has significant cognitive compromise as a result of MCI. His Indiana-based neuropsychologist and current neurologist Freidman, for reasons that cannot be fully explained, are positively biased toward the petitioner and have concealed and minimized the severity of these neurocognitive deficits.
- The respondent reported that, related to MCI, the petitioner was, from the time of the subject child J    's birth in    /2015, dangerously forgetful and of compromised judgement: he left a potentially fatal dose of psychostimulant accessible to the crawling J    – she pulled this tablet from the child's mouth in the presence of a witness; he left

Page 32 of 50

Crabtree & Russell Children          FES #: 1482          Dkt/Case #: 18-CI-501606

medications scattered about, which was witnessed by the cleaning lady; he walked in his sleep and engaged in acts he could not recall while doing so; and his personality changed and he became irritable and short-tempered. Indeed, he resented the newborn J    and referred to this infant as "a f****** kid."

- The petitioner was chronically disinterested in the subject child J    and relegated all childcare tasks to the respondent and childcare staff. Relatedly, in 1/2017, the respondent filed for divorce – which she fully intended to see to completion. However, she was sobered by mediation as she was informed that she would likely not prevail with regard to her goals of securing sole custody and restricting father-child contact. Seeing no other solution, the respondent sought marital reconciliation.

- Following the subject child K    's birth in    2017, the respondent's concerns regarding the petitioner's neurocognitive compromise continued – indeed, his judgment was abysmal and he was an active risk to the safety and welfare of the children: he gave the subject child J    needle-nose pliers to play with; when she told him to take a dangerous object away from J   , the petitioner removed a bubble wand from one of J    's hands and left the sharp object in the child's other hand; he "airplaned" an infant over a stairway; he failed to secure a baby gate leading to stairs; he put a sharp metal handle in J    's sandbox for this child to play with; he allowed J    to play by an open, 2nd story window with no screen; and he left the gas on the stove several times.

- In 7/2017, the respondent made clear her expectation that the petitioner would sign an agreement that he would not have unsupervised contact with the children until she was comfortable with him doing so; further, he would store his medications in the garage or his car/another secure location.  Petitioner Crabtree may claim that he signed this agreement under duress, but this is simply not accurate – he signed the agreement because he knew he was compromised and was absolutely a risk to the children. Despite this safeguard, the marriage continued to deteriorate – the petitioner was a callous spouse who was indifferent when she fell down the stairs shortly following childbirth; he ignored the children – he did not play with or engage these children, he did not bathe these children, and he "never put a spoon of food in K    's mouth." In 1/2018, the petitioner's previously noted personality changes become more pronounced and he was frankly aggressive – he grabbed, twisted, and bruised her arm. She called his PCP, Dr. Williams, who documented the incident.

- In 5/2018, the petitioner vacated the family home shortly after he was informed by former nanny, Kim Steinbock, that the respondent sought to have him killed – frankly, this is a preposterous allegation. A medical student, Stephanie Nelson, who studied in the family home overheard Ms. Steinbock suggesting to the respondent that the respondent should have the petitioner killed. Ms. Steinbock was fired – her behavior was odd and she was strangely possessive of the children. The petitioner's allegations that she has subsequently approached others to have him killed is fabrication. She did indeed bring an expert in to search the family home for recording devices – she had reason to believe that the petitioner was recording her, and she knows, with certainty, that he also "bugged" her offices.

- In 6/2018, the petitioner's aggression escalated and he pushed her into the refrigerator while she was holding the subject child J    – relatedly, she filed the first of several EPOs. Her friend and college, Dr. Sheila Guelda, was present when the petitioner engaged in this act of violence.

- The respondent fears the petitioner – he is outraged that she had the gall to "out" his cognitive compromise. To retaliate, he directly stated that he will "ruin" her life – he will

Page 33 of 50

SR-149

devastate her financially and he will destroy her medical practice. Further, though he has
no interest in the children, he is aware that harming the children and separating her from
these children is the greatest way to cause her distress and, as such, this is what he intends
to do.

- The respondent never referred to the petitioner as "Dad" or Daddy"; he never referred to
himself as "Dad" or "Daddy" until such time he decided to posture that he was these
children's father to this Court. The subject children are in no way his children – regardless
of the Court's ruling, his claim to these children is illegitimate.

- J     began to report that the petitioner was abusive a soon as he became adequately verbal,
in the summer of 2018. Despite the respondent's objections, the Court did not act to protect
the children and, in 8/2018, petitioner Crabtree was allowed unsupervised parenting time
– not surprisingly, the petitioner hit J     in the head.

- J    's psychiatrist, Dr. Nichols, reported to CPS the respondent's concerns: The petitioner
is compromised due to MCI, he has access to guns, he had just recently secured car seats,
he allowed J    to play by an open window, and he took J    for ice cream, causing this
child to vomit. From this time onward, there have been near constant CPS/CHFS and
Pediatric Forensic Medicine [PFM] investigations related to the petitioner's misconduct:

  o The petitioner has physically abused these children; he has broken J    's arm, he
    has dropped this child and injured his back, he has bruised the children's ears, he
    has hit these children in the mouth, there have been abrasions, bruises, and scratches
    that could not be explained, K    's frenulum was torn, and K    's fingernails were
    torn off. Relatedly, the children have had numerous medical contacts and imaging
    studies, including MRIs, skeletal surveys, and follow-up skeletal surveys.

  o The petitioner has been medically and hygienically negligent – the children are
    returned to the respondent's care with fecal matter dried on their skin, they
    developed skin rashes in his care, and they have been ill and not taken to a doctor.
    Indeed, K    had the flu and her symptoms were ignored by the petitioner; J    's
    scrotal cellulitis was not treated; the children have been returned with ear infections
    and fevers.

  o The petitioner has sexually abused J    from 9/2018 to the present – J    has
    reported sexual abuse by the petitioner to "18 people," including family, friends,
    Dr. Crumbo, and CPS staff. Specifically, J    has stated that his father has pulled,
    grabbed, and rubbed his "pee pee." The petitioner does this on the couch while
    watching TV, as well as in the bed, and in the bed, under the covers. J    has also
    reported that his father puts his "pee pee" on J    's "pee pee."

  o The petitioner is now starting to sexually abuse the subject child K    – J
    reported that the petitioner rub's K    's "no no area."

  o The petitioner is emotionally/psychologically abusive and cruel to J    ; J    has
    been "traumatized" by the petitioner's abuse – he denies this child his requests to
    call/FT the respondent, he threatens to retaliate against this child should he allow
    the respondent to take his video, he becomes frustrated with this child and lashes
    out [on one occasion, he hit the child in the head for kicking the back of his car
    seat], and he has locked j    in a cabinet/closet, which was "dark" and this child
    was "afraid."

  o The petitioner is hostile and inappropriate at exchanges of the children – on one
    occasion, the petitioner assaulted her in a parking garage; he is argumentative; and

SR-150

recently, he placed the front of his body close to the back of her au pairs body while she put the subject child K     in her car.

The respondent underscored that she is, frankly, stricken with disbelief that CPS/CHFS and this Court have failed to act to protect the children. The  respondent underscored that CPS/CHFS, CPS/CHFS supervisors, and this Court have failed to act 1) despite the multitude of allegations described above; 2) despite awareness that the petitioner was arrested and charged with her assault; 3) despite awareness that CACU/LMPD has opened and focused a criminal child abuse investigation on petitioner Crabtree; 4) despite multiple EPO filings; and 5) despite the multitude of individuals who have been "highly concerned" or "concerned" about abuse including but not limited to pediatricians, ER/ED staff, psychiatrist Nichols, Dr. Guelda, Dr. Herr, and Dr. InKim. Further, PFM's professional decision making has been problematic – indeed, Dr. Currie recused herself soon after the first referral; Drs. Currie and Rao have refused to meet with her and take her calls; and, after review of compelling medical documentation, medical neglect and physical abuse has not been verified. The respondent asserts that, despite appeals to administration, no action was taken by PFM to protect the children from the petitioner's abuse. Near the end of the evaluation process, the respondent stated that she believes that the petitioner, who has politically influential associates and who previously managed money for the hospital with which PFM is affiliated, has exerted pressure on PFM to ignore the children's plight and bias their findings in the petitioner's favor.

Based upon comprehensive record review, collateral interviews including extensive consultation with CACU's Det. Ernst and PFM's Dr. Rao, and approximately 20 hours of forensic interview, it is the conclusion of the undersigned that there is an abundance of support for petitioner Crabtree's stated concerns: *The respondent has engaged in a deliberate, premeditated, and, frankly, "diabolical" campaign to convince, in particular, the toddler aged subject child J     that he is the victim of multiple forms of abuse perpetrated by the petitioner/his father. After she recognized, through mediation in 2017 that she would likely not prevail with regard to her goal of eliminating him from the children's lives, she sought marital reconciliation with a plan to capitalize on his medical problems – she sought to create a paper trail of medical documentation to create a fiction that he was demented. When these efforts failed, she sought to use the power of the child welfare systems to legitimize her false claims that he was a cognitively compromised child physical abuser and pedophile. The only way to accomplish this goal was to foster these beliefs in J     , who would then make physical and sexual abuse allegations against the petitioner. He has no doubt that there was intentional and malicious coaching. The respondent often engaged in behavior, in the presence of the children, which communicated to these children that he is stupid, unsafe, and unworthy of their respect and love. The petitioner's narrative indicated that he fully appreciates that these behaviors imply acts consistent with what is often called 'parental alienation.' The respondent seized every opportunity to present J     to medical and mental health professionals, who were mandated reporters – when the respondent did not quickly achieve desired results, she filed serial EPOs naming him as perpetrator, had him falsely arrested for an assault he did not commit, and enlisted others to stalk and harass him in the hopes that he would withdraw from the subject children's lives. The petitioner firmly believes that the respondent is a threat to the welfare and safety of others, including the children and himself, by virtue of criminal mentality. Her goal is to possess the subject children and eliminate him from these children's lives. She is capable of absconding with the children; he worries that she may harm the children if it appears that she will not achieve her legal goals. He also believes that she attempted to solicit his murder.*

Page 35 of 50

The cumulative information indicates the following:

- **There is no support for the respondent's claims of DV/IPV:**
    - Prior to the time the respondent filed for divorce in 2017, there were no allegations of DV/IPV or child abuse. The respondent acknowledges that she initiated marital reconciliation because she was made aware, in mediation, that she was unlikely to accomplish her legal goals with regard to securing sole custody and controlling all father-child contact.
    - There have been 7 EPOs, several of which have alleged DV/IPV – none have been upheld and all have been dropped or dismissed.
    - Following a 2-day hearing which focused on the alleged assault of respondent Russell by petitioner Crabtree, this Court heard from the respondent's witness as well as reviewed video evidence. Per a detailed finding of Fact, this Court opined that the respondent exaggerated and provided testimony that was frankly untrue.
- **There is no support for the respondent's persistent claims from 2018 to the present that the petitioner is cognitively compromised:** Though she was directly informed or was sent correspondence, in 2018, by PCP Williams, neurologist Puri, neurologist Friedland, psychiatrist Schrodt, and neuropsychologist Burton that the petitioner did not suffer from MCI such that his overall adjustment and functioning was compromised or his complex judgment impaired, she has persisted, to the present, with claims that the respondent is unable to parent related to neurocognitive compromise. Despite awareness that neuropsychologist Burton conducted follow-up assessments of the petitioner's neuropsychological functioning in 2017 and 2018, she rejected his conclusions that the petitioner's cognitive functioning had improved related to better chemical management of Celiac Disease and ADHD. Indeed, she alleged that Dr. Burton was positively biased and, for unknown reasons, minimized the petitioner's cognitive problems. Further, though she was aware that Dr. Puri did not perceive the petitioner's rejection of a prescription for Aricept [a medication to address the effects of dementia] to be problematic, she presented this information to the undersigned so as to imply that the petitioner was non-compliant with medical advice. Medical records and EPO petitions from these proceedings, spanning 2018, 2019, and 2020 document the respondent's ongoing claims – indeed, she is documented to have informed a medical provider that the petitioner had an "early form of dementia." Lastly, though the respondent stated that she was supportive of the undersigned's recommendation that the petitioner be assessed by a neutral neuropsychologist, she rejected the recommendation of Dr. Perri based upon a stated belief that Dr. Perri would be vulnerable to the political influence of the petitioner's friends/associates. This led to a substantial delay in the completion of the custodial evaluation. Upon deposition, the respondent was unable to provide information about these politically-affiliated individuals; when queried in 6/2020 by the undersigned, the respondent insinuated that Senator Mitch McConnell may have been willing to pressure Dr. Perri to bias his results in favor of the petitioner.
- **After comprehensive review of medical records spanning 2018 to the present, the Division of Pediatric Forensic Medicine has concluded that there is no support for the respondent's claims that petitioner Crabtree is physically abusive and medically/hygienically negligent – to the contrary, PFM has noted serious concerns that the respondent is exaggerating or fabricating medical events and situations to achieve a secondary goal:** Respondent Russell has alleged that petitioner Crabtree has engaged in multiple acts of child physical abuse and supervisory neglect, as well as has

Page 36 of 50

been medically and hygienically negligent. Across 8 investigations, the Division of
Pediatric Forensic Medicine has concluded that there is no evidence that the petitioner is
physically abusive or medically/hygienically negligent. To the contrary, in 5/2020 and
7/2020, PFM concluded: "J    's current presentation is very concerning for pediatric
condition falsification by the mother. Additionally, prior presentations for J    and his
sibling were highly concerning for pediatric condition falsification by the mother, through
fabrication of child maltreatment concerns … These authors would have concerns for J   .
and his sibling if exposed to the caregiving environments where concerns have been noted,
without interventions and services to address the underlying issues and to help prevent
future harm to the children."

   o  Highly manipulative behavior was noted on the part of respondent Russell:

      ▪  In 9/2018, PFM noted: "*Despite multiple conversations with the mother
         [respondent Russell], it appears that she continues to not accurately
         recount the PFM impressions regarding J    and his sibling ... these
         authors have identified no findings definitive of physical abuse ... the
         mother has been informed of this multiple times ... contrary to her
         interpretation of Dr. Currie's initial note on the case, the elbow injury was
         never documented to be diagnostic of abuse.*"

      ▪  Though respondent Russell informed the undersigned that PFM would not
         meet with her [yielding the impression that PFM had refused
         communications with her], PFM records documented that respondent
         Russell telephoned PFM staff during off hours and when informed that a
         physician would not be available; she had conversations with Dr. Rao, Drs.
         Rao and Green, Dr. Green and Nurse DeJarnette, and then a conference call
         with Drs. Currie, Rao, and Green. During these conversations, the
         respondent misrepresented what one physician reported, stated that the
         subject child J:   has told "8 or 9 people that are not me" that the petitioner
         inflicted his injury, and informed that she had called multiple people,
         including the "governor's wife" about her concerns regarding the subject
         child J   's safety. PFM noted discrepancies in the respondent's statements
         about J    's reports of how said injury occurred. When dissatisfied with the
         responses of Drs. Rao and Green, the respondent contacted Division Chief,
         Dr. Currie, after hours, on her private cell phone. Dr. Currie reports that the
         respondent's claims that she was given this private number by Dr. Currie
         herself are inaccurate. During this call, the respondent stated that she was
         "super confused" as to "why nothing is being done." She reported that PFM
         and CPS "do not know whole story of what's going on... right hand does
         not know what the left hand is doing." The respondent alleged that CPS was
         blaming the lack of urgency on PFM. The following were addressed:

         •  In a subsequent report, PFM notes that respondent Russell reported
            that she was told by the Norton's Children's Hospital [NCH]
            physician that a mark on the subject child K    was "very
            concerning" for a bruise. PFM staff twice followed up with the ER
            physician who twice clarified that there was no definitive finding of
            a bruise and no definitive concern for inflicted injury. To the
            contrary, the NCH physician stated that respondent Russell was

Crabtree & Russell Children            FES #: 1482                Dkt/Case #: 18-CI-501606

informed that it could not be determined that the mark was definitively a bruise or that this was definitively concerning.

- The respondent stated that Dr. InKim reported to her that he knows petitioner Crabtree well enough to know that he "needs a watchful eye" and "he will let these injuries continue and not ask for help." However, Dr. InKim has refused to sign an affidavit regarding this alleged statement.
- The respondent stated to these PFM physicians that petitioner Crabtree "is going to kill them [the children]" if they remain in his care.

o Based on the respondent's reports that the petitioner had "an early form of dementia" and was sexually abusing J    , mental health evaluation was recommended for the petitioner; based on respondent Russell's observed behavior, PFM recommended mental health evaluation for the respondent: *"Concerns for possible mental health issues were noted with regards to both parents. Of particular concern was that mother's statements were noted to be contradictory to the ED/NCH physician's statements."*

o The respondent has alleged that physicians at PFM have been somehow persuaded to bias results in the favor of the petitioner as he was once a financial manager for the hospital with which PFM is affiliated. Dr. Currie responded that this allegation is baseless and, frankly, offensive.

o Dr. Currie reported that the respondent has appealed to her administrative supervisor, the Department Chair and to a former officer of PFM's affiliated hospital.

- **There is no support for the respondent's claims to child welfare authorities that the petitioner is emotionally, physically, and sexually abusive and engages in chronic acts of supervisory and medical/hygienic neglect:**
  o CACU and CPS/CHFS fully investigated 30 or more allegations of misconduct – none were substantiated.
  o Det. Ernst found "not one shred" of evidence that the petitioner has engaged in any form of maltreatment of the children during extensive criminal investigation.
  o Witnesses who were reported by the respondent to have first-hand information of events or been privy to relevant information have either been deemed to lack credibility, were not produced or identified by the respondent, or refused to provide the information that the respondent requested.
  o Per the reports of Dr. Crumbo and Sacred Heart staff, the subject child J demonstrates no anxiety or fear of the petitioner as reported by the respondent – to the contrary, J    is excited to see the petitioner and asks him to pick him up early from school; J   's comportment in Dr. Crumbo's office is typical and his separation behavior, when in the care of the petitioner, is well within the normal range.
  o Per the reports of Sacred Heart, CPS/CHFS, and CAC/Forensic interview staff, J    has spontaneously made similar comments: his mother says his father is a "monster," but his father is not a "monster"; his mother "hates" his Daddy, but J "likes my Daddy"; his mother is not telling the truth, but his father is telling the truth; his mother says his father hurt this child and his sibling, but J   fell down

Page 38 of 50

- 26 -

**SR-154**

while running on the sidewalk and his sister hurt herself. Indeed, J     stated his mother "thinks" she is telling the truth, but she is not.

- There is no support for the respondent's claims that the petitioner, who has no religious convictions or associations, affiliated himself with a ministry to travel to impoverished areas to access children. CACU fully investigated this allegation – there were no concerns; Southeast Christian Church confirmed that the petitioner has been an active member since 2012. Further, and notably, without any way to anticipate that the undersigned would ask questions pertaining to his faith, the petitioner reached inside the collar of his shirt and pulled out a necklace with a small gold cross.

- There is a tremendous amount of support [including audio/video recordings from the respondent's seized cell phone, as well as teachers' reports] for the petitioner's claims that the respondent has engaged in a campaign of behavior intended to denigrate him and the image of father in the eyes of the subject children. Comprehensive review of this information is beyond the scope of the instant CONCLUSIONS. The reader is encouraged to read the collateral interview with CACU's Det. Ernst, pp. 39-53 of the attached NARRATIVE REPORT. In the very strong opinion of the undersigned, so long as CACU did not alter audio recordings or the statements of witnesses, it is certain that the respondent has engaged in an extreme, repetitive pattern of behaviors that are fully consistent with what many refer to as 'parental alienation.' Further, upon final forensic interview, the respondent acknowledged the accuracy of a percentage of the audio and video recordings. As such, there is no doubt that coaching has occurred – J    has been asked repetitive, leading questions; he has been interrogated; and he has been aware that he is asked to report that his father does things to hurt him [he has looked directly at the camera when making reports]. J     has been exposed to toxic, negative statements about his father and has been led into extreme emotional upset by the respondent, who introduces the notion that this child and his sibling are not "safe" in the care of the petitioner. Without question, both J    and the petitioner have been egregiously wronged by the respondent.

- There is support for the petitioner's claims that the respondent attempted to solicit his murder, as well as was linked to individuals who have stalked and harassed him:
  o Det. Ernst reported to the undersigned in collateral interview that there is credible evidence to support that the respondent discussed the petitioner's murder with more than one individual.
  o There exists an affidavit, from Ms. Steinbock, that the respondent sought to have the petitioner killed, sought a gun with a silencer, suggested a time when the respondent sought to have the petitioner killed while out of town, and noted her need for a person to be a "go between" the respondent and the person who was to kill the petitioner.
  o Detective Ernst stated that the petitioner's stalker, Mr. Schnatter, absolutely exists. He has been photographed/video recorded in the petitioner's garage and he presented to the petitioner's workplace. There exist voicemails and, per petitioner Crabtree, his attorney, Mr. Mudd, has spoken with stalker Schnatter. Det. Ernst stated that she has reason to believe that the respondent is linked to this stalker.
  o An individual, who may or may not be stalker Schnatter, left flyers on the cars in the parking lot of the petitioner's employer which labeled him a pedophile. Only the respondent or someone familiar with information related to the petitioner's former wife would have had access to the information reported in the flyer. Noteworthy is that the respondent and her cousin, Leslie Poore, reported to the

Page 39 of 50

undersigned that they located, contacted, and spoke with the petitioner's former wife, Tammy Lewis.

o  An individual, who may or may not be stalker Schnatter, sent a letter to the respondent's employer posturing to be a client who happened to be in Family Court and became aware that the petitioner is the subject of multiple EPOs and is a perpetrator of DV/IPV and child abuse. Only the respondent or someone familiar with information related to the instant proceedings would have been aware of the information contained in the letter.

o  A *female* caller purporting to be from the office of counsel for the respondent, Mr. Clay, contacted Susan Bumann-Reihl of the Latin School of Prospect, where the petitioner had recently enrolled the children for summer programming during his work time/parenting days. This caller objected to the children's enrollment as the mother of the children had not consented – should harm befall the children, she would hold Ms. Bumann-Reihl personally responsible; there would be litigation. This caller also sought to cast aspersions on the character of the petitioner – the Latin School was informed that he had child abuse cases pending, was charged with 4th Degree Assault of the children's mother, and the school was informed that they had "a violent parent on their hands."

o  A woman identifying herself as a Julie Locke called the children's preK Director, Ms. Houghlin. Ms. Locke was said to have a FB page that features objections to the Hon. Denise Brown. At that time, Director Houghlin was unaware that Ms. Locke was contacting her in affiliation with respondent Russell; Ms. Locke identified herself as a "victim advocate." Ultimately, Ms. Locke's purpose was revealed – Ms. Locke was attempting to guide Director Houghlin to retract or alter her previous statements about respondent Russell and the subject children to CPS. Ms. Locke underscored to Director Houghlin that CPS has history of, in essence, gross incompetence. Further, Ms. Locke sent Ms. Houghlin a screen shot of the statement that Ms. Houghlin made to CPS about the Crabtree/Russell case – thus, Ms. Houghlin was able to conclude that respondent Russell very likely had provided Ms. Locke with this information. Following the communication with Ms. Locke described above, Director Houghlin sent respondent Russell an email asking for child-related information. Respondent Russell replied by confronting Director Houghlin with her reports to CPS [which the respondent had access to through an Open Records request]. Director Houghlin set firm limits, stating that she would gladly meet with the respondent to share information with regard the children – however, she made clear that she was unable to discuss details of the CPS investigation. Respondent Russell failed to respond to this firm feedback and persisted by stating that she suspected that CPS documented what she suspected was not an accurate account of what Director Houghlin reported to CPS – did Director Houghlin prefer to discuss this with the respondent's attorney? Ms. Houghlin states that she contacted her HR Director; the HR Director contacted the school attorney. Ms. Houghlin stated that respondent Russell then contacted Ms. Houghlin by Email and was "a little bit" threatening. Ms. Houghlin opted not to respond to the respondent.

During the course of the instant evaluation, former FOC Guthrie submitted a report, dated 12/2018, which 1) recommended neuropsychological evaluation related to possible degradation of

Page 40 of 50

SR-156

judgement and neurological compromise as an outgrowth of Multiple Sclerosis; 2) asserted that the respondent openly solicited others to kill petitioner Crabtree – "this is antisocial and dangerous behavior ... It suggests significant mental health issues that require treatment... suggests that Dr. Russell's personality may not admit subordination to the law if she is dissatisfied with the outcome of this case."

- A letter, dated 12/27/2018, from the office of Jeffrey Cohen, MD, Neurologist, documented the status of the respondent's neurological health.  [Note: Dr. Cohen's CV, which was requested and reviewed, easily establishes that he is an esteemed expert on the topic of Multiple Sclerosis – indeed, his credentials are stellar and he is prolifically published in well-respected, peer-reviewed journals.] Dr. Cohen documented that the respondent's clinical symptoms are mild and remained stable and mild between 2012 and 2018 "despite her being off [medication] therapy." Though imaging studies have revealed the presence of lesions, there is an absence of neurological symptoms, fatigue, and depression; neurologic examinations have remained within normal limits; and results on neurocognitive performance tests have been non-anomalous. Hence, chemical therapy is not mandated. Dr. Cohen also noted that neuropsychological testing is not required as respondent Russell has been evaluated numerous times since 2003. As of recent testing in 2018, she had no notable deficits in memory, communication/language, attention, executive function, or judgement. Indeed, she demonstrated above average functioning. Dr. Cohen concluded "it is very unlikely that Dr. Russell has significant cognitive impairment. Dr. Cohen also noted that, for the reasons denoted above, the concerns of FOC Guthrie that MS may possibly explain the "sporadic and volatile interactions of the parties" are not viable.  Given the above statements of Dr. Cohen and consistent observations of above-average intellectual functioning across 20 hours of forensic interview, the undersigned is confident that the respondent does not suffer from MS such that her intellectual and mental health is adversely impacted. Thus, she was not referred for neuropsychological assessment.
- The undersigned concurs with FOC Guthrie that solicitation to commit murder is indeed an antisocial act, suggestive of dangerous behavior and an unwillingness to subordinate oneself to laws and the rules of social institutions. In addition to FOC Guthrie, Detective Ernst, GAL Murphy, and the petitioner have expressed concern to the undersigned that the respondent may pose risk of harm to the children should it become evident that she will be unable to achieve her legal goals. Noteworthy is that petitioner Crabtree is documented by psychiatrist Nichols to have shared concerns, on 10/13/2018, that respondent Russell was capable of harming the children: "...took his guns early on and has had access to his guns ... father worries that mother would do something terrible if the children were removed from her."  Should this Court conclude that the respondent has sought to solicit petitioner Crabtree's murder or other criminal activities such as conspiring to stalk or harass, it is essential for the reader to understand that organic mental illness related to MS would *not* account for these deliberate, pre-planned, and highly controlled acts. Rather, the underlying psychopathology would be a disorder of the personality, which would have been present throughout the respondent's adult lifespan.

Based upon the information detailed above, it is the opinion of the undersigned that FOC Guthrie's concerns that respondent Russell demonstrates deeply entrenched, pathological behaviors are accurate. Specifically, it is the opinion of the undersigned that the origin of the

Page **41** of 50

SR-157

respondent's maladaptive maternal behavior is rooted in a severe **Unspecified Personality Disorder, with prominent Narcissistic and Antisocial Traits [Histrionic and Borderline qualities are present but are less pronounced].**

A personality disorder is a deeply ingrained and inflexible pattern of relating, perceiving, and thinking that is of sufficient severity to compromise one's overall adjustment and functioning. Personality disorders are recognizable by late adolescence or early adulthood and continue throughout adulthood. Some aspects of personality disorders become less problematic throughout middle age (e.g., behavioral aspects of antisocial personality such as the active commission of crimes); however, others persist and continue to impair the diagnosed individual's functioning (e.g., personality traits such as antagonism and empathic deficits). Personality pathology is also exacerbated during times of stress.

Pathological narcissism [and Narcissistic Personality Disorder] is characterized by an excessive need for admiration, a grandiose sense of self-importance, and lack of empathy. **NPD and/or prominent narcissism is particularly damaging to the diagnosed individual's ability to parent in a responsive and empathic manner.** Individuals with this disorder are self-focused and react negatively to criticism or feedback. They often believe that they are more knowledgeable than professionally-trained others and may fail to heed important warnings as a result. Not only does NPD interfere with an individual's ability to parent in an empathic, safe, and minimally adequate manner, but the characteristic lack of insight associated with the disorder complicates treatment (and often results in treatment non-compliance and/or dropout).

- As is referenced above, respondent Russell is described by numerous professionals to be entitled and demanding – her expectation has been preferential treatment and she does not hesitate to impose her needs on even professional others. When she is not accommodated, the records demonstrate that she engages in highly manipulative behaviors designed to achieve her desired goal. Her comportment as described by PFM is highly consistent with narcissism.
    - o Respondent Russell called PFM Director Currie, on her personal cell phone and after hours. Dr. Currie reports that she did not give the respondent her cell phone number and that the respondent obtained the cell number through some unknown means.
    - o The respondent called PFM physician Rao outside of the hours that she was informed her call could be received.
    - o The respondent called Dr. Currie when she was dissatisfied with Dr. Rao's conclusions; the respondent called the Chairman of the Department when she was dissatisfied with Dr. Currie's response; the respondent called a former officer of the hospital with which PFM is affiliated.
- As demonstrated by numerous audio/video recordings recovered from her seized cell phone, the respondent's comportment with petitioner Crabtree is markedly narcissistic in flavor – she rather callously exerts her superiority and power over the petitioner: she speaks to him as if he is an idiot, she demeans his parenting in the presence of the children, she makes direct statements that she is a far superior parent, she seeks to intimidate, she makes threats, and she misuses the statements of Dr. Crumbo to shore up a false assertion.
- Per a Finding of Fact issued by this Court following a 2-day DVO hearing, the respondent provided exaggerated and false information regarding her allegations that the petitioner assaulted her. Her willingness to strip the children from contact with the petitioner based

Page **42** of **50**

on false information is a testimonial to narcissistic entitlement and a lack of empathy for the children. If it is accurate that the respondent utilized this same false information to have petitioner Crabtree arrested and prosecuted in connection with this assault – again, pathological narcissistic entitlement contributes to her remarkable ability to be psychologically comfortable with causing an innocent other such harm.

- If Det. Ernst's conclusions are deemed to be accurate by this Court – again, pathological narcissistic entitlement significantly contributes to the respondent's above-referenced ability to be psychologically comfortable with causing an innocent other possible false prosecution.

- The respondent believes that only she is worthy and capable of parenting the subject children. There is every indication [per Dr. Crumbo, school administration and staff, CPS/CHFS] that these children love and benefit from contact with the petitioner; the respondent's statements in forensic interview make clear that she believes that these children belong to her and that the petitioner, whose legal claim has been validated by the Family Court, has no right to these children.

- The respondent expulsed the petitioner from a family hotel room at Disney World related to his placement of a pill on a ledge – the petitioner reports that J     could not access this pill; the respondent reports that the pill, theoretically, could have been accessed. As self-described, the respondent's behavior was histrionic.

- Video/audio of visitation exchanges document dramatic behavior, with one exchange demonstrating a disproportionate emotional response in which the respondent states in the presence of the children that the petitioner is irresponsible regarding the children's "life or death" [this example would be mitigated if the car seats were, in actuality secured incorrectly].

- The respondent's texts to the petitioner in 8/2019, which are described in the INDENTIFICATION & ISSUE SUBSECTION of the NARRATIVE REPORT are notably manipulative and self-serving.

- The respondent was observed to have had significant difficulty with awareness of appropriate boundaries – while such traits can be attributable to other types maladaptive personality features,  these behaviors can also arise out a disproportionate sense of entitlement:

  o Per Dr. Crumbo, the respondent was not at all hesitant to discuss allegations of abuse in the presence of J    c – indeed, she would make statements and reports, even of alleged sexual abuse, in the presence of J    :. At times, she would spell words to talk over J     's awareness, but the context was likely discernable to J    : "He could pick up on the tension and the mood and interpret it." This behavior persisted though Dr. Crumbo role-modeled how to set appropriate limits and boundaries by making statements to J     that he must go outside the room to play as the adults were talking. On one occasion, when Dr Crumbo encouraged the respondent to redirect the child to the playroom, the respondent told the child it was "ok with her if he stayed in the room" – this was particularly problematic as J₁ had entered the room while the respondent was providing Dr. Crumbo with a highly animated description of adult concerns. Indeed, as J₁    was, on these occasions, a cognitively intact 3 and 4-year-old, he most certainly was picking up bits and pieces, if not chunks, of the negative commentary about the petitioner/his father.

  o The undersigned witnessed the same behavior as described above by Dr. Crumbo during the home visit and during mother-child interactions in 6/2020.

Page 43 of 50

Crabtree & Russell Children                FES #: 1482                Dkt/Case #: 18-CI-501606

- o The respondent often texted the undersigned's cell phone; numerous texts were received after hours/on weekends. [The undersigned did not set limits as the information was diagnostically helpful – however, the boundary violation was nonetheless present.]
- o The respondent reported that she contacted the "First Lady" of KY/Governor's wife or her office regarding the subject children.
- o The respondent made numerous attempts to contact Dr. Perri regarding the petitioner's pending neuropsychological evaluation to engage him in what she knew would be a HIPAA violation.

Those diagnosed with Antisocial Personality Disorder typically have little to no regard for right and wrong. Though respondent Russell does not meet criteria for a formal diagnosis of APD as there is no evidence that she demonstrated conduct disturbance in childhood or adolescence, she nonetheless demonstrates features of this disorder. Those with antisocial personalities may violate the law and the rights of others, and frequently are in conflict with others, authority figures, and institutions. They lie manipulate, exploit opportunities, are prone to irritability when they perceive their needs or demands to be unmet, are capable of behaving violently, and are comfortable intimidating others. These individuals are prone to impulsivity, violent interpersonal relationships, and often act in an irresponsible or reckless manner. They are deficient in the ability to empathize, and often lack regret or remorse about having harmed others. Individuals with this form of personality pathology have higher rates of adjudicated child abuse and neglect than the general population. The intensity of antisocial symptoms tends to peak during the 20s and typically gradually decrease over time. It remains unclear if the lessening in severity of symptoms is a result of the aging process or merely reflects an increased awareness of the consequences of antisocial behavior.

- Examples of such antisocial behaviors abound throughout the instant and attached reports.
- The reader is referred above to the table, which presents the internal and external inconsistencies in the respondent's reports, as well as her use of manipulation and lies of omission and commission.
- The reader is referred below to the discussion of psychopathy for a summary of possible criminal antisocial acts.
- Videos/audios which demonstrate deliberate coaching of J    , with indifference to this child's distress is both antisocial and narcissistic in quality.
- Deliberate infliction of emotional distress upon the petitioner by virtue of bringing forth false allegations that could result in criminal prosecution and by inducing the distress in J     then sending the petitioner texts/pictures/videos of this child's distress is both antisocial and narcissistic in flavor.

Although the respondent presents with features of both narcissistic and antisocial personality disorders, the respondent's personality pathology can best be conceptualized as a constellation of maladaptive personality features from numerous domains of personality trait variation, each of which may be more or less prominent at a given period of time and each of which may interact (with other personality characteristic or contextual factors) to influence behavior.

The reports of Dr. Crumbo, the reports of Det. Ernst/CACU, the notations from PFM regarding a high degree of concern regarding Pediatric Condition Falsification, information obtained in 20 hours of forensic interview, the reports of Sacred Heart pre-K staff, and most persuasively, the

Page 44 of 50

SR-160

audio/video evidence which demonstrated intentional coaching to generate allegations of child sexual and physical abuse, denigration of the petitioner in the presence of the subject children, and the induction of a hysterical tantrum in J____ based on fear of the petitioner, indicates that respondent Russell's parental judgment is critically compromised. These behaviors also represent a remarkable and, frankly, astounding, lack of empathy for the subject children and, in particular, the older subject child J____. Indeed, the respondent is clearly psychologically comfortable inducing hysteria and fear in J____'; she interrogates this child to destroy any happiness he may have had in his father's care; she creates the image for this child that his much loved father is, in this child's words, "a monster"; and Dr. Crumbo's reports and the records indicate that the respondent's behavior precipitated J____'s loss of independent play skills [2 years old] and *created* separation anxiety at a developmentally atypical time [4 years old]. When confronted in the final forensic contact, the respondent did not state regret, much less demonstrate any emotional response indicative of remorse. Rather, she was dismissive: "I used to do that, I don't do that anymore." She is lacking in any insight into the wrongfulness of her behavior; she perceives herself to be an excellent mother whose parenting is superior to the petitioner's in every way.

**Should this Court conclude that the respondent 1) has engaged criminal behavior to include solicitation to commit murder and stalking; 2) was complicit in the public denigration and humiliation of the petitioner by leaving flyers and sending the aforementioned letter to his employer; 3) was complicit or facilitated Julie Locke's inappropriate contact with pre-K Director Houghlin and then sought to intimidate this Director to achieve the goal of having Ms. Houghlin alter her reports to CPS under duress; and/or 4) was complicit or facilitated the anonymous call to Prospect Latin School to denigrate the petitioner and with the intent to intimidate and threaten Director Bumann-Reihl into terminating the subject children's summer enrollment, the undersigned notes that this behavior is indicative of psychopathy/sociopathy. If psychopathy/sociopathy is indicated, this has profound implications as this level of psychopathology cannot be ameliorated – there are no treatment interventions that can mitigate risk to the children. Under such a circumstance, a persuasive argument could be made that there should be no mother-child contact and, if contact did occur, this contact should remain supervised, by sight and sound, and with safety mechanisms in place, until such time the children reached the age of majority.**

[Psychopathy, as defined by Hare & Neumann (*Psychopathy: Assessment and Forensic Implications*, Canadian Journal of Psychiatry, 2009; 54(12): 791-802) is not a diagnosis, but a form of personality disorder, akin to Antisocial Personality Disorder, that is best conceptualized as a psychiatric construct. Psychopathy is "a cluster of interpersonal, affective, lifestyle, and antisocial traits and behaviors, including grandiosity, egocentricity, deceptiveness, shallow emotions, lack of empathy or remorse, irresponsibility, impulsivity, and a tendency to violate social norms." Psychopaths are "shallow, unable to form strong emotional bonds with others, and lack empathy, guilt, or remorse." Psychopaths are skilled, pathological liars, who have a disproportionate sense of entitlement; they are emotionally callous, manipulative, and are often successful at conning others; they do not accept responsibility for their actions, no matter how egregiously they may have wronged others or caused others suffering; and they often have poor anger management and behavioral controls: "Their impulsivity and poor

Page 45 of 50

Crabtree & Russell Children          FES #: 1482                Dkt/Case #: 18-CI-501606

behavioral controls may result in reactive forms of aggression or violence, but other features (for example, lack of empathy and shallow emotions) also make it relatively easy for them to engage in aggression and violence that is more predatory, premeditated, instrumental [designed to achieve a goal], and cold-blooded in nature." Psychopathy is associated with increased risk for violence and criminal acts. Unlike others, people with psychopathy do not suffer personal distress related to the wrongfulness of their actions – they do not perceive their actions to have been wrong.  Psychopaths seek treatment "only when it is in their best interests to do so," such as when they are Court-mandated or as a condition of parole/probation.  They do not benefit from interventions focused on the development of insight, empathy, of the development of a moral conscience. Treatment interventions should be geared toward reducing recidivism for those criminally convicted with the explicit goals of reducing future harm to others. The lack of treatment for psychopaths is particularly vexing as the research literature describes a group of psychopaths, deemed "successful psychopaths" who do not come into contact with the criminal system (Neumann & Hare, 2008, Psychopathic Traits in a Large, Community Sample: Links to Violence, Alcohol Use, and Intelligence, Journal of Consulting and Clinical Psychology, Vol. 76, No. 5, 893-899).  Well-designed studies and meta-analysis have revealed that there is reason to be pessimistic regarding the psychotherapeutic treatment of the psychopath – indeed, there are very low rates of efficacy and there is evidence that psychopaths actually learn social cues in 1:1 therapy that they then employ to make themselves more effective at exploiting others.  Harris and Rice [2009] conclude that "there is no evidence that any treatments yet applied to psychopaths have been shown to be effective in reducing violence or crime. In fact, some treatments that are effective for other offenders are actually harmful for psychopaths in that they appear to promote recidivism. We believe that the reason for these findings is that psychopaths are fundamentally different from other offenders and that there is nothing 'wrong' with them in the manner of a deficit or impairment that therapy can 'fix.' Instead, they exhibit an evolutionarily viable life strategy that involves lying, cheating, and manipulating others." Successful interventions are described as "institutional incapacitation [incarceration] where practical": "... the existing literature only suggests ways to limit psychopaths advantages ... more complete solutions lie in interventions based in future advances in basic neuroscience and molecular genetics" (Harris & Rice, 2006, Treatment of Psychopathy: A Review of Empirical Findings in Handbook of Psychopathy, Ch 28, 555-572).]

While the respondent does present with what would typically be protective factors (i.e. intelligence, advanced education, occupational stability, and the support of at least two good friends), these things have yet to significantly mitigate her maternally maladaptive behaviors as detailed by the audio/video evidence, the information in the PFM reports, and the collateral reports of CACU/Det. Ernst. The extent to which risk factors for violence are present hinges on this Court's estimation regarding whether or not the respondent has engaged in the above-described criminal acts and the extent to which she may have sought to inspire fear or intimidate the petitioner, SH Director Houghlin, and the Latin's School's Director. In the opinion of the undersigned, it is unlikely that Det. Ernst/CACU misrepresented the evidence and, in this regard, the undersigned is inclined to believe the risk of violence presented by the respondent is uncomfortably high. However, the undersigned also appreciates that this Court has access to the full scope of evidence and information, and, as such, this Court may come to a different conclusion.

Page 46 of 50

Crabtree & Russell Children                    FES #: 1482                    Dkt/Case #: 18-CI-501606

Noteworthy is that, prior to the initiation of these proceedings, the respondent presented no known risk factors for violence and, in this regard and in the absence of the aforementioned possible acts of murder for hire, possible complicity with stalking and harassment, and possible intimidation of the petitioner and school staff, her historical risk of violence is low.

At the time of the instant report's submission, there was a pending CPS investigation related to Dr. Crumbo's CPS report of likely coaching [J      's heightened awareness of surveillance cameras and the shift of his reports that sexual abuse was then in the bed/under the covers] and the undersigned's conclusion that, by virtue of the audio/video evidence alone, the respondent has emotionally injured the subject child J  ; K    is at risk of Emotional Injury. Even in the absence of formal substantiations/adjudications, the undersigned's conclusion of Emotional Injury and PFM's high level of concern for Pediatric Condition Falsification [PCF; Munchausen's by Proxy] indicate that it is appropriate for the undersigned to note that the respondent presents empirical risk factors for engaging in future acts of child abuse and neglect. These risk factors, as based largely on the CARE [Agar, 2003], include:

- Suicidal or Violent/Aggressive Ideation [Present if Court concludes solicitation for murder occurred; Present if Court concludes involvement in stalking]
- Personality Disorder w/Anger, Impulsivity, Behavioral Instability
- Attitudes Supportive of Child Abuse/Neglect [Video/audio evidence; PCF]
- Extreme minimization or denial of parental misconduct
- Negative Attitudes Towards Intervention [Does not perceive she requires treatment]
- Distorted Attitudes Towards Child [Enmeshment w/J    ]
- Parent-Child Relationship/Interaction Problems [the development of separation anxiety as described by Dr. Crumbo]

PAGES 48-50 REDACTED

- 35 -

**SR-163**