UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

**ELECTRONICALLY FILED**

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                              CRIMINAL ACTION NO. 3:22-CR-00058-DJH

STEPHANIE RUSSELL                                          DEFENDANT

## STEPHANIE RUSSELL'S MOTION *IN LIMINE* CONCERNING ADMISSIBILITY OF MENTAL HEALTH TESTIMONY AND FAMILY COURT RECORDS

The Court has asked the parties to file motions *in limine* "regarding the scope of admissible mental-health testimony and records from the preceding family-court litigation" in the upcoming trial.  (Order, R. 120 pg. 2 ¶ (3), Page ID # 517.)  As explained below, evidence within the stated categories is useful because it illuminates defendant Stephanie Russell's state of mind at relevant moments in time, and thus the evidence will be admissible at trial for two material purposes: to establish that Ms. Russell was justified in acting in defense of her children when she engaged in the charged conduct, and to negate the government's proof that Ms. Russell acted with the specific intent to effectuate the murder of her ex-husband.

## INTRODUCTION

Motions *in limine* provide courts an opportunity to decide, within narrow limits, whether to exclude "irrelevant, inadmissible, or prejudicial evidence" by pretrial order. *United States v. Stone*, 543 F. Supp. 3d 535, 539 (W.D. Ky. 2021) (Russell, J.) (citing *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984), Fed. R. Evid. 103(c), *and Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013)). The court should not exclude evidence before trial "[u]nless such evidence is patently 'inadmissible for any purpose,'" however. *Ibid.* (quoting *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997). Rather, "the better practice is to defer evidentiary rulings until trial, so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Ibid.* (quoting *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975) *and Gresh v. Waste Servs. of Am., Inc.*, 738 F. Supp. 2d 702, 706 (E.D. Ky. 2010) (internal punctuation omitted)).

A court's authority to bar testimony before trial is limited even further in criminal cases by the Sixth Amendment. The accused has the constitutional "right to put before a jury evidence that might influence the determination of guilt." *Taylor v. Illinois*, 484 U.S. 400, 408 (1988) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987)). It is, therefore, "reversible error for a trial Judge to refuse to present adequately a defendant's theory of

defense." *United States v. Johnson*, 416 F.3d 464, 467 (6th Cir. 2005) (quoting *United States v. Garner*, 529 F.2d 962, 970 (6th Cir. 1976)).  Accordingly, if the accused asserts a "defense [that] finds some support in the evidence and in the law, the defendant is entitled to have the claimed defense discussed in the jury instructions." *Ibid.* (internal punctuation omitted).  The burden on the defendant "is not a heavy one," the Sixth Circuit has cautioned, and it is properly satisfied "even when the supporting evidence is weak or of doubtful credibility." *Ibid.* (quoting *United States v. Riffe*, 28 F.3d 565, 569 (6th Cir. 1994) and *Garner*, 529 F.2d at 970) (internal punctuation omitted).  Moreover, "[i]n analyzing whether the defendant has met his burden, the court must construe the evidence in the light most favorable to the defendant." *United States v. Perez-Rodriguez*, 13 F.4th 1, 19 (1st Cir. 2021).  "[T]he court is not permitted to weigh the evidence, make credibility determinations, or resolve conflicts in the proof," and it "must draw all reasonable inferences in favor" of the defendant's theory.  *Ibid.* (citations and punctuation omitted).

## FACTUAL BACKGROUND

There is evidence in the record to support three key propositions: at all relevant times, Ms. Russell was convinced that her two preschool-age children were in grave danger when with her ex-husband; after having complained to the legal authorities on so many occasions, and having been rebuffed every time, Ms. Russell

3

had concluded that further efforts to obtain the help of law enforcement would be futile; and Ms. Russell's mental health was severely disturbed, from both the empirical and clinical perspectives, when she engaged in the conduct alleged in the indictment.

Ms. Russell's sureness that her ex-husband posed a severe threat to her children's safety is documented throughout the Jefferson Family Court's records of the child custody litigation. That court's final order cites over two dozen occasions when Ms. Russell reported suspected abuse to Child Protective Services, specialists with Pediatric Forensic Medicine, court officials, school personnel, and others. (*See* Family Ct. Order, R. 123-3 pg. 60 ¶ 284, Page ID # 615; pg. 6 ¶¶ 24-25, Page ID # 560; pp. 55-57 ¶¶ 259-269, Page ID # 610-612.)  Ms. Russell expressed concerns that her children had suffered neglect or outright abuse from her ex-husband, including occasions involving: an elbow injury, several instances of toileting regression, a head injury, a bruised ear, a back injury, a lip injury, neglected symptoms of flu and strep throat, a tongue injury, a damaged fingernail, a bruised thigh, a bruised abdomen, confinement of one of the children in a cabinet, and sexual abuse.  (*Id.* at ¶¶ 24, 53, 217, 218, 240, 247, 255, 263, 264, 266, Page ID # 561, 567, 601-602, 606-609, 611.) Additional suspicions were reported by third parties concerning instances of sexual abuse and doubts about the ex-husband's

cognitive functioning and parenting skills.  (*Id.* at ¶¶ 114, 149, 245, 273, 275, Page ID # 581, 587, 607, 613.)  Ms. Russell discussed these reports and others with Family Court expert Kelli Marvin, Ph.D., telling Dr. Marvin that her ex-husband had hit one child in the head, had broken one child's arm, had neglected the children's medical and hygienic needs, had emotionally abused one child, and had sexually abused both children.  (Marvin Rep., R. 123-4 pg. 22, Page ID # 675.)  Ms. Russell similarly recounted these concerns to prosecution expert Amy Trivette, M.D., describing her ex-husband as a "pedophile" and asserting that he "was emotionally, physically, and sexually abusing the children, and medically negligent / neglectful of them."  (Trivette Rep., R. 123-2 pg. 5, Page ID # 545.)  In March 2022, Ms. Russell reached out to self-described spiritualists for help, asking (with all credulity) for a "death spell" on her ex-husband and texting, "He is molesting my child."  (Text msgs., R. 123-6 pp. 8, 11, 30, Page ID # 712, 715, 734.)  Consistent with all this, a chief part of Ms. Russell's conversations with the undercover agent / pretend hitman in May 2022 was her certainty that her ex-husband was hurting her children.  "He has been molesting my little boy," Ms. Russell told him, "[h]e's been molesting him since he was two and a half."  (Tr. of calls, R. 123-5 pg. 2, Page ID # 690.)  "He's got early onset dementia that nobody f-cking cares about," she added in a later conversation.  (*Id.* at pg. 14, Page ID # 702.)

Every time Ms. Russell sought help from the authorities, she got nothing.  Dr. Marvin, the Family Court specialist, offers a summary:  "From 2018 to the present [August 2020]," she wrote, "[a]pproximately 25 … child welfare reports/allegations … identified [the ex-husband] as perpetrator…." (Marvin Rep., R. 123-4 pg. 5, Page ID # 658.)  Of these, "all … were unsubstantiated." (*Ibid.*)  In addition to the child welfare allegations, Dr. Marvin counted eight Child Protective Services investigations, another eight Pediatric Forensic Medicine consultation reports, and three forensic interviews of Ms. Russell's son by the Crimes Against Children Unit.  (*Id.* at pg. 6, Page ID # 659.)  All of these were closed by the authorities without taking any action regarding Ms. Russell's ex-husband.  (*Id.* at pp. 24-27, Page ID # 677-680.)  Indeed, the Jefferson Family Court order reveals that, in early February 2019, Ms. Russell tried to submit a child welfare report to the Child Protective Services office, "but CPS declined to accept it, given the number of reports it had received from [Ms. Russell]." (Family Ct. Order, R. 123-3 pg. 54 ¶ 257, Page ID # 609.)  Ms. Russell was treated with similar disregard by an administrator at her child's school after she criticized the school's handling of an abuse allegation.  (*Id.* at pg. 55 ¶ 259, Page ID # 610.)  Staff at the Pediatric Forensic Medicine agency eventually decided that Ms. Russell's reports of abuse were all instances of "condition falsification" (also called "Munchausen's by Proxy") and

6

thus, by definition, Ms. Russell was "exaggerating or fabricating medical events … to achieve a secondary goal." (Marvin Rep., R. 123-4 pp. 24, 35, Page ID # 677, 688; *see also* Trivette Rep., R. 123-2 pg. 6, Page ID # 546.)  After years of this, writes Dr. Marvin, Ms. Russell was "stricken with disbelief that CPS/CHFS and [Jefferson Family] Court have failed to protect the children" despite, among other things, "the multitude of individuals who have been 'highly concerned' or 'concerned' about abuse...." (Marvin Rep., R. 123-4 pg. 23, Page ID # 676.)  The conviction that she had no hope of aid from the authorities to protect her children is a theme running through Ms. Russell's communications with the pretend hitman.  "[N]obody's helping me, I just need somebody to help me," she says early in their first conversation.  (Tr. of calls, R. 123-5 pg. 1, Page ID # 689.)  "Nobody cares.  Nobody cares," she says repeatedly, "They don't care.  They don't care." (*Id.* at pp. 2-3, Page ID # 690-691.)  "It's really hard, it's really hard to watch this happen and nobody care," she complains (*id.* at pg. 5, Page ID # 693), and she notes that even when there was evidence, "we presented it to the judge, she didn't care." (*Id.* at pg. 14, Page ID # 702.)

Ms. Russell's ongoing fear for her children's safety, and her belief that no one else would help her, exacerbated underlying Obsessive-Compulsive and post-traumatic stress disorders and triggered a mentally disturbed condition.  (Butler Rep., R. 123-1

7

pp. 3, 5, Page ID # 528, 530.)  Her "decompensated thinking and behavior" first manifested in the Family Court litigation, writes defense forensic psychiatrist Walter Butler, M.D.: "[S]he believed her two children had been neglected or abused by her then estranged husband," and her perception of her ex-husband "as dangerous to her children" caused a progressive deterioration "to the point of a delusional psychosis…." (*Id.* at pg. 5, Page ID # 530.) Though Ms. Russell functioned well in ordinary life – she showed "general adaptability in daily functioning, [a] confident demeanor, and conscientious work ethic" – people with Ms. Russell's clinical profile "decompensate along a predicted pathway" when experiencing "significant distress and challenge." (*Id.* at pg. 3, Page ID # 528.)  "In times of great stress," Dr. Butler explains, "persons with this personality pathology can psychologically descend into a severe ruminative and fixated obsessive state, where such psychopathology has been shown in the research to reach levels at which paranoid, delusional and psychotic thinking can begin to emerge within the broader context of cognitive compartmentalization." (*Id.* at pg. 4, Page ID # 529.)  By the time of the events in the indictment, Dr. Butler continues, Ms. Russell had become "profoundly delusional and obsessively fixated.  Her thoughts and behaviors were rageful, distorted from reality, delusional and psychotic." (*Id.* at pg. 5, Page ID # 530.)  Dr. Butler likens Ms. Russell's condition to a "psychotic 'road rage' state of

mind." (*Ibid.*)  She existed in a state of "altered internal reality," he writes, "singularly focused and obsessively … directed" toward the goal of "protect[ing] her children at all costs," but simultaneously unable to achieve "even simple acknowledgement of these divergent thoughts and behaviors…." (*Ibid.*)

Dr. Marvin offers a different, but also troubling, assessment of Ms. Russell's mental condition as of August 2020.  She writes that Ms. Russell was suffering "a severe Unspecified Personality Disorder, with prominent Narcissistic and Antisocial Traits." (Marvin Rep., R. 123-4 pg. 30, Page ID # 683.)  "A personality disorder," Dr. Marvin explains, "is a deeply ingrained and inflexible pattern of relating, perceiving, and thinking that is of sufficient severity to compromise one's overall adjustment and functioning," and is a pathology that is "exacerbated during times of stress." (*Ibid.*)  Ms. Russell's "personality pathology," Dr. Marvin continues, "can best be conceptualized as a constellation of maladaptive personality features from numerous domains of personality trait variation, each of which may be more or less prominent at a given period of time and each of which may interact (with other personality characteristics or contextual factors) to influence behavior." (*Id.* at pg. 32, Page ID # 685.)  Ms. Russell's "behavior is indicative of psychopathy / sociopathy," Dr. Marvin suggests.  (*Id.* at pg. 33, Page ID # 686.)

9

## DISCUSSION

The evidence summarized above is relevant to two central jury questions in this case: (1) whether Ms. Russell's conduct was legally justified because she believed her acts were necessary to defend her children from serious harm, and (2) whether the government can prove beyond a reasonable doubt that Ms. Russell acted with the specific intent to kill her ex-husband when she engaged in the behavior alleged in the indictment.

### 1.      Actions in defense of others:

As a defense against criminal charges, the principle of "[j]ustification pertains to the category of action that is exactly the action that society thinks the actor should have taken, under the circumstances." *United States v. Newcomb*, 6 F. 3d 1129, 1133 (6th Cir. 1993).  One example of the class of justification defenses is "necessity," the Sixth Circuit has observed: it is "a particular example of a defense that, when proved, will *justify* the defendant's action, because 'the theory of necessity is that the defendant's free will was properly exercised to achieve the greater good and not that his free will was overcome by an outside force as with duress.'" *Ibid.* (citing Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* 381-388 (1972) *and quoting United States v. Contento–Pachon*, 723 F.2d 691, 695 (9th Cir.1984)) (emphasis in original, internal punctuation omitted).

The Sixth Circuit has identified five factors that control the application of justification defenses.  *Newcomb*, 6 F.3d at 1134-1135.  To submit a necessity claim to the jury, the defendant must offer some evidence that:

> (1) [the] defendant was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury;
>
> (2) [the] defendant had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to choose the criminal conduct;
>
> (3) [the] defendant had no reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm; …
>
> (4) a direct causal relationship may be reasonably anticipated between the criminal action taken and the avoidance of the threatened harm[; and
>
> (5)] the defendant … did not maintain the illegal conduct any longer than absolutely necessary.

*Ibid.* (quoting *United States v. Singleton*, 902 F.2d 471, 472-473 (6th Cir. 1990)) (internal punctuation omitted).  The defense applies equally when the defendant acts to prevent an imminent injury to a third party.  *Id.* at 1135.  The relevant proof will be sufficient if "a reasonable jury could conclude by a preponderance of the evidence that each of the … five circumstances exist…."  *United States v. Hargrove*, 416 F.3d 486, 490 (6th Cir. 2005).

Two considerations bear prominently on Ms. Russell's entitlement to the necessity defense. First, there can be no doubt that Ms. Russell believed her children were at risk; some third parties suspected the same, too, in certain instances. The necessity defense does not require proof that the defendant's belief was demonstrably correct, only that the belief was "well-grounded," *see Newcomb*, 6 F.3d at 1134, and Ms. Russell plainly had evidence – visible bruises, observations of the ex-husband's parenting conduct by medical professionals, disclosures of abuse volunteered by one of the children to a therapist (*see* Family Ct. Order, R. 123-3 ¶¶ 110, 226-228, 273, Page ID # 580, 603, 613) – to corroborate her own suspicions.

Second, Ms. Russell can satisfy the requirement that she demonstrate "more than just a subjective belief that going to the police would be futile...." *See United States v. Dixon*, 901 F.3d 1170, 1179 (10th Cir. 2018). Not only had Ms. Russell tried to obtain the authorities' help for years – had tried repeatedly, and utterly without success – the enforcement agencies had eventually begun refusing even to take her reports. (*See* Family Ct. Order, R. 123-3 pg. 54 ¶ 257, Page ID # 609.) She can accordingly fulfill the mandate that she "put forth specific reasons to doubt that the law enforcement alternative was viable." *Cf. Dixon*, 901 F.3d at 1179 (quoting *United States v. Beckstrom*, 647 F.3d 1012, 1017 (10th Cir. 2011)).

2.    **Proof of diminished capacity to negate the government's evidence that Ms. Russell acted with the specific intent to cause her ex-husband's death:**

An accused may defend herself against criminal charges by offering proof that "she [could] not attain the culpable state of mind required by the definition of the crime." *United States v. Kimes*, 246 F.3d 800, 806 (6th Cir. 2001).  One type of proof in this category is "diminished capacity evidence": testimony – both from ordinary witnesses and experts – that can "cast a reasonable doubt on the government's proof that [the defendant] had the necessary *mens rea*." *Ibid.*  Proof of diminished capacity as it bears on *mens rea* is not an affirmative defense regulated by the Insanity Defense Reform Act (IDRA), 18 U.S.C. § 17(a): "Notwithstanding the IDRA's restrictions on the use of mental defect evidence as a *defense*," the Sixth Circuit has commented, "evidence of a defendant's diminished mental capacity remains admissible to prove that the defendant could not form the required *mens rea*." *United States v. Odeh*, 815 F.3d 968, 980 (6th Cir. 2016) (citing *Kimes*, 246 F.3d at 806) (emphasis in original).

The necessary correspondence between proof and *mens rea* limits the types of cases in which diminished capacity evidence is useful.  Though it oversimplifies the rule somewhat, it is accurate for present purposes to say that diminished capacity evidence is relevant only in cases where the crime charged is a specific intent offense, and not when a general intent crime is involved.  *Kimes*,

246 F.3d at 806-807; *but cf. Odeh*, 815 F.3d at 976.  The Sixth

Circuit spelled out the distinction:

> [A] specific intent crime is one that requires a
> defendant to do more than knowingly act in violation
> of the law.  The defendant must also act with the
> purpose of violating the law.  The violation of a general
> intent statute, by contrast, requires only that a
> defendant 'intend to do the act that the law
> proscribes.'  In other words, 'a general intent crime
> requires the knowing commission of an act that the
> law makes a crime.  A specific intent crime requires
> additional 'bad purpose."

*Kimes*, 246 F.3d at 806-807 (*quoting United States v. Gonyea*,

140 F.3d 649, 653 (6th Cir. 1998) *and United States v. Kleinbart*,

27 F.3d 586, 592 n. 4 (D.C.Cir. 1994)).

The two crimes charged against Ms. Russell are specific

intent crimes.  To convict Ms. Russell of murder for hire, the

government must prove that she acted with the specific intent that

her ex-husband be killed; to convict Ms. Russell of stalking, the

government must demonstrate that she acted with the specific

intent to harass or intimidate her ex-husband.  18 U.S.C. § 1958,

18 U.S.C. § 2261A(2)(B); *United States v. Runyon*, 994 F.3d 192,

203 (4th Cir. 2021) (§ 1958 is a specific intent crime), *United States

v. Shrader*, 675 F.3d 300, 313 (4th Cir. 2012) (§ 2261A(2) is a

specific intent crime)).  Proof of Ms. Russell's diminished mental

capacity is therefore relevant to prove that she could not form the *mens rea* required by the two statutes.

The extensive evidence discussed above offers concrete reason to doubt that Ms. Russell undertook her actions with the deliberate and purposeful desire to cause intimidation and death. The diminished capacity evidence provides a basis to conclude instead that Ms. Russell engaged in her conduct while "profoundly delusional and obsessively fixated" with "thoughts and behaviors [that] were rageful, distorted from reality, delusional and psychotic," and that she acted "[w]ithin the context of this altered internal reality of protracted 'road rage' psychosis…." (Butler Rep., R. 123-1 pg. 5, Page ID # 530.)

## CONCLUSION

Ms. Russell urges the Court to deny the government's motion to exclude mental-health testimony and records from the preceding family-court litigation from the trial of this case.

Respectfully submitted,

*Michael R. Mazzoli*

Scott C. Cox
Michael R. Mazzoli
Scott Coleman Cox, II
COX & MAZZOLI PLLC
600 West Main Street, Suite 300
Louisville, Kentucky 40202
502-589-6190
MMazzoli@coxandmazzoli.com

and

David B. Mour
Law Office of David B. Mour
513 S. Second Street
Louisville, KY 40202
502-473-6464
dmour@louisvillefirm.com

Attorneys for Defendant Russell

## CERTIFICATE OF SERVICE

On February 23, 2024, I electronically filed this document through the ECF system, which will send a notice of electronic filing to counsel of record.

*Michael R. Mazzoli*

Michael R. Mazzoli

16