**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**AT LOUISVILLE**

UNITED STATES OF AMERICA                                            PLAINTIFF

v.                                    CRIMINAL ACTION NO.  **3:22-CR-00058-DJH**

STEPHANIE M. RUSSELL                                                DEFENDANT

## UNITED STATES RESPONSE TO DEFENDANT'S MOTION IN LIMINE [DN 124]

Comes the United States of America, by counsel, for its response to Defendant's Motion *In Limine* Concerning Admissibility of Mental Health Testimony and Family Court Records, [DN 124].

Stephanie Russell is a defendant without a legally acceptable defense theory. Nevertheless, she is casting about for something to excuse or justify her purposeful criminal conduct.  To that end, she intends to call an expert witness at trial to bombard the jury with irrelevant, confusing, and prejudicial testimony about Russell's mental health.  While wide latitude should be given to a defendant to present a defense in a criminal trial, it should not be so wide that it makes a mockery of truth-finding.

Russell asserts that the evidence described in her motion is admissible at trial (i) to establish that she was justified in acting in defense of her children when she engaged in the charged conduct[1]; and (ii) to negate the *mens rea* of the two specific intent crimes with which she is charged.

---

[1] To that end, Russell has submitted Sixth Circuit Pattern Crim. Jury Instruction 6.07, Justification, as a proposed supplemental jury instruction.  [DN 126-1, PageID # 777].

I.    Evidence From Family-Court Litigation

To read the Factual Background set forth in Defendant's motion *in limine* is to ignore entirely the fact that there was a seven-day trial conducted in Jefferson Circuit Court, Family Division Seven over a four-month period between December 10, 2020, and April 16, 2021.  [DN 123-3, *Crabtree v. Russell*, 18CI501606, PageID # 556].  Defendant asserts that there is evidence in the record to support the proposition that:

> …Russell was convinced that her two preschool-age children were in grave danger when with her ex-husband; after having complained to the legal authorities on so many occasions, and having been rebuffed every time, …Russell had concluded that further efforts to obtain the help of law enforcement would be futile; and …Russell's mental health was severely disturbed, both from the empirical and clinical perspectives, when she engaged in the conduct alleged in the indictment.

[DN 124, PageID # 743-44].

Russell argues that "[e]very time [she] sought help from the authorities, she got nothing." [*Id.* at PageID # 746].  According to Russell, approximately 25 child welfare reports against her ex-husband, and allegations of sexual abuse by Russell's ex-husband against the oldest child which were referred to the Louisville Metro Police Department, Crimes Against Children Unit, "were closed by the authorities ***without taking any action regarding [Defendant's] ex-husband.***" [*Id.*] (emphasis added).

In addition, Defendant claims that Child Protective Services declined to accept a child welfare report from her in February 2019 because of the number of reports it had already received from her.  [*Id.*] Defendant complains that she "was treated with similar disregard by an administrator at her child's school after she criticized the school's handling of an abuse allegation."  [*Id*].

The record of the family court trial, however, belies Russell's assertions that "she had no hope of aid from the authorities to protect her children."   [*Id.* at PageID # 747].   Despite Russell's insistence that when she sought help from the authorities she got nothing, there is an express finding by the Family Court concluding that (i)  on all twenty-five reports to Child Protective Services, CPS investigated Russell's ex-husband and determined the allegations against him to be unsubstantiated [DN 123-3, Defendant's Offer of Proof, Findings of Fact, Conclusions of Law and Custody Decree, ¶ 284, PageID # 615]; and (ii) the LMPD-CACU investigation was closed after an eighteen month investigation in which the Detective concluded "there was no evidence to support any claims that [Russell's ex-husband] was physically or sexually abusing the children."  [DN 123-3, ¶ 287, PageID# 616].

It is hard to imagine a more disingenuous recitation of the factual background than the one contained in Russell's motion *in limine*.  Dr. Kelli Marvin is the forensic psychologist who evaluated Russell and her ex-husband to make a recommendation to the family court judge regarding custody of the parties' two children.  Russell attached a copy of Dr. Marvin's summary report to her Offer of Proof, and selectively quotes from the fifty-page report that Russell was "'stricken with disbelief that [various authorities] have failed to protect the children' … despite, among other things, 'the multitude of individuals who have been 'highly concerned' or 'concerned' about abuse…"  [DN 124, PageID # 747].  Russell omits the fact that Dr. Marvin's summary above was merely a recounting of Russell's own self-serving version of events. Russell ignores entirely the next five pages of Dr. Marvin's report in which she finds, among other things:

- There is no support for [Russell's] claims of [Domestic Violence/Interpersonal Violence]:…
- There is no support for [Russell's] persistent claims from 2018 to the present that [her ex-husband] is cognitively compromised:…

- After comprehensive review of medical records spanning 2018 to the present, the Division of Pediatric Forensic Medicine has concluded that there is no support for [Russell's] claims that [her ex-husband] is physically abusive and medically/hygienically negligent – to the contrary, PFM has noted serious concerns that [Russell] is exaggerating or fabricating medical events and situations to achieve a secondary goal:…
- There is no support for [Russell's] claims to child welfare authorities that [her ex-husband] is emotionally, physically, and sexually abusive and engages in chronic acts of supervisory and medical/hygienic neglect:….

[DN 123-4, Defendant's Offer of Proof, PageID # 677-679].

In this case, during the status hearing on January 24, 2024, defense counsel stated they wanted to call at trial witnesses to testify "about what they saw."  While the meaning of this statement isn't readily apparent on its face, the one-sided statement of factual background in Russell's motion *in limine* suggests the Defendant may intend to call her self-described "multitude of individuals who have been 'highly concerned' or 'concerned' about abuse."  [DN 124, PageID # 747]  It appears Defendant may want to relitigate her allegations of physical and sexual abuse to convince the jury that she was justified in hiring someone to kill her former husband.  To do so ignores entirely the Findings of Fact made by the Family Court Judge who found:

- [LMPD's CACU Detective] reported significant concerns about [Russell] as developed through the course of the investigation of [Russell's ex-husband].  Specifically, [CACU] believes [Russell] coached and influenced the child to make false disclosures of abuse about [Russell's ex-husband].
- During the investigation, [CACU] contacted Sacred Heart in March 2020.  During this contact, Sacred Heart expressed concern over [Russell's] behavior, including observations that [Russell] was coaching the older child to make false allegations of abuse against [her ex-husband].
- Dr. Marvin also believes [Russell] has coached the older child into making false claims of abuse against [her ex-husband], as [Russell] chose to submit only certain videos from the plethora of disclosures she obtained from the child, which Dr. Marvin described as cherry-picking the best takes….
- As part of the LMPD CACU investigation, [the lead Detective] also reported major concerns as to [Russell's] veracity and reliability as a reporter of the alleged abuse.  [CACU] described this behavior as manipulating, misleading and misrepresenting

information to the point that [Russell] lacked all credibility. ***This is similar to behavior the court has witnessed from [Russell] in testimony before this court.*** (emphasis added).

- Child Protective Services records indicate concerns with [Russell's] honesty as well, referring to her behavior as dishonest and deflective.

- In their report on October 6, 2018, Pediatric Forensic Medicine expressed significant concerns about [Russell's] credibility. Of particular note was [Russell] lying as to statements she attributed to a treating ER physician, reporting the doctor concluded one of the children had a bruise. When contacted, the ER provider denied any such statement and informed PFM he expressed no concern as to the mark. They took steps to address with [Russell] her pattern of misrepresenting information and providing inaccurate descriptions of PFM findings to third parties.

[DN 123-3, ¶¶ 289, 291, 292, 295, 298, 300, PageID # 615-620].

Ultimately, the Family Court judge concluded, as a matter of law, that an award of joint custody was not in the best interest of the minor children and on January 31, 2022, awarded sole custody to Russell's ex-husband. [*Id*., ¶ 6, PageID 641]. The court also found, as a matter of law:

> While [Russell[] has made constant allegations that [her ex-husband] is an unfit or abusive parent, the court concludes there is no evidence to support these claims. Over the course of over three (3) years, these claims have been investigated countless times over several agencies, as well as through the custody evaluation. The issues have also been before this court in the form of motion and domestic violence petitions. Despite this, no independent third party has produced any evidence in support of [Russell's] claims. Rather, they have all come to the same conclusion, which is that [Russell] has fabricated these allegations and then used the children and misinformation in order to build a false narrative that [her ex-husband] is abusive and mentally unable to care for the children due to his MCI diagnosis. Further, the older child's disclosures of alleged abuse are not reliable, given the coaching/influence/manipulation exerted by [Russell] to obtain them, as well as the child's young age….Finally, the court does not find [Russell] to be a reliable reporting source in this action, due to her ongoing manipulation of information and lack of credibility, as experienced by almost all third parties associated with this litigation.

[*Id.* at ¶ 6, PageID 643].

In short, Russell's assertion that she had been rebuffed and ignored by legal authorities is patently false. It should also be clear that Russell was not, in fact, convinced that her children

were in grave danger in light of the evidence that she was dishonest, manipulative, had a pattern of misrepresenting information to third parties as well as to the family court, in addition to the conclusion that she had herself engaged in a long term pattern of emotional abuse of her oldest child by coaching the child to falsely believe he/she was a victim of physical and sexual abuse.. [*Id*. at ¶ 7, PageID # 644].

The Court asked the parties to brief "the scope of admissible mental-health testimony and records from the preceding family-court litigation" in Russell's upcoming trial.  [R. 20, PageID # 517].  Based upon the factual background set forth her motion *in limine*, Defendant may intend to disregard entirely the findings of fact and conclusions of law made in the family court after trial, and to present again her complaints that the children were being abused by their father. This Court, at the status conference on January 24, 2024, stated that it did not intend to conduct a "trial within a trial."  Defendant's apparent intention to relitigate her claims of physical and sexual abuse made during the custody litigation with her ex-husband guarantees that there will be a "trial within a trial"  unless this Court excludes the evidence.

In this case, it is clear that the issue of whether Russell's children were being physically neglected or sexually abused was squarely before the Family Court judge who took extensive evidence as part of the custody litigation between Russell and her ex-husband and then actually decided not only that there was overwhelming evidence that no such abuse had ever occurred, but that Russell was fabricating evidence, at the expense of the emotional health of her children, in order to serve her stated goal of removing her ex-husband from the children's  lives completely, at any cost.  [DN 123-3, ¶ 7, PageID # 645].

Defense counsel have indicated to the government that Russell intends to assert her rights under the Fifth Amendment and not testify at trial.  This, of course, is always subject to change.

However, if that remains the case when trial commences, one must ask how Defendant intends to introduce evidence that "she was convinced that her two preschool-age children were in grave danger" and that "further efforts to obtain the help of law enforcement would be futile" unless it be through inadmissible hearsay testimony offered through third parties.  Defendant can present evidence herself that she was concerned but should not be permitted to call on third parties to testify about what Defendant had told them.

To the extent that Defendant's motion *in limine* evidences a desire to present evidence to the jury in this criminal case in support of her allegations that abuse had occurred, she should be barred by the Court from doing so.   Defendant's assertions could obviously be rebutted by the same witnesses heard by the Family Court including the witnesses from Child Protective Services, LMPD's Crimes Against Children Unit, witnesses from Pediatric Forensic Medicine, and the children's guardian *ad litem* appointed by the family court, among others, but to do so would indeed entail a "trial within a trial."  Defense efforts to relitigate the abuse claims already investigated and litigated as part of the custody dispute should be precluded by the Court under Rule 403 of the Federal Rules of Evidence.  Even if the Court concluded that such evidence is relevant, its probative value is substantially outweighed by the danger of confusing the issues, misleading the jury, and wasting time.

II.    <u>Russell's Affirmative Defense of Justification is Unsupported by the Law or the Facts</u>

Russell has tendered Sixth Circuit Pattern Criminal Jury Instruction, 6.07, contending that the admissible evidence at trial will support giving such an instruction to the jury because Russell was "justified in acting in defense of her children when she engaged in the charged conduct."  [DN 124, PageID # 741].  The evidence will not support this instruction, and Russell

7

should be precluded at trial from presenting to the jury any argument that she acted out of necessity or was otherwise justified in engaging in the offense conduct charged.[2]

"The defense of necessity, or choice of evils, traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of evils . . . [In modern cases,] . . . the majority felt that the defense [was] designed to spare a person from punishment . . . if he reasonably believed that criminal action "was necessary to avoid a harm more serious than that sought to be prevented by the statute defining the defense." *United States v. Newcomb*, 6 F.3d 1129, 1133 (6th Cir. 1993) (*citing United States v. Bailey*, 444 U.S. 394, 409-410 (1980)). *See also United States v. Grainger*, 2007 WL 2272777, at * 2 (6th Cir. Aug. 9, 2007).

Russell is charged with attempting to hire someone to murder her former husband, and claims that she is entitled to a necessity defense because she believed that her husband was abusing her children.  (DN 124, PageID#744).  Oddly, and as detailed above, Russell's pleadings entirely failed to address or even mention that all her allegations of abuse were squarely refuted and rejected in an 18-month criminal investigation and after a lengthy family court trial.  In fact,

---

[2] Russell is offering two incompatible defense theories.  Justification is an affirmative defense.  It concedes that the *mens rea* was present for the criminal conduct, but excuses conduct that would otherwise be punishable. Defendant has the burden of proving all the elements of a necessity defense.  A necessity defense, however, does not negate the *mens rea* of the crime itself.  *Dixon v. United States*, 548 U.S. 1, 6-7 (2006).  In this case, there is no evidence to suggest that Russell did not know and understand that she was hiring someone to kill her former husband.  Russell seeks to offer her evidence of mental condition, however, for two different purposes.  She offers it first as an affirmative defense to excuse otherwise purposeful conduct because she acted out of necessity believing her children were in danger.  In the second instance, the mental condition evidence is offered purportedly to establish that she could not form the requisite specific intent because she had become "profoundly delusional and obsessively fixated. Her thoughts and behaviors were rageful, distorted from reality, delusional and psychotic."  [R. 124, Page ID # 748]. The risk of confusing the jury with Defendant's unfocussed evidence regarding her "mental condition" should be apparent and the risk of confusion is very high.

the family court judge stated that "this is the most contentious custody action this court has ever seen (p. 3, pg. 86), and found that Russell's husband "has not committed any acts of domestic violence or abuse against [Russell] or the children (p. 5, pg. 87), and determined that it was in the best interests of the children to award permanent sole custody to their father.

Russell's necessity defense fails for three reasons. First, she clearly did not choose the lesser of two evils. She chose to respond to her own baseless allegations of abuse by attempting to have her husband murdered. Even if we assume for the sake of argument that abuse was occurring, murder is not a lesser evil compared to abuse. *See e.g. Staples v. Director*, 2017 WL 11575219, at *4 (E.D. Tex. Nov. 28, 2017) (dismissing writ of habeus corpus with prejudice, finding no evidence to support necessity defense where defendant shot another man who he thought might shoot him, stating "Appellant suggests no reason on appeal why his own death would have been a greater harm than Polley's); *Delgado v. McEwen*, 2015 WL 10793478, at * 5 (C.D. Cal. Aug. 24, 2015) ("necessity is not recognized as a defense to murder in California because the necessity defense presupposes that the crime the defendant commits . . . is less harmful than the crime he seeks to avoid"). It would violate public policy and any semblance of logic to justify the commission of a more serious offense to prevent the commission of a less serious offense.

Second, Russell cannot meet her burden of proving each element of the necessity defense. *See United States v. Johnson*, 416 F.3d 464 (6th Cir. 2005) ("where an affirmative defense consists of several elements and testimony supporting one element is insufficient to sustain it even if believed, the trial court . . . need not be burdened with testimony supporting other elements of the defense"); *United States v. Ridner*, 512 F.3d 846, 849 (6th Cir. 2008) ("When the issue arises in a pre-trial motion, as opposed to a court's refusal to give an accurate

jury instruction . . . the defendant must proffer evidence that is legally sufficient to support the defense." Although "the defendant's burden is not a heavy one and is met even where there is weak supporting evidence," "the defense is limited to rare situations and should be construed narrowly.")

Russell cannot satisfy the first element of the necessity defense, that "the defendant was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury." Russell first sought to hire someone to murder her husband in approximately April 2018. At that time, she was still living with him and the children in the same house, and there were no allegations of abuse. As such, there was not even an allegation of an imminent threat when she first sought to have her ex-husband murdered.

Moreover, if there really was an "imminent and impending threat . . . of death or serious bodily injury" to her children at any time between April 2018 and May 2022, Russell would have taken immediate action, perhaps by running away with the children and taking them to a safe place, or by killing her ex-husband herself. Instead, Russell spent over 4 years trying to hire someone to kill her ex-husband, taking numerous steps to conceal her role in the crime, including using code words and burner phones, hoarding cash, and asking the purported hitman to make the murder look like a suicide and to force her husband to send her a suicide note from his cell phone before he was murdered. In truth, the only necessity Russell recognized was the necessity to kill her husband without incurring criminal liability. In other words, she was always far more concerned with taking as much time as necessary to escape blame for her husband's murder than protecting her children from any supposed imminent threat. The evidence, even when viewed in

the light most favorable to the defense, shows conclusively that there was no "imminent and impending threat . . . of death or serious bodily injury."

Russell also cannot satisfy element three of the necessity defense, which requires that she demonstrate that she had "no reasonable, legal alternative to violating the law." As noted above, there is no evidence that Russell reported any alleged abuse of her children to law enforcement or child protective services in April 2018, when she first pursued her husband's murder in April 2018. Accordingly, she cannot satisfy element three.

Third and finally, the necessity defense is evaluated objectively, with the reasonable person standard, and not based on the defendant's subjective beliefs. *United States v. Johnson*, 416 F.3d 464, 469 (6th Cir. 2005). Even when considered in the light most favorable to the defendant, given the family court's findings and Russell's four years of scheming and concealing her efforts to get her ex-husband out of the picture, no reasonable person would believe that there was an actual imminent and impending threat of death or serious bodily injury to Russell's children.

For all these reasons, the necessity defense is inapplicable and should be precluded.

III.   Defendant's Mental Condition Evidence is Irrelevant and Inadmissible

Finally, for the reasons set forth in the United States' Motion *In Limine* to Preclude Testimony Pursuant to Rule 12.2 Regarding Mental Disease or Defect [DN 125], the evidence Russell seeks to offer to support the proposition that her "mental health was severely disturbed, from both the empirical and clinical perspectives, when she engaged in the conduct alleged in the indictment" [R. 124, PageID # 744] is irrelevant, and therefore inadmissible, because it is not being offered to negate the specific *mens rea* of the charged crimes.

Instead, what Russell seeks to do is offer the kind of generalized evidence of her mental condition intended as an excuse for her criminal conduct.  This isn't permissible under the law. If Russell was, in fact, "severely disturbed" when she engaged in the offense conduct, then she should have asserted an insanity defense under Rule 12.2(a) of the Federal Rules of Criminal Procedure.  Russell summarizes her expert's proposed testimony as evidence that she engaged in the charged conduct while "profoundly delusional and obsessively fixated" with "thoughts and behaviors [that] were rageful, distorted from reality, delusional and psychotic," and that she acted "[w]ithin the context of this altered internal reality of protracted 'road rage' psychosis…."  [DN 124, PageID # 755].

Russell's mental condition evidence is not dissimilar from that offered by the Defendant in *United States v. Pohlot*, 827 F.2d 889 (3ʳᵈ Cir. 1987) in which the Court held that (1) the Insanity Defense Reform Act ("IDRA") prohibited the defendant from introducing evidence of mental abnormality in order to establish a "diminished responsibility" or "diminished capacity" defense; (2) IDRA did not prevent the defendant from introducing evidence of mental abnormality in order to negate *mens rea* and disprove the intent element of the crime itself; and (3) the specific psychiatric testimony offered, relating to defendant's subconscious motivation in attempting to hire a professional killer to murder his wife, did not support a legally acceptable theory of lack of *mens rea*.   The Third Circuit also cautioned:

> Congressional prohibition of diminished responsibility defenses requires courts to carefully scrutinize psychiatric defense theories bearing on mens rea. Psychiatrists are capable of supplying elastic descriptions of mental states that appear but do not truly negate the legal requirements of mens rea.  Presenting defense theories or psychiatric testimony to juries that do not truly negate mens rea may cause confusion about what the law requires.

*Pohlot*, 827 F.2d at 890.

12

Like Russell here, Pohlot was charged with using facilities in interstate commerce to contract for the killing of his spouse. At trial, Pohlot testified that he had been abused by his wife, and that the murder plot was "a weak attempt to fight back," and had had been hatched to fulfill psychological motivations, not truly to kill his wife. "It was a fantasy," Pohlot testified. *Pohlot,* 827 F.2d 889, 893. Pohlot offered the testimony of a psychiatrist to buttress his own statements. Based on a series of meetings with Pohlot, but relying only on Pohlot's version of events, Pohlot's psychiatrist diagnosed Pohlot as a "compulsive personality, passive dependent personality and passive aggressive personality." *Id.* Pohlot's psychiatrist testified:

> that Pohlot "did not really know" what hiring [the hitman] meant until it was discussed in the context of psychiatric treatment. [He] testified, in essence, that Pohlot's real hope was not to kill his wife but to live with her again.

*Id.* at 906.

The Third Circuit, in applying the law to Pohlot's defense, ultimately concluded that the law required exclusion of his evidence of mental abnormality because it did not support a legally acceptable theory of a lack of *mens rea*:

> It is clear that Pohlot acted with considerable awareness of what he was doing and with considerable purpose. Pohlot engaged in careful activity, over a lengthy period of time, sending first a deputy and then engaging in several phone calls and personal meetings all directed at one purpose: hiring someone to murder his wife. Pohlot came to a firm agreement, made payment, and expressed concern and took action to assure that the crime was not ultimately traced to him.
>
> * * * * *
>
> Taken in context, suggestions that Pohlot did not intend [the hitman] to commit murder focuses not on Pohlot's conscious mind but on his unconscious. To accept this theory as a defense to mens rea requires manipulation of the concept of intent beyond what the "intent" element of 18 U.S.C. § 1952A requires. Pohlot therefore offered his evidence of mental abnormality in support of a legally unacceptable theory of lack of mens rea that amounts covertly to a variation of the partially diminished capacity defense precluded by [18 U.S.C.] § 17(a)…the district court…was correct in instructing the jury under the circumstances not to

consider this evidence in deciding whether Pohlot possessed the requisite mens rea.

Like the defendant in *Pohlot*, the defendant's proffered "mental condition evidence" is in support of a covert variation of a diminished capacity defense that is precluded under the Insanity Defense Reform Act.   Unlike the Court in *Pohlot*, the United States submits that considering the strong danger of misuse and confusion, and because district courts should admit evidence of mental abnormality on the issue of mens rea only, the jury in Russell's case should never hear the proposed testimony of Dr. Butler at all.

Purposeful activity is all the law requires.  There is nothing in the offered testimony that goes to negate the overwhelming evidence that Russell solicited several individuals to find someone to get rid of her husband, initiated contact with someone she believed to be a professional hitman, negotiated for payment for the killing of her former husband, sent identifying information, including her ex-husband's address, to the hitman, and engaged in text messages and phone calls with a single purpose:  hiring someone to murder her former husband. All of defendant's evidence of Russell's mental condition at the time is being offered for the improper purpose of justifying, excusing, or mitigating her criminal conduct.

The real purpose behind Defendant's proposed mental condition evidence is reflected in her motion *in limine* when she cites to Dr. Kelli Marvin's custodial evaluation.  Russell states that:

> Dr. Marvin offers a different, but also troubling assessment [the Defendant's] mental condition as of August 2020.  She writes that [the Defendant] was suffering "a severe Unspecified Personality Disorder, with prominent Narcissistic and Antisocial Traits."  (citation omitted).  [The Defendant's] "behavior is indicative of psychopathy/sociopathy," Dr. Marvin suggests.

[DN 124, PageID # 749].

It is remarkable that Defendant references these provisions of Dr. Marvin's report for a couple of reasons.  First, Russell claims it affords a look at Russell's mental condition in August of 2020.  Her solicitation, communications, negotiations, and payment to effect a contract killing of her husband, however, occurred two years later, in 2022.  Defendant makes no effort to link her mental condition in 2020 to her purported inability to form the intent to hire someone to kill her former husband in 2022.  Second, Russell apparently seeks to admit testimony that she has the traits of several personality disorders, including traits of antisocial personality.  Russell apparently believes a personality disorder is a mental condition that bears on the issue of guilt; it is not.

The Mayo Clinic states:

Antisocial personality disorder, sometimes called sociopathy, is a mental health condition in which a person consistently shows no regard for right and wrong and ignores the rights and feelings of others. People with antisocial personality disorder tend to purposely make others angry or upset and manipulate or treat others harshly or with disregard.

Symptoms of antisocial personality disorder include repeatedly:

- Ignoring right and wrong.

- Telling lies to take advantage of others.

- Not being sensitive to or respectful of others.

- Using charm or wit to manipulate others for personal gain or pleasure.

- Having a sense of superiority and being extremely opinionated.

- Having problems with the law, including criminal behavior.

- Being hostile, aggressive, violent or threatening to others.

- Feeling no guilt about harming others.

- Doing dangerous things with no regard for the safety of self or others.

- Being irresponsible and failing to fulfill work or financial responsibilities.

    cruel indifference. They lack remorse or do not regret their behavior.

People with antisocial personality disorder often violate the law, becoming criminals.

https://www.mayoclinic.org/diseases-conditions/antisocial-personality-disorder/symptoms-causes/syc-2033928.

Having a disordered personality, particularly one with antisocial traits, may help explain why Russell engaged in a crime of violence, but it does nothing to negate the mens rea of the charged crimes, and is expressly excluded as a defense pursuant to 18 U.S.C. § 17(a).

Russell seeks to offer at trial the kind of elastic description of her mental state that the court warned about in *Pohlot,* and fails entirely to demonstrate a genuine link between her expert's proffered testimony and the required mens rea.  The proposed expert mental disease testimony is so general that it cannot explain the effect Russell's purported "mental condition" had on her ability to form the criminal intent to hire someone to have her ex-husband killed. Russell seeks to offer mental condition evidence that does precisely what Congress intended to limit under the Insanity Defense Reform Act, that is to eliminate any form of legal excuse based on a defendant's lack of control (or "road rage") as well as eliminating affirmative defenses such as "diminished capacity.  *United States v. Cameron*, 907 F. 2d 1051, 1061 (11th Cir. 1990). It may be evidence appropriate for the Court to consider at sentencing, but it is evidence that should be excluded, as a matter of law, from the jury's consideration at trial.[3]

---

[3] Defendant's evidence of mental condition, or as she now describes it, "diminished capacity" is evidence appropriate for sentencing, not at trial unless the Defendant is pursuing an affirmative defense of insanity.  There are two provisions of the federal Sentencing Guidelines that expressly provide for consideration of such evidence at sentencing:

**§5H1.3. Mental and Emotional Conditions (Policy Statement)**
Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. See also Chapter Five, Part K, Subpart 2 (Other Grounds for Departure).

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court grant the United States' objection to Defendant's proffered evidence of mental condition relating to guilt and exclude from evidence at trial the testimony of Walter R. Butler, J.D., M.D. [DN 123-1, Russell's Offer of Proof, PageID # 526].  In addition, the United States requests that the Court preclude the Defendant from arguing a defense of necessity, offering evidence in an effort to relitigate the alleged abuse already litigated in Family Court, and that the Court decline to give the instruction on necessity proposed by the Defendant.

Respectfully submitted,

MICHAEL A. BENNETT
United States Attorney


   _/s/  Marisa J. Ford____
Marisa J. Ford
David R. Weiser
Assistant U.S. Attorneys
717 W. Broadway
Louisville, KY  40202
(502) 582-5911

---

In certain cases a downward departure may be appropriate to accomplish a specific treatment purpose. See §5C1.1, Application Note 7.

Mental and emotional conditions may be relevant in determining the conditions of probation or supervised release; e.g., participation in a mental health pro-gram (see §§5B1.3(d)(5) and 5D1.3(d)(5)).

**§5K2.13. Diminished Capacity (Policy Statement)**
A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commis-sion of the offense. Similarly, if a departure is warranted under this policy state-ment, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.
However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public; or (4) the defendant has been convicted of an offense under chapter 71, 109A, 110, or 117, of title 18, United States Code.