UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA PLAINTIFF

v. CRIMINAL NO. 3:22-CR-00058-DJH

STEPHANIE M. RUSSELL DEFENDANT

## UNITED STATES' NOTICE OF INTENT TO INTRODUCE EVIDENCE OF OTHER ACTS

The United States, by and through undersigned counsel, respectfully states its intention to introduce in its case-in-chief evidence of uncharged conduct and other conduct in which the Defendant, Stephanie M. Russell ("Russell"), engaged. It is the position of the United States that this evidence is relevant admissible evidence, pursuant to Rule 401 and 402, however, in an abundance of caution, notice, pursuant to Rule 404(b) is hereby provided.

## FACTUAL BACKGROUND

The victim, R.C., and Russell were a couple for over a decade before they married prior to the birth of their first child in December 2015, and R.C. is documented as the father on this child's birth certificate. Russell filed a petition for divorce from R.C. in January 2017, and sought sole custody of their infant child, and opposed any unsupervised parenting time for R.C. After Russell refused to sign a mediated agreement that R.C. would receive unsupervised parenting time, and Russell learned she was unlikely to prevail in her effort to secure sole custody, Russell and R.C. attempted reconciliation and Russell's petition to divorce was dismissed on June 13, 2017. During the period of reconciliation, a second child was born to R.C. and Russell on November 25, 2017.[1]

---

[1] Russell and R.C. were legally married at the time of the births of both children. The children were conceived prior to the parties' marriage by in vitro fertilization which used Russell's eggs and the sperm of a donor.

Although Russell and R.C. were married at the time of the second child's birth, Russell declined to document R.C. as father on the second child's birth certificate, though Russell's counsel agreed that R.C.'s name would be added, and the Family Court subsequently ordered Russell to complete the process. Russell refused to comply and ultimately the Court issued a Judgement of Paternity and, in approximately June 2020, a birth certificate was issued for the second child identifying the victim, R.C., as the father.

Approximately one year after Russell's divorce petition was dismissed voluntarily, a former nanny came forward in May 2018 to report that Russell had engaged in conversation about having R.C. killed. Russell was alleged to have asked the nanny to meet her at McDonald's at which time she stated that she "needed to get rid of [R]." Russell asked if she knew "any really bad people" and how to obtain "a silencer for a gun." Russell is also alleged to have stated that she did not want "it" to "happen at their house because the children would be there, but that [R.] was going out of town on a golf trip at the end of the month (May) and so that would be a good time for it to happen." Russell sought a "broker" to "make the arrangements so that she was not involved." Finally, a few weeks after the meeting at McDonald's, Russell reported to the witness that "she thought she had 'found someone' but that she still needed a broker to make the arrangements." The former nanny came forward to report these conversations to R.C. who promptly vacated the family home he was sharing with Russell and their two children. R.C. filed a petition for dissolution of the marriage a month later, on June 12, 2018.

From the time the victim, R.C., filed his divorce petition, the family court litigation was characterized by escalating allegations of domestic violence, child abuse and neglect, and child sexual abuse made by Russell against R.C. Specifically:

- On June 30, 2018, Russell filed the first of what would become seven (7) Emergency Protective Orders, all of which were ultimately dropped or denied by the court.

- Approximately 31 reports to Child Protective Services were made, all but six of which alleged that the victim, R.C., was a perpetrator of child abuse or neglect. From August 11, 2018, through June 2020, Child Protective Services investigated the victim, R.C. regarding the twenty-five different reports made by Russell or by others aligned with her. On all twenty-five reports, Child Protective Services determined the allegations against R.C. to be unsubstantiated by the medical evidence.

- Eight medical investigations were conducted by the Division of Pediatric Forensic Medicine, all of which pertained to allegations of medical child abuse or neglect alleged to have been perpetrated by Russell's former husband. Again, PFM concluded that the victim, R.C., had not engaged in any acts of maltreatment vis-à-vis his children.

- The Louisville Metro Police Department, Crimes Against Children Unit, conducted an investigation which last approximately eighteen months. The LMPD CACU investigation was closed on May 14, 2020, after concluding that there was no evidence to support or corroborate any claims Russell, or others acting at her behest, had made that her former husband, R.C., was physically or sexually abusing the children. The investigation also did not reveal any criminal neglect by R.C. in his caregiving for the two children as Russell had alleged.

In the summer of 2018, the victim filed a motion in the custody proceeding for equal parenting time with his children. In August 2018, the family court granted Russell's request for custodial evaluation and entered an order allowing the victim, R.C., unsupervised parenting time with the children. In the aftermath of the Court's order for temporary parenting time, the victim

will testify that Russell stated, "she had two options as a result of the Court's ruling:  1) kill [R.][2]; or 2) use the … children's passports to leave the country with them."

On or about June 25, 2020, the forensic psychologist conducting the custodial evaluation concluded that Russell was engaging in active emotional abuse of the oldest child which had been ongoing since 2018 because Russell was coaching the child to make false allegations of abuse against his father, R.C.  Following an emergency hearing on June 30, 2020, the family court awarded temporary sole custody of the two children to their father, R.C., and supervised telehealth visits were implemented between Russell and the children conducted by Children's Safe Haven.

Following an eight-day trial held between December 10, 2020, and April 16, 2021, the Jefferson Circuit Court ultimately entered Findings of Fact, Conclusions of Law and Custody Decree on January 31, 2022, concluding that the rebuttable presumption of joint custody had been overcome, and awarding sole custody of the two minor children to their father, R.C., and ordering supervised parenting time for Russell.  Russell's attempt to hire a hitman to murder R.C. as charged in Count 1 of the indictment followed a few months after entry of the permanent custody decree.

## **PROFFERED EVIDENCE[3]**

The United States maintains that the evidence described above is relevant evidence pursuant to Rule 401 and 402 that is admissible to prove the elements of the charged crimes.  The proffered evidence is also *res gestae* or evidence that is inextricably intertwined with the charged conduct.  *See United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000) (finding that *res gestae*

---

[2] According to the victim, Russell has made verbal threats against his life on multiple occasions.  Russell once told R.C. that she would kill him in his sleep and, because she is a physician, could make it look like an accident.

[3] The United States has endeavored to be comprehensive in its description of uncharged "bad acts" by Russell.  The events described in the background above took place over 3 ½ years of contentious custody litigation during which Russell relentlessly pursued an agenda of manipulating information to deny the victim's parental rights in the two children.  It may introduce all or some of the proffered evidence.  It does not intend to introduce, for example, specifics of each of the unsubstantiated claims that Russell made to Child Protective Services alleging neglect or physical abuse.  Rather, the United States intends to introduce the evidence in the same summary form in which it appears in this notice.

evidence is "background evidence" that "consists of those other acts that are inextricably intertwined with the charged offense or those acts, the telling of which is necessary to complete the story of the charged offense" and thus does not implicate Rule 404(b)); *United States v. Everett*, 270 F.3d 986, 992 (6th Cir. 2001) (quoting *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir.1995) ("Rule 404(b) is not applicable where the challenged evidence is "inextricably intertwined" with evidence of the crime charged."

Alternatively, the United States maintains that the evidence described above is admissible under Fed. R. Evid. 404(b) for permitted, rather than prohibited, uses[4] (i.e. motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident). *See* Fed. R. Evid. 404(b); *United States v. Johnson*, 27 F.3d 1186, 1190 (6th Cir. 1993); *United States v. Ismail*, 756 F.2d 1253, 1259 (6th Cir. 1985); *United States v. Dabish*, 708 F.2d 240, 242 (6th Cir. 1983).

Russell's failed attempt to deny her former husband his parental rights through false complaints of cognitive impairment, physical neglect, domestic violence, and physical and sexual abuse ultimately resulted in her permanent loss of custody of her two children in January 2022. The evidence described herein is necessary to complete the story which culminated in her attempt to hire a hitman in May of 2022 in order to remove her former husband completely from the picture, hoping that in his absence custody would be returned to her. If the Court concludes that this evidence is not intrinsic however, evidence of the litany of bad acts in which Russell

---

[4] Without conceding that such evidence is subject to Fed. R. Evid. 404(b), the United States tenders this filing as Notice of Intent in accordance with Fed. R. Evid. 404(b)(2).

engaged should be permitted at trial because it goes to show Russell's motive, intent, plan, and absence of mistake or accident.

                Respectfully submitted,

                MICHAEL A. BENNETT
                United States Attorney


                */s/  Marisa J. Ford*
                Marisa J. Ford
                David R. Weiser
                Assistant U.S. Attorneys
                717 West Broadway
                Louisville, Kentucky 40202
                PH: (502) 582-5911
                Email: marisa.ford@usdoj.gov
                       david.weiser@usdoj.gov